No. 25-2746

# United States Court of Appeals for the Ninth Circuit

THE ESTATE OF BIBI AHMAD
*Plaintiff-Appellant,*

V.

UNITEDHEALTH GROUP INCORPORATED AND UNITED
HEALTHCARE INCORPORATED,
*Defendants-Appellees.*

———————————————

Appeal from the U.S. District Court for
the Central District of California, Los Angeles
The Honorable Mónica Ramírez Almadani
(Case No. 8:23-CV-02303-MRA-DFM)

# APPELLANT'S OPENING BRIEF

Ally Alain, Cal. State Bar No. 345524
ALLY LAW
28202 Cabot Road, Third Floor
Laguna Niguel, California 92677
Tel: 949-799-2232
*Counsel for Appellant*

# TABLE OF CONTENTS

INTRODUCTION ................................................................................ 1

JURISDICTIONAL STATEMENT ...................................................... 4

ISSUES PRESENTED FOR REVIEW ................................................ 4

STATUTORY PROVISIONS ............................................................... 6

STATEMENT OF THE CASE.............................................................. 6

LEGAL BACKGROUND ................................................................... 10

    The Medicare Act................................................................... 10

SUMMARY OF ARGUMENT ........................................................... 12

STANDARD OF REVIEW ................................................................. 16

ARGUMENT...................................................................................... 17

**I.  THIS ACTION IS NOT EXPRESSLY PREEMPTED BECAUSE IT IS BASED ON GENERALLY APPLICABLE STATE STATUTORY PROVISIONS AND NOT ON LAWS "WITH RESPECT TO MEDICARE ADVANTAGE PLANS".......17**

    A.  Medicare Advantage preemption applies only to "MA plans offered by MA organizations". ........................................ 18

        1. Statutory text governs where unambiguous, even if an agency adopts a broader interpretation............................22

        2. The phrase "with respect to" must be interpreted using its ordinary meaning. ...........................................24

3. Neither of the United Appellees is an MAO nor offers an MA plan. ..................................................................... 31

4. Preemption does not extend to affiliates or non-MAO parent companies. .................................................................. 33

5. Consumer protection claims do not necessarily arise under the Medicare Act. ................................................................ 34

6. Appellant's claims are not preempted because they do not require interpreting any federal Medicare standards .......... 35

B. Not all claims involving health insurers are preempted. 37

C. Expanding preemption beyond MA plans and MA organizations would defy statutory limits and yield absurd results. ...................................................................... 40

1. United cannot claim federal preemption here, while disavowing MAO status in other federal proceedings .......... 41

2. Neither United Appellees here are an MAO, offer an MA plan, nor are subject to direct federal oversight .................. 43

D. Even if United qualified as an MA organization, not all claims are preempted. ................................................... 44

II. THIS ACTION IS NOT EXPRESSLY PREEMPTED BECAUSE UNITED ADMITTED IT IS NOT AN MA PLAN OR MA ORGANIZATION, AND LOPER BRIGHT EXTINGUISHES ITS PREEMPTION DEFENSE. ...................................................... 45

A. United admitted in binding written discovery that it is neither an MA plan nor an MA organization. ........................... 46

B. Because United is not an MA plan or MAO, it is not entitled to preemption. ................................................... 48

C.     CMS, not the statute, introduced the overbroad language preempting affiliates of MA organizations. ...............................49

D.     CMS lacked authority to enlarge the text of the congressional statute..................................................................51

E.     Courts have extended preemption reasoning too far—to preempt all claims against all United affiliates. .......................54

    1. Uhm's precedential value should be confined to its facts.57

    2. California courts have similarly overextended Uhm. ......60

    3. Aylward is inapplicable to this case. ...............................63

F.   Following Loper Bright, courts may no longer defer to CMS agency regulatory interpretations. ...........................................64

G.     Circuit Courts are applying Loper Bright and rejecting similar agency overreach...........................................................67

**III.  THIS ACTION IS NOT IMPLIEDLY PREEMPTED BECAUSE IT DOES NOT INTRUDE ON CMS'S REGULATORY AUTHORITY OVER MA PLANS. ....................................................69**

**IV.  LEAVE TO AMEND SHOULD HAVE BEEN GRANTED BECAUSE APPELLANT HAS UNCOVERED THAT OTHER GROUNDS FOR THIS ACTION EXIST. ......................................71**

A.     Amendment would allege that United fraudulently induced California regulators to issue it a license. ...................72

B.     Amendment would clarify that United is not an MA plan or MA organization...................................................................72

C.     Amendment would not be futile under Loper Bright's clarified legal standard. ...........................................................74

    D.    Appellant explicitly requested leave to amend. ...............75

**V.    THE MEDICARE ACT WAS NOT DESIGNED TO COMPEL DISMISSAL OF CASES LIKE THIS ONE. .................76**

CONCLUSION ......................................................................79

STATEMENT OF RELATED CASES.................................80

CERTIFICATE OF COMPLIANCE ....................................81

CERTIFICATE OF SERVICE.............................................82

ADDENDUM .......................................................................83

# TABLE OF AUTHORITIES

**Federal Cases**                                                   **Page(s)**

*American Auto. Ass'n v. AAA Legal Clinic of Jefferson Crooke*,
930 F.2d 1117 (5th Cir. 1991) ........................................................ 46

*Ardary v. Aetna Health Plans*,
98 F.3d 496 (9th Cir. 1996) ........................................... 34, 35, 36, 45

*Asarco v. Union Pac. R.R.*,
765 F.3d 999 (9th Cir. 2014) ........................................................ 17

*Ashcroft v. Iqbal*,
129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) ..................................... 76

*Aylward v. SelectHealth*,
35 F.4th 673 (9th Cir. 2022) ................................................. *passim*

*Baughman v. Walt Disney World Co.*,
685 F.3d 1131 (9th Cir. 2012) ........................................................ 8

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ............................................................. 72, 76

*Chevron, U.S.A., Inc. v. NRDC, Inc.*,
467 U.S. 837 (1984) ............................................................. *passim*

*Congress. Rice v. Santa Fe Elevator Corp.*,
331 U.S. 218 (1947) ................................................................ 22

v

*Cook v. Allstate Ins.*,

   337 F. Supp. 2d 1206 (C.D. Cal. 2004) ............................................ 46

*CSX Transp. v. Easterwood*,

   507 U.S. 658 (1993) .................................................................. 17, 22

*Doe v. United Health Grp.*

   2018 WL 3998022 (E.D.N.Y. Aug. 20, 2018) .................................... 43

*Doe v. Unocal Corp.*,

   248 F.3d 915 (9th Cir. 2001) .......................................................... 34

*Eminence Capital v. Aspeon*,

   316 F.3d 1048 (9th Cir. 2003) ........................................................ 76

*Escarcega v. Verdugo Vista Operating*,

   2020 WL 1703181 (C.D. Cal. Apr. 8, 2020) ......................... 50, 62, 63

*Estate of Lockett v. Fallin*,

   841 F.3d 1098 (10th Cir. 2016) ...................................................... 46

*FCC v. FCC*

 (In re MCP No. 185), 124 F.4th 993 (6th Cir. 2025) ................... 15,68

*FDA v. Brown & Williamson Tobacco Corp.*,

   529 U.S. 120–33 (2000) ........................................................... 23, 24

*Foman v. Davis*,

   371 U.S. 178 (1962) ...................................................................... 75

*Garland v. Cargill,*

602 U.S. 406 (2024) ................................................................. 65

*Glob. Rescue Jets, L.L.C. v. Kaiser Found. Health Plan,*

30 F.4th 905 (9th Cir. 2022) ...................................... 34, 6

*Gomez v. Hasbro, Inc.,*

2020 WL 5797980 (C.D. Cal. July 27, 2020) ................................... 48

*Gregory v. Ashcroft,*

501 U.S. 452–61 (1991) .................................................. 34

*Hardt v. Reliance Std. Life Ins.,*

560 U.S. 242 (2010) ...................................................... 23

*Johnson v. Mammoth Recreations,*

975 F.2d 604 (9th Cir. 1992) ............................................ 76

*Lee v. City of Los Angeles,*

250 F.3d 668 (9th Cir. 2001) ........................................... 47

*Lokken v. UnitedHealth Grp. No. 0:23-cv-03514,*

2025 WL 571393 (D. Minn. Feb. 13, 2025) ............................... 36,74

*Loper Bright Enters. v. Raimondo,*

603 U.S. 369 (2024) ............................................. *passim*

*Lopez v. Garland,*

116 F.4th 1032 (9th Cir. 2024) ....................................... 68

vii

*Marder v. Lopez,*

   450 F.3d 445 (9th Cir. 2006) ........................................................... 17

*Medtronic, Inc. v. Lohr,*

   518 U.S. 470 (1996) ................................................................... 17, 3

*Milton H. Greene Archives v. Marilyn Monroe LLC,*

   692 F.3d 983 (9th Cir. 2012) ........................................................... 46

*Moss v. U.S. Secret Serv.,*

   572 F.3d 962 (9th Cir. 2009) ................................................. 17, 71, 76

*N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins.,*

   514 U.S. 645 (1995) ................................................................. 27, 31

*Niehaus v. Greyhound Lines,*

   173 F.3d 1207 (9th Cir. 1999) ......................................................... 17

*Riegel v. Medtronic,*

   552 U.S. 312 (2008) ................................................................ 25, 26

*Ryan v. UnitedHealth Group,*

   98 F.4th 965 (9th Cir. 2024) .......................................................... 42

*Scottsdale Ins. Co. v. Educ. Mgmt., Inc.,*

   2007 WL 2746885 ..................................................................... 46, 7

*Tellabs, Inc. v. Makor Issues & Rights,*

   551 U.S. 308 (2007) ................................................................... 47

*Uhm v. Humana,*

   620 F.3d 1134 (9th Cir. 2010) .................................................. *passim*

*United States v. Bestfoods*,

   524 U.S. 51 (1998) .......................................................................... 34

*United States v. Menasche,*

   348 U.S. 528–39 (1955) ................................................................ 23

**Federal Statutes**

28 U.S.C. § 1291 ............................................................................... 4

28 U.S.C. § 1332 ............................................................................... 4

28 U.S.C. § 1367 ............................................................................... 4

29 U.S.C. § 1144 .............................................................................. 27

42 U.S.C. § 1395 .......................................................................... *passim*

42 U.S.C. § 1395w–26 .................................................................. *passim*

42 U.S.C. § 1395w–28 ................................................................... 5, 20

42 U.S.C. § 1395w–28(a)(1) ..................................................... 11, 32, 69

42 U.S.C. § 1395w–28(b)(1) ............................................................. 20

42 U.S.C. § 1395w–21–29 ................................................................ 10

**State Cases**

*Farm Raised Salmon Cases*,

    42 Cal. 4th 1077 (2008) ................................................................ 23

*McCall v. PacifiCare*,

    25 Cal. 4th 412, 21 P.3d 1189 (2001) ..................................... *passim*

*People v. Hard*,

    112 Cal. App. 4th 272 (2003) ....................................................... 25

*Quishenberry v. UnitedHealthcare, Inc.*,

    14 Cal. 5th 1057 (2023) ......................................................... *passim*

*Roberts v. United Healthcare Servs.*,

    2 Cal. App. 5th 132 (2016) .................................................. 52, 61,62

*Steinberg v. Chiang*,

    223 Cal. App. 4th 338 (2014) ....................................................... 24

**Rules**

Fed. R. App.  P. 4 ......................................................................... 4

Fed. R. App. P. 32 ........................................................................ 5

Fed. R. Civ. P. 12 ........................................................... 7, 17, 29, 47

Fed. R. Civ. P. 36 ........................................................................ 46

Fed. Rule Evid. 201 ...................................................................... 47

Fed. Rule of Evid. 801 .................................................................... 8, 47

9th Cir. R. 28-2.7 ........................................................................... 36

9th Cir. R. 28-2.6 ........................................................................... 2

## Other

42 C.F.R. § 422.2262 ...................................................................... 40

42 C.F.R. § 422.2 ....................................................................... 52, 54

69 Fed. Reg. 46866, 46913 (Aug. 3, 2004) ......................................... 50

70 Fed. Reg. 4588, 4665 (Jan. 28, 2005) ........................................... 51

# INTRODUCTION

This suit is expressed in the complaint as a consumer class action arising under generally applicable state law, alleging UnitedHealth Group and United Healthcare's (collectively "United") predatory practices targeting *elderly, disabled, marginalized, and financially constrained beneficiaries* who may receive government health benefits.

United deliberately and systematically misrepresented the nature of federal Medicare coverage to certain *vulnerable populations*–falsely marketing commercial insurance plans as "*additions*" to Original Medicare, rather than the replacements they actually are. United and its producers fraudulently induced millions of beneficiaries into unwittingly *disenrolling* from their unhindered federal Medicare benefits, thereby losing trusted physicians, suffering severe financial harm–notably exposure to collections for unpaid medical bills, and being denied critical coverage–including life-threatening cancer care.

United moved to dismiss, asserting Medicare Act [1] preemption.

---

[1] The Medicare Act at 42 U.S.C. § 1395w26(b)(3)– states: "The standards established under this part shall supersede any State law or regulation…*with respect to MA plans which are offered by MA organizations*..." [Emphasis added.] ("MA" denotes Medicare Advantage)

1

The district court was sympathetic, and took the matter under a nine-month submission. Ultimately, the district court acknowledged: "*This Court does not minimize the seriousness of the allegations… or the grave issues in addressing vulnerable populations' access to healthcare.*" 1-ER-13. However, it was forced to dismiss Appellant's claims at the pleading stage based on preemption–on grounds that had nothing to do with the merits.

The district court's dismissal is erroneous for three reasons. *First*, the court erred because the state laws upon which this action is based are not laws "*with respect to*" an "MA plan offered by an MA organization". Instead, this action is based on California laws generally applicable to all. Since the *Chevron*[2] doctrine has been overturned in *Loper Bright*[3], courts may no longer defer to regulatory agency interpretations, and must engage in traditional statutory interpretation–including of the phrase "*with respect to*". This action is not preempted. There is a paradigm judicial shift under *Loper Bright*. Courts must now independently evaluate the plain text of 42 U.S.C. §

---

[2] *Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837 (1984)

[3] *Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024)

1395w–26(b)(3)–not defer to CMS's[4] overreaching statutory interpretations. The district court also adopted implied preemption without statutory basis, relying on CMS implementing regulations.

*Second*, in response to written discovery in this action, both United Appellees conceded that they are not MA plans, and are therefore not protected by the express Medicare preemption which might otherwise provide grounds for preemption. The district court prejudicially rejected Appellant's ex parte application attaching United's binding discovery admissions that they are neither an MAO nor an MA plan. The court also denied Appellant's request to take judicial notice of CMS's public website reflecting that same status.

*Third*, the district court incorrectly denied leave to amend based on "futility" grounds, even though if permitted, Appellant would allege additional facts—including that United fraudulently obtained its state license and violated conditions of licensure—which fall outside the scope of Medicare preemption, and that it is not an MA plan or MA organization. These facts were not reasonably known at the time of filing

---

[4] Centers for Medicare and Medicaid Services

the operative complaint.

This case is not about disrupting MA plans or CMS's role. It is about stopping non-Medicare actors from hiding behind a shield that Congress never gave them–and sending a clear message to America's largest health insurer that its reign of unlawful conduct and financial abuse of vulnerable populations must end.

The district court ruling should therefore be *reversed*.

## JURISDICTIONAL STATEMENT

This case arises under 28 U.S.C. § 1332(d)(2). The district court had supplemental jurisdiction pursuant to 28 U.S.C. § 1367. It dismissed the case by order dated March 28, 2025, *entered* on March 31, 2025. 3-ER-574. Appellant filed a Notice of Appeal on April 28, 2025, within 30 days of that entry. 3-ER-568. *See* Fed. R. App. P. 4(a)(1)(A). This Court therefore has appellate jurisdiction pursuant to 28 U.S.C. § 1291.

## ISSUES PRESENTED FOR REVIEW

Pursuant to the 2003 amendment to the Medicare Act, Congress delineated a limited rule of federal preemption which applies to state law

"*with respect to*" *Medicare Advantage ("MA") plans offered by Medicare Advantage organizations ("MAOs")*. Congress assigned CMS the role of overseeing such MAOs—regulated entities subject to federal compliance requirements. However, CMS has no authority under this section to oversee or regulate third-party or private marketers and producers that are not MAOs and do not administer MA plans.

1. Whether the district court erred in holding that the express preemption clause in 42 U.S.C. § 1395w–26(b)(3) bars Appellant's– state-law, consumer protection claims.

2. Whether the district court erred in applying Medicare preemption to Appellees who admitted in this action that they are neither an MA plans nor an MA organization.

3. Whether the district court's denial of leave to amend the single iteration of the complaint on grounds of "futility" constituted reversible error, given Appellant's nonfrivolous, additional allegations that (1) *United fraudulently induced*

*the state licensing agency to issue it a license by submitting misleading statements, and then knowingly violated its conditions*–conduct explicitly excluded from preemption under § 1395w–26(b)(3), and (2) neither Appellee qualifies as an *"MA plan" nor an "MA organization"*.

**4.** Whether the district court prejudicially erred in denying Appellant's request for judicial notice of CMS's public website, and rejecting its ex parte application attaching United's verified discovery admissions that it is not an MA plan or an MA organization.

## STATUTORY PROVISIONS

An addendum with the pertinent statutory provisions is included at the end of this brief, Cir. R. 28-2.7.

## STATEMENT OF THE CASE

This putative class action addresses United's predatory marketing practices and targeted *financial elder abuse*. 3-ER-419, 440. It challenges

United's deliberate, deceptive nationwide marketing campaigns to *elderly, disabled, and marginalized beneficiaries* of government health benefits–falsely representing commercial insurance plans as including and combining "all the benefits of Original Medicare", while concealing that Medicare Advantage enrollment *replaces* and extinguishes Original Medicare ("OM"). 3-ER-514–515. The proposed class seeks to protect the rights of those similarly situated *vulnerable* populations. 3-ER-514, 516.

United argued federal preemption pursuant to 42 U.S.C. § 1395w–26(b)(3) under a Rule 12(b) motion. Appellant opposed, citing United's binding admissions that it was neither an MAO nor offered an MA plan–the two explicit requisites under the preemption statute. 1-ER-6–7; 2-ER-159–160.

On March 28, 2025, after a nine-month under-submission review, the district court ultimately granted dismissal, without leave to amend. The district court's dismissal was on grounds that had nothing to do with the merits. 1-ER-12–13. The court cited *Uhm*[5] and *Aylward*[6], applying preemption because the claims "relate to" MA plan activity—while

---

[5] *Uhm v. Humana*, 620 F.3d 1134 (9th Cir. 2010)
[6] *Aylward v. SelectHealth*, 35 F.4th 673 (9th Cir. 2022)

7

acknowledging that neither United Appellee was an MA organization. 1-ER-7–11.

The district court also denied Appellant's request for judicial notice of the CMS.gov public website showing that United was not an MA plan or MAO. 1-ER-2,7–8. The court also rejected Appellant's ex parte application attaching United's binding discovery admissions attesting to that same non-MAO status–as though they did not exist. However, just as a jury would be permitted to consider such evidence and binding party admissions at trial, the court had no legitimate basis to disregard them at the pleading stage. *See e.g.,* Fed. Rule of Evid. 801(d)(2) [party admissions not hearsay]; *Baughman v. Walt Disney World Co.*, 685 F.3d 1131, 1133 n.2 (9th Cir. 2012).

The court erred because neither of the United Appellees was an MA plan nor an MAO–and thus preemption does not extend to distinct, legal entities claiming mere affiliation or purportedly participating "*alongside*" an MAO. 2-ER-11. 42 U.S.C. § 1395w–28(a)(1)explicitly sets forth the definition of an MAO–which United admitted it does not meet. Further, the court held that "*it is undisputed that some United Healthcare entity within the…many affiliates is an MA organization*" (1-ER-11)–but that

8

finding does not give United MAO status. The district court's preemption dismissal rested solely on inapplicable statute and a failure to perform a post–*Loper Bright* analysis of the law. 2-ER-23–26, 60-67.

At the heart of this appeal is the straightforward Medicare preemption statute 42 U.S.C. § 1395w–26(b)(3) which states:

> "The standards established under this part shall supersede any State law or regulation…*with respect to MA plans which are offered by MA organizations ...*"

Preemption is not limitless.[7] Congress did not intend the statute to compel dismissal of cases like this one, nor did it intend to confer anyone "blanket immunity". 2-ER-26. The express preemption statute does not apply here because neither United Appellees showed or even argued that they are an MAO, MA plan, or contracted with CMS, and because this action does not seek MA benefits.

At its heart, this action underscores critical public policy of upholding generally applicable federal and state consumer protection laws, expressed as seven claims under California's False Advertising

---

[7] *Quishenberry v. UnitedHealthcare, Inc.*, 14 Cal. 5th 1057 (2023).

9

Law, Unfair Competition Law, Consumer Legal Remedies Act, and common law. 1-ER-6; 3-ER-506–511. It pleads enforcement intended to ensure transparent and truthful marketing communications especially to this *vulnerable* demographic–by two non-MAO legal entities fraudulently promoting the nation's largest and most profitable, commercial insurance carrier. 1-ER-3–4; 3-ER-419.

The district court denied leave to amend on grounds of futility, and judgment was entered. 1-ER-12–13. This appeal followed.

## LEGAL BACKGROUND

### The Medicare Act

Title XVIII of the Social Security Act, popularly known as the Medicare Act, establishes a federally subsidized health insurance program for elderly and disabled persons, administered by the Department of Health and Human Services ("DHHS"). 42 U.S.C. §§ 1395 *et seq*. DHHS delegated the administration of the Medicare Act to CMS, an agency housed within it.

In 1997, Congress enacted Part C of the Medicare Act ("Part C"), creating the Medicare Advantage ("MA") program. §§ 1395w–21–29.

10

Under the terms of Medicare Part C, Original Medicare Parts A and B ("OM") beneficiaries can relinquish their federal benefits and replace OM with a commercial MA plan–in place of the government benefits. CMS regulates how the MA organizations ("MAO") market and manage their MA plans. 1-ER-3. CMS has no regulatory authority or oversight over non-MAOs, as its enforcement and rulemaking authority under 42 U.S.C. § 1395w–26 and its implementing regulations is expressly limited to MA plans offered by MA organizations. *See* 42 U.S.C. § 1395w–28(a)(1) (defining "MA organization"). Part C of the Medicare Act contains an express preemption provision at 42 U.S.C. § 1395w–26(b)(3):

> "The standards established under this part shall supersede any State law or regulation (other than State licensing laws or State laws relating to plan solvency) with respect to MA plans which are offered by MA organizations under this part".

Prior to Congress's amendments to the Medicare Act in 2003, the preemption provision stated that federal standards would supersede state law and regulations with respect to MA plans "to the extent such law or regulation is inconsistent with such standards," and it identified certain standards that were specifically superseded. § 1395w–26(b)(3)(A) (2000). Under the MA scheme, an MAO that is explicitly licensed and

11

regulated by CMS to administer an MA plan directly steps into the government's shoes–hence the MAO is afforded federal preemption.

## SUMMARY OF ARGUMENT

This action addresses United Appellees' (defendants) predatory practices in connection with *elderly, disabled, and financially constrained* beneficiaries of government health benefits. This suit underscores the critical public policy of upholding generally applicable federal and state consumer protection laws, and seeks to ensure truthful marketing communications to this *vulnerable* demographic–by independent legal entities and producers promoting the nation's largest and most profitable commercial health insurer.

The district court acknowledged: "*the seriousness of the allegations*" and "*the grave issues in addressing vulnerable populations' access to healthcare*". 1-ER-13. The court ultimately granted United's Motion to Dismiss, which was predicated solely on preemption. Preemption under § 1395w-26(b)(3) applies only to. *A plans which are offered by MA organizations*". Notwithstanding that neither Appellee is an MAO nor MA plan, the district court erroneously determined that Appellees were

entitled to preemption for purportedly participating *"alongside"* an MAO plan. 1-ER-11. The district court was wrong to the core because a court may find federal preemption only where it is the clear and manifest purpose of Congress. Nothing in § 1395w-26(b)(3) authorizes granting preemption to non-MAO and non-MA plan entities.

The district court incorrectly deferred to CMS's expanded agency interpretations of Medicare preemption, without independent judicial scrutiny of the plain statutory text and congressional intent. 1-ER-11. Applying inapplicable facts from *Uhm* and *Aylward*, the court determined that the Medicare Act expressly preempts all of Appellant's claims. However, the district court erred because the plain text of § 1395w-26(b)(3) must control. In light of *Loper Bright, Chevron* deference has been abrogated, and CMS agency views no longer control preemption analysis. *Uhm* and *Aylward* must be confined to their facts, and addressing *stare decisis and Loper Bright*–this new appeal falls outside of those cases.

This appeal warrants *de novo* review on three principal grounds. *First,* this action is not expressly preempted because it arises under generally applicable state consumer protection laws—not laws *"with*

respect to" "*MA plans offered by MA organizations*." United Appellees are neither an MA plan nor an MAO. The statutory text of 42 U.S.C. § 1395w-26(b)(3) limits preemption to "*MA plans offered by MA organizations*", not all health-related entities or marketers. The Act does not preempt all state consumer protection claims, particularly where Congress has expressly preserved such remedies under § 1395. Courts must now apply that plain text without agency deference under *Loper Bright.*

*Second,* Appellant's claims aren't preempted because United conceded in binding discovery admissions that it is neither an MA plan nor an MAO. 2-ER-158-160. Thus, United is not entitled to invoke MA preemption. Even if MA preemption applied to United, it would not affect claims involving United's explicit misrepresentations about OM, which has no preemption clause. *McCall v. PacifiCare*, 25 Cal. 4th 412, 21 P.3d 1189 (2001).

Additionally, Appellant's claims are not preempted because they require only a comparison of United's own conflicting marketing statements, not interpretation of any Medicare standard**.** United, a non-MAO, systematically misrepresented that MA plans are an *"addition to"* OM, whereas at least one official MAO website correctly stated that

14

*Medicare Advantage "replaces" Original Medicare"*. 3.ER-483, 509, 511. These terms have distinct, plain meanings, and United cannot lawfully suggest MA plans do both. The deceptive language at issue turns on the ordinary meanings of "replace" and "combine", which a jury can discern by comparing the plain text of the MAO's own website with United's challenged marketing, without interpreting any federal regulation.

*Third*, even if Appellant's initial claims were preempted, the district court erred in denying leave to amend based on "futility". Appellant sought leave to amend, and would plead that United fraudulently induced the state agency to issue it a health plan license, which it then knowingly breached (which is an exception to preemption), and that United is neither an MA plan nor an MAO. These crisp new facts—discovered after filing—fall outside the scope of federal preemption and support reversal.

Appellant additionally relies on the Sixth Circuit's recent ruling in *FCC v. FCC* (*In re MCP No. 185*), 124 F.4th 993 (6th Cir. 2025) ("Ohio Telecom"), marking that federal agencies may not expand statutory reach without clear legislative authority.

This appeal thus raises an issue of first impression in the Ninth

Circuit's post-C*hevron* jurisprudence. This case is not about disrupting MA plans or CMS's role. It's about stopping unregulated actors from hiding behind a shield Congress never gave them. This Court should decide this case cleanly based on the plain text of the congressional language.

In sum, this appeal presents a live and consequential statutory interpretation question: whether § 1395w-26(b)(3)—which applies only "*with respect to MA plans…*"—can be extended to shield private actors who do not offer MA plans, are not an MAO, and are not under CMS regulatory oversight. United pretextually rests on an overbroad reading of preemption to "affiliates" that prior courts sustained through CMS agency deference. Under *Loper Bright*, that framework no longer controls.

The district court should be reversed, and the case permitted to proceed on its merits.

## STANDARD OF REVIEW

This case was dismissed at the pleading stage on preemption grounds, notwithstanding the district court's acknowledgment of the

16

"*seriousness of the allegations in the Complaint*" and "*the grave issues in addressing vulnerable populations' access to healthcare*". 1-ER-13.

This Court reviews the district court's Rule 12(b)(6) dismissal, the preemption determination, and the denial of leave to amend *de novo. Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006); *Asarco v. Union Pac. R.R.*, 765 F.3d 999, 1004 (9th Cir. 2014).

Preemption is a question of law and reviewed *de novo. Niehaus v. Greyhound Lines*, 173 F.3d 1207, 1211 (9th Cir. 1999). Similarly, denial of leave to amend is subject to *de novo* review where based on futility. *Moss v. U.S. Secret Serv.*, 572 F.3d 962 (9th Cir. 2009).

## ARGUMENT

### I. THIS ACTION IS NOT EXPRESSLY PREEMPTED BECAUSE IT IS BASED ON GENERALLY APPLICABLE STATE STATUTORY PROVISIONS AND NOT ON LAWS "WITH RESPECT TO MEDICARE ADVANTAGE PLANS".

Judicial preemption analysis begins with a strong "*presumption against…preemption*"–especially when state police powers are implicated. *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996). Courts must resolve any ambiguity against preemption absent a clear and manifest

17

congressional intent. *CSX Transp. v. Easterwood*, 507 U.S. 658, 664 (1993).

This is not the sort of action Congress intended to preempt when it enacted § 1395w26(b)(3)– as part of the Balanced Budget Act of 1997 (which established Medicare+Choice, now Medicare Advantage), nor when it amended the provision in 2003 through the Medicare Prescription Drug, Improvement, and Modernization Act ("MMA"). While those amendments expanded CMS's oversight role over MA plans, Congress did not correspondingly expand the preemption clause to sweep in all state laws of general applicability. Doing so would contradict settled statutory interpretation principles and undermine the public policy foundations of consumer protection.

## A. Medicare Advantage preemption applies only to "MA plans offered by MA organizations".

Congress confined preemption to specific federal standards under § 1395w-26(b)(3). It amended this section to establish a tailored preemption rule that applies only state laws *"with respect to"* *"MA plans offered by MA organizations*." However, a number of notable cases have since expanded the statutory text far beyond the plain language and

limits Congress intended.

Congress intended that this provision would permit CMS to set national standards and exercise regulatory oversight over MA plans through its direct authority over MAOs. But congressional authority does not empower CMS to regulate non-MAO parties outside the statutory scheme.

Federal preemption under the Medicare Act has some significant limitations. One is the explicit language that the statute does not apply to state licensing and plan solvency. As stated, under Part C's preemption provision, these "standards . . . supersede any State law or regulation… with respect to MA plans -----MAOs." *Id.*

To recall, the amended preemption statute 42 U.S.C. § 1395w–26(b)(3) states:

> "The standards established under this part shall supersede any State law or regulation …*with respect to MA plans which are offered by MA organizations ...*" [*Emphasis added.*]

Most critically, a *Medicare Advantage organization* is defined under 42 U.S.C. § 1395w-28(a)(1):

> *"The term 'Medicare Advantage organization' means a public or private entity organized and licensed ...that is certified by the Secretary as meeting the requirements and standards...for such an organization."*

MAO means a plan of coverage for health benefits under Part C. § 1395w-28(b)(1). Here, Appellees conceded that neither are an MAO as defined by § 1395. 2-ER-159160–; 3-ER-429–430.

In adopting these provisions, Congress did not intend to grant 'blanket' immunity from all state regulation to entities loosely affiliated with MA plans, especially with other generally applicable common laws that do not undermine the administration of the federal MA program. *Quishenberry v. UnitedHealthcare,* 14 Cal. 5th 1057, 1065 (2023).

Likewise, Congress did not empower CMS to regulate "affiliated" or "related to" third-party actors, nor did it extend preemption to non-MAO entities operating wholly outside the CMS framework. In implementing the MA program, CMS was acting at the express direction of Congress and within the heartland of its delegated authority to regulate "MAOs that offer MA plans". CMS set forth specific standards and oversight mechanisms—standards that presume the MAO and the MA plan are under direct CMS contract and subject to audit, reporting, and

compliance obligations.

Allowing the United Appellees to pretextually cloak themselves in "MA preemption" where neither administer an MA plan contradicts both the language of the Act and the policy it was designed to advance. The district court erred in applying federal preemption here because evading all oversight would subvert the careful balance Congress struck—one that protects the *elderly, disabled, vulnerable, marginalized, and financially disadvantaged*, while ensuring uniformity and accountability once within the MA system. Allowing such actors to surreptitiously override state law protections undermines that balance, and plainly contravenes Congress's intent to ensure fair access and transparency in publicly funded health programs

Instead, Congress intended that where federal law expressly prescribes specific duties for "*'MA plans offered by MAOs*," those federal standards would supersede applicable state requirements.

To effectuate that intent, courts have applied a *case-by-case* approach to preemption—asking whether the state-law duty would supplant a specific MA standard. Yet the briefing and decision below rely on overbroad assertions, such as the notion that any state-law claim

21

"*related to*" MA plans are preempted–"*even if those defendants were not MA Organizations themselves*"–because Medicare Part C regulations have established standards. 1-ER-11. Additionally, the district court ruled that it was "*enough*" that a defendant purportedly participated "*alongside*" an MAO in marketing MA plans. Such a categorical approach is inconsistent with the text and purpose of the MA preemption provision, and would improperly displace a dizzying range of legitimate state regulation. That is not what Congress intended.

### 1. Statutory text governs where unambiguous, even if an agency adopts a broader interpretation.

Both the federal and California rules of statutory construction require courts to begin with the plain language of the statute. The core question in this case is a simple one. At the heart of MA preemption is the plain text of § 1395w-26(b)(3). Preemption of state law requires the courts "in the first instance [to] focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent." *CSX Transp.*, 507 U.S. at 664. The court may find preemption only where it is the clear and manifest purpose of Congress. *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947).

Under *Loper Bright,* courts must exercise independent judgment without deferring to agency interpretations. Statutory interpretation begins with the "*plain meaning rule*". *First,* where the text is unambiguous, it controls—regardless of an agency's contrary interpretation. Interpretation is a judicial function–not an agency one. *Hardt v. Reliance Std. Life Ins.*, 560 U.S. 242, 251 (2010).

The plain meaning limits preemption to the operation of "*MA plans offered by MAOs*". The district court was bound to apply that plain meaning, and determine whether the statute expressly applies to non-MAO entities like Appellees. It does not.

Every word and clause must be given effect, and courts must avoid construing statutes in a way that renders any part superfluous. *United States v. Menasche*, 348 U.S. 528, 538–39 (1955). If ambiguity exists, courts examine statutory structure and purpose to discern legislative intent. *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132–33 (2000). Finally, preemption clauses are construed narrowly, and any ambiguity must be resolved *against preemption* absent congressional intent. *Medtronic, Inc.*, 518 U.S. at 485; *Farm Raised Salmon Cases*, 42 Cal. 4th 1077, 1088 (2008).

23

*Second,* the *statute must be construed as a whole*–every word and clause must be given effect, keeping in mind the nature and obvious purpose of the statute. *Third,* courts *must avoid surplusage*–give effect to every word of the statute, and avoid interpretations that render any word meaningless. Courts may not omit what has been inserted. *Steinberg v. Chiang*, 223 Cal. App. 4th 338, 351 (2014).

*Fourth,* the specific language controls general language on the same subject. *Lastly,* the legislative intent controls, and the interpretation should avoid absurd results. A construction leading to consequences which are unjust or unintended by the legislature will be avoided. *FDA*, 529 U.S. at 133.

In sum, § 1395w26(b)– should not be interpreted broadly to preempt generally applicable state laws as to non-MA plan or non-MAO actors, especially where no express language compels that outcome.

## 2. The phrase "with respect to" must be interpreted using its ordinary meaning.

The plain language of a statute is its most logical and necessary construct. The MA statute is intended to and implicates preemption of some–but not all state laws. Courts consider the common usage of the

24

words, dictionaries, the purpose of the statute, and the consequences of different interpretation.

As used in § 1395w-26(b)(3), the phrase "with respect to" functions as a scope-defining term meaning "concerning" or "regarding". The statutory text provides: "The standards established under this part shall supersede any State law or regulation…*with respect to MA plans which are offered by MA organizations* under this part." [Emphasis added].

'With respect to' means "*with reference to: in relation to*." Merriam-Webster Dictionary. Its presence in the Medicare Act signals congressional intent to narrowly preempt state laws concerning MA plans which are offered by MAO's. The definition of "with respect to" must align with the legislative intent and purpose of the statute. *People v. Hard*, 112 Cal. App. 4th 272 (2003).

In a legal context, "with respect to" generally indicates that a statement or action is focused on or linked to a particular subject, party, or provision. *Riegel v. Medtronic*, 552 U.S. 312, 330 (2008) interpreted the phrase "*with respect to*" in an express preemption clause, it did so in the context of binding, specific federal requirements promulgated through formal FDA rulemaking. The court determined that state laws are

preempted only to the extent they are different from or in addition to the requirements imposed by federal law.

Here, by contrast, United did not identify any CMS "standard" established under Part C that conflict with Appellant's claims. Section 1395w-26(b)(3) preempts only such federal standards—not all state laws tangentially related to MA plans. The lack of any identified federal standard is fatal to United's preemption defense. Likewise, *Quishenberry* falters because–without *Chevron* deference–"*with respect to*" means what it plainly says: it limits express preemption to matters concerning "MA plans offered by MA organizations". *Quishenberry,* 14 Cal. 5th at 1065.

Moreover, *Riegel* did not rely on *Chevron* deference to expand the preemption clause; its interpretation flowed directly from the statutory text. That reinforces why prior cases which relied on *Chevron* and CMS agency regulatory implementations—cannot control here. Under *Loper Bright*, courts may not defer to agency interpretations that depart from the statutory text.

The statute, not CMS, defines the scope of preemption—and it is unambiguous. United relies on interpretation of preemption from non-binding CMS guidance or later judicial gloss based on Chevron—now

overturned. 3-ER-453.

In contrast, Congress purposely did not use the more forceful *"relating to"* preemption phrase used in statutes like ERISA (29 U.S.C. § 1144(a)). Instead, here it used *"with respect to"*, a weaker and contextually bounded term. Courts interpreting other statutes have acknowledged the softer scope of "with respect to" compared to "relating to". *N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins.*, 514 U.S. 645 (1995) (warning against overbroad preemption constructions.)

Additionally, "respectively" means "in the order given" and "in particular: separately", as in separately for each person or thing. Merriam-Webster Dictionary. "Related" means "connected by reason of an established or discoverable relation". Here, the district court explicitly relied on the theory that Appellees are "related to" an MAO–to grant their motion to dismiss on preemption grounds–<u>not</u> *"with respect to"*. 1-ER-13. Specifically, the district court explained that:

> *"Under the Ninth Circuit's interpretation of the statutory language (which this Court is bound to accept), the fact that the MA Plans are subject to the CMS marketing regulations is sufficient to find Plaintiff's state law claims preempted, regardless of whether the*

27

*Defendants are MA Organizations"*.

However, that disregards the statute's plain text which requires the actors themselves to be an MAO. The court explained that pursuant to *Uhm,* it is irrelevant that United is neither an MAO nor an MA plan, because "the claims that plaintiff brought against them were "*entirely derivative of [the defendants'] relationship" with an MAO, even if those defendants were not MA Organizations themselves*". 1-ER-11. That is legally flawed for two reasons.

*First,* the express statute requires that defendants must be an "MA plan offered by an MA organization" for preemption to apply. § 1395w26(b)(3)–. There are two requisite prongs to the statute which courts are bound to surgically apply. There is no dispute that neither prong is met because neither Appellee is an MAO nor offers an MA plan, hence no preemption. 2-ER-92.

*Second,* Appellant's claims are not "derivative" of any MAO's actions. They stem from United's deceptive marketing, including false promises and misleading website content—by unregulated affiliates and third-party marketers outside CMS oversight. 2-ER-102, 202, 208–209; 3-ER-478–479. United's misrepresentations were entirely independent of

28

the MAO they were promoting, and preemption does not shield independent misconduct by non-MAOs. The court's overbroad reading contradicts the statute's plain text and improperly extends preemption beyond its intended scope.

The nuance here is that United disclosed nearly one hundred pages of affiliated or "related to" entities in this litigation. ECF No. 28-2, Appendix B (not reproduced in Appellant's ER due to volume). The interpretation of "related to" or "affiliated"—where preemption is triggered simply because an entity appears on an extremely vast affiliate list—would stretch the statute far beyond recognition–producing an absurd outcome Congress never intended. And United's "affiliate" list has only since substantially expanded. Preemption applies only to the MAO. Any other application requires a factual determination, which is inappropriate for a Rule 12 dismissal.

Applying the district court's ruling and preemption to any entity "that markets 'alongside' an MAO"–then all 97-pages of United's disclosed "subsidiaries" (approximately 3495 distinct legal entities (2-ER-111; ECF 28-2)) are all entitled to federal MA preemption protection as "related to" the single qualified United MAO entity. Hence, nearly all

29

4000 "affiliates" are exempt from the law. That would yield a truly lawless state where any MAO purported "affiliates"–no matter how far removed–can claim the MA preemption "get-out-of-jail-free card". 2-ER-92, 103.

In contrast, courts have acknowledged the broader scope of "relating to" language as compared to "with respect to." *In N.Y. State Conf. of Blue Cross & Blue Shield Plans*, 514 U.S. 645, the Supreme Court emphasized the expansive nature of the "relate to" language in ERISA's preemption clause, while also cautioning against overly broad interpretations that could lead to boundless preemption. The Court noted that "relate to" could not be interpreted to extend to the furthest stretch of its indeterminacy, as this would render preemption virtually limitless.

The Supreme Court has cautioned against interpreting these terms too broadly, otherwise, nothing would escape preemption: "If 'relate to' were taken to extend to the furthest stretch of its indeterminacy, then for all practical purposes preemption would never run its course, for really, universally, relations stop nowhere".

This approach reflects a recognition of the softer scope of terms like "with respect to" when compared to "relating to," as the latter has been

30

historically interpreted to have a broad and sweeping effect. Thus, the distinction between "relating to" and "with respect to" is meaningful in statutory interpretation, with courts acknowledging the broader and more expansive nature of the former term in preemption contexts. *Travelers,* 514 U.S. 645.A

law "relates to" in the normal sense of the phrase, if it has a connection with or reference to such a plan." Here, Congress explicitly used "with respect to" in § 1395w-26(b)(3), a much narrower term. It demonstrates Congress's intent to address particular issues rather than preempting a wide range of unrelated and limitless matters. United disagrees. It claims preemption is limitless as to any claims against any insurance related entity. 2-ER-105.

Accordingly, post-*Chevron*, courts must apply an independent reading of statutory text, especially when Congress has chosen language like "*with respect to*." Absent explicit congressional intent that federal standards cover the precise conduct or remedy at issue for non-MAOs, state law consumer protection claims grounded in general tort or statutory fraud—should not be preempted.

### 3. Neither of the United Appellees is an MAO nor offers

an MA plan.

Appellee UnitedHealth Group ("UHG") admitted in verified written discovery below that it "does not itself administer any MA plan, and it has *no agreement with CMS* to do so…" It also conceded it is "*not a Medicare Advantage Organization.*" 2-ER-158, 160; also 2-ER-14, 201, 202, 207; 3-ER-452. Additionally, United conceded "*a parent company is presumed to have an existence separate from its subsidiaries.*" 3-ER-429. Yet, the district court granted dismissal as if non-MAOs were entitled to the full sweep of federal preemption designed to protect MAOs from conflicting standards. The statute does not authorize that.

Despite UnitedHealth's use of a bevy of confusing name variations–each a distinct legal entity–(2-ER-92)–it is established that *UnitedHealthcare Insurance Company (UHIC)*–not a party to this suit–is the MAO. 2-ER-209. The United Appellees are not MAOs or MA plans. 42 U.S.C. § 1395w–28(a)(1).

Although CMS regulates MAOs, it has no oversight of non-MAOs like the United Appellees. In the district court, United pretextually moved for preemption by emphasizing federal control over regulated MAOs. But United failed to address its non-MAO status, and the

authority of state law and agencies in protecting the public through generally applicable consumer protection laws. 3-ER-452–453. Here, generally applicable state laws impose obligations on entities, including non-MAOs involved in marketing commercial insurance under the MA framework. 2-ER-24, 78.

### 4. Preemption does not extend to affiliates or non-MAO parent companies.

Section 1395w-26(b)(3) applies only to entities that contract directly with CMS, and are "MA plans offered by MAOs". It contains no language extending preemption to affiliates, subsidiaries, those who "participated alongside", or parent corporations of MAOs. 1-ER-11. That textual silence is significant. Courts do not presume preemption where Congress is silent–particularly where the effect would be to eliminate state consumer protection remedies–and they do not presume preemption beyond the statutory text. *Gregory v. Ashcroft*, 501 U.S. 452, 460–61 (1991).

Nor can courts disregard corporate formalities–each corporation is presumed a separate legal entity, even if related. Given that *UHIC Inc.* is the MAO, Appellees *UnitedHealth Group Inc. and United HealthCare Inc.* are distinct legal entities with no contract with CMS–and are not

MAOs. Preemption applies only to MAOs, not to non-MAO affiliates, "related to" parties, or parent companies. *United States v. Bestfoods*, 524 U.S. 51, 61 (1998) (parent not liable for subsidiary's acts); *Doe v. Unocal Corp.*, 248 F.3d 915, 926 (9th Cir. 2001). Here, UnitedHealth Group Inc., UnitedHealth Care Inc., and UHIC are separate legal entities, and thus preemption does not apply to the non-MAOs. Nothing in the statute neither identifies nor defines "affiliates" or "alongside" functions as qualifying for preemption. The district court erred by collapsing this significant legal distinction. 1-ER-11.

### 5. Consumer protection claims do not necessarily arise under the Medicare Act.

"Consumer protection claims do not always 'arise under' the Medicare Act." *Glob. Rescue Jets, L.L.C. v. Kaiser Found. Health Plan*, 30 F.4th 905, 918 (9th Cir. 2022). "Where, at bottom, a plaintiff is complaining about the denial of Medicare benefits", the claim "arises under" the Medicare Act. *Uhm*, 620 F.3d 1134.

By contrast, in *Ardary v. Aetna Health Plans*, 98 F.3d 496, 500 (9th Cir. 1996), the Court held that state law claims for wrongful death did not arise under the Medicare Act because they did not seek to recover

benefits. *McCall,* 25 Cal. 4th at 412 upheld *Ardary's* holding.

This action is not preempted because it raises consumer protection claims that neither arise under the Medicare Act nor seek Medicare benefits. The district court's ruling was based on express preemption, but the statute's terms do not reach the non-MA plan conduct or the non-MAO parties at issue. That approach is incorrect.

### 6. Appellant's claims are not preempted because they do not require interpreting any federal Medicare standards.

This action boils down to plain meaning, not federal law. The simple question is whether United's marketing—website, emails, and calls representing that commercial plans "combine", "are additions to", offer "all the benefits of Medicare"—is misleading when the official MAO website truthfully states that "*MA "replaces" Original Medicare.*" *See e.g.,* 3-ER-402, 419–420, 436, 476, 495.

Courts[8] have denied preemption where adjudication requires only

---

[8] *See e.g., Lokken v. UnitedHealth Grp. No. 0:23-cv-03514, 2025 WL 571393 (D. Minn. Feb. 13, 2025).* (rejecting MA preemption where claim "requires only an evaluation of United's own policy documents") While not binding, *Lokken* in a materially similar case, held that breach of contract and implied covenant claims were not preempted under § 1395w–26(b)(3) because they did not require interpreting CMS-

reviewing United's own materials, not CMS-approved plan terms. *Ardary*, 98 F.3d at 500 [no preemption where state claims did not "arise under" Medicare]; *McCall*, 25 Cal. 4th at 412.

Here, the analysis requires no more than consulting Webster's Dictionary and comparing United's disputed public-facing websites and marketing emails. 2-ER-102, 170–171, 198, 202, 208–209; also 3-ER-333. These terms have distinct, plain meanings. Webster's defines <u>*replace*</u> as "to take the place of" or "to be used instead of", and <u>*combine*</u> as "to unite into a single thing or group". United cannot lawfully suggest MA plans do both.

That simple, plain-text comparison is not preempted for a number of legally sufficient reasons. First, under § 1395w-26(b)(3), preemption applies only to "*MA plans offered by MA organizations*"–not third-party marketers and holding companies. Second, these plain terms may be interpreted by a jury and "claims could be proved "without regard to any provisions of the [Medicare] Act relating to provision of benefits". *Glob. Rescue*, 30 F.4th 905. Third, Original Medicare has no express

─────────────

approved plan terms.

preemption clause. *McCall,* 25 Cal. 4th at 412.

**B. Not all claims involving health insurers are preempted.**

Even if United was an MA plan offered by an MAO–it was not–Congress did not intend to provide MAOs "blanket immunity". United claimed all "*claims against an insurance entity*" are preempted. 2-ER-105. That is incorrect. Even if United claimed status as "an MA plan offered by an MA organization"–it did not–preemption is not limitless. § 1395w26(b)(3)–. *Quishenberry*, 14 Cal. 5th at 1065; 1-ER-159. In any event, United's preemption defense fails as a matter of law because it is neither an MAO nor MA plan within the meaning of the governing statute. 1-ER-8; 2-ER-32.

Express preemption under § 1395w–26(b)(3) applies only to "MA plans offered by MAOs"–not to "affiliated" or "related to" entities. United swore under oath that it is "*not a Medicare Advantage Organization*", "*does not itself administer any Medicare Advantage Plan*", and has "*no agreement with CMS to do so*". 2-ER-158–60. The district court and United incorrectly relied on purported MAO "affiliate" status, but nothing in the statute defines an "affiliate". 2-ER-97.

37

Although the district court deemed Appellant's claims preempted, recent congressional commentary underscores that such conduct is not protected under a "federal shield". Senator Chuck Grassley[9], who shepherded Medicare Part C into law twenty eight years ago, wrote UnitedHealth a few months prior citing its pervasive MA fraud, including efforts to falsely diagnose enrollees with revenue-generating diagnoses. Representative Greg Murphy publicly called UnitedHealthcare "the worst offender", and criticized it for MA fraud: "You take a stone-cold healthy person and they suddenly have 15 things wrong with them." (Newsweek[10], March 2025). These remarks mirror the precise harm which Appellant alleges—United's deceptive MA enrollment, misuse of patient records for bonus payments from the government while simultaneously denying payment for the same care, and systemic manipulation of vulnerable seniors for profit. 1-ER-4–6.

The express MA preemption clause was enacted to shield a short

---

[9] *See* https://www.judiciary.senate.gov/press/rep/releases/grassley-pushes-for-answers-on-unitedhealth-groups-medicare-advantage-billing-practices?

[10] https://www.newsweek.com/united-healthcare-pushing-boundaries-medicare-fraud-republican-2049688

list of federal contractors who directly step into the federal government's shoes–not predatory commercial marketers. 2-ER-91, 111, 133. The preemption statute applies only "with respect to" "MA plans offered by MA organizations". The core question here is simple: Is United entitled to preemption as a non-MAO, non-MA plan defendant? 2-ER-91, 133, 3-ER-454. The answer should be no.

The district court granted United preemption because "s*ome United Healthcare entity within the…many affiliates… is an MAO*". 1-ER-11. "Related to" is not and has never been a legally sufficient standard for MA preemption. But neither Appellee is subject to direct CMS oversight. 2-ER-91, 132–33, 3-ER-454. If loose judicial thresholds like "*some"* entity among a thousand affiliates was the applicable standard for being defined as an MAO–then all of United's thousands of "related to" affiliates and various brokers would all claim preemption–a truly lawless result. 1-ER-11; 2-ER-91, 111–112; 3-ER-491.

For its part, United claimed that any discussion about it not meeting the definition of an MA plan or MAO is a "*total sideshow*". 2-ER-41. But statutory text at § 1395w-26(b)(3) is not ambiguous–it only applies "*with respect to" "MA plans offered by MAOs".* United admits it is

not an MAO or MA plan. The statute is hardly a "*sideshow*"–without preemption, United is just a common, ordinary, for-profit, corporation squarely subject to common law. It's not special. 2-ER-32, 114; 3-ER-423.

## C. Expanding preemption beyond MA plans and MA organizations would defy statutory limits and yield absurd results.

The Medicare regulations impose no requirements on non-MAOs–such as downstream producers, promotional contractors, or "affiliated" corporations–including the United Appellees. 42 C.F.R. § 422.2262. CMS cannot regulate non-MAOs, or require pre-submission of their marketing materials for approval. Because non-MAOs maintain no direct contract with CMS, they are not bound by MAO regulations. Nothing in the statute grants CMS control over non-MAOs or marketing by legally distinct entities–including both United Appellees here. Even if CMS purported to regulate them, it lacks enforcement power absent a direct contract.

Congress never intended to provide blanket immunity to any and all entities and persons who conduct business with an MAO. Nothing in § 1395w26(b)(3)– mentions or defines "affiliates". The district court afforded United full preemption because "*some United Healthcare entity*

40

*within the network of that company's many affiliates that is an MAO*". 1-ER-11. That is not sufficient.

Misinterpreting § 1395w-26(b)(3) to extend preemption to such conduct by "affiliates"–an unrecognized status under the statute–would yield an unjust result. MAOs could and would avoid legal and regulatory accountability simply by outsourcing deceptive marketing to third-party promoters who lack any tether to CMS or the government.

United's consumer fraud and harm is *not hypothetical* (3-ER-491–492)—it is precisely the systematic scheme executed–whereby vulnerable Medicare beneficiaries are unknowingly disenrolled (3-ER-336–337, 438–439, 454, 512, 543–545) from OM into commercial insurance plans. United's known conduct exemplifies how CMS's regulatory framework is easily circumvented through strategic delegation to non-MAO actors, leaving vulnerable beneficiaries exposed to unchecked misinformation under the false cloak of federal preemption.

### 1. United cannot claim federal preemption here, while disavowing MAO status in other federal proceedings.

United is well known for selectively invoking federal law when it is convenient–arguing MAO status in this case to claim MA

41

preemption–while denying that identical or other federal status in other federal proceedings to avoid MA and ERISA liability.

This Court should reject United's gamesmanship. *Ryan* was upheld against UHG, who characterizes itself in this action as a mere 'holding company.' *Ryan v. UnitedHealth Group*, 98 F.4th 965, 969 (9th Cir. 2024) [Reversed dismissal holding that plaintiff stated viable ERISA and Parity Act claims factually relevant to Appellees' delegation of federal plan schemes across its associates]–. 2-ER-195, 207–208; 3-ER-428. *Ryan* notably turned on (1) a California agency report that UnitedHealth entities applied a more stringent review to assess mental health claims, and (2) a factual determination that denial of Ryan's claims occurred during that same reporting period. Analogously, here United's deceptive marketing materials involve the same period (2018-2024) as the U.S. Senate report "*Deceptive Marketing Practices*", specifically referencing 'United Healthcare Medicare Advantage' conduct. 3-ER-326–329, 348; 2-ER-207, 213. Thus *Ryan* repeats here.

*Doe* dismissed UHG and United Healthcare Insurance Company as *improper* defendants under ERISA, adopting that they were not plan administrators and could not be treated as if they were. *Doe v. United*

42

*Health Grp.* 2018 WL 3998022, at *4 (E.D.N.Y. Aug. 20, 2018). 2-ER-212. Similarly, *Tamburrino* acknowledged United's own assertion that entities other than UHIC "do not qualify as administrators or fiduciaries" under ERISA. *Tamburrino v. UnitedHealth Grp.,* 21-12766 (SDW)(ESK) (D.N.J. Apr. 25, 2022). 2-ER-213.

Yet in this case, United invoked sweeping federal preemption under § 1395w–26(b)(3), without having any CMS contract. United's surreptitious flip-flopping underscores why courts should scrutinize its assertions closely–and why United should be judicially estopped from claiming MAO-based preemption here–after denying the same status elsewhere.

United cannot disclaim federal status when sued under ERISA or state law, but opportunistically embrace it when seeking federal preemption protection under § 1395w-26(b)(3). United's two-faced approach is gamesmanship–which this Court should reject.

## 2. Neither United Appellees here are an MAO, offer an MA plan, nor are subject to direct federal oversight.

The MA statute is explicit that *two prongs* must be met to trigger preemption (i) the entity must be an MAO, and (ii) offer an MA plan.

43

Since United cannot satisfy either prong, it can't invoke preemption. Specifically, United makes it clear that each subsidiary is a distinct entity, that it is not an MAO or MA plan, and it unequivocally asserts that it must *not* be considered as one and the same. Therefore United's Motion could not be granted on an express preemption theory. 2-ER-430.

Additionally, this action should not be subject to preemption, even under broad statutory construction because Appellant alleged that United made misleading statements without disclosure of other facts–hence fraudulent concealment and inducement. 3-ER-506, 535–536; 2-ER-112. Fraudulent concealment and misrepresentation are not automatically preempted. *Quishenberry*, 14 Cal. 5th 1057. At the very least, United's preemption defense is a factual determination that is not appropriate for dismissal at the pleading stage.

### D. Even if United qualified as an MA organization, not all claims are preempted.

Even assuming United qualified as an MA plan and MAO–it does not–Original Medicare (Parts A and B) unlike Medicare Part C–contains no preemption provision. *McCall,* 25 Cal. 4th 412. 3-ER-423–424. Appellant's claims arise not from the administration or denial of MA

benefits, but from the fraudulent disenrollment of vulnerable beneficiaries from federally guaranteed Original Medicare ("OM"), regularly without their knowledge. This is a legally material distinction. 3-ER-424.

The actionable harm–unknowingly relinquishing OM coverage entirely–is not a denial of MA benefits, but the loss of Medicare entitlement itself, a consequence that cannot be redressed through the administrative remedies available under the Act. Because OM lacks a preemption clause, and the claims arise outside of federal benefits administration, preemption does not apply. *McCall,* 25 Cal. 4th 412.

Lastly, claims that do not seek recovery of Medicare benefits do not "arise under" the Medicare Act. *Ardary v. Aetna Health Plans,* 98 F.3d 496, 500 (9th Cir. 1996). This action does not seek such benefits. Further, claims against entities not directly regulated under the MMA are not preempted if they don't arise under the Act. *Uhm,* 620 F.3d 1134. The same reasoning applies here to reject United's preemption defense.

## II. THIS ACTION IS NOT EXPRESSLY PREEMPTED BECAUSE UNITED ADMITTED IT IS NOT AN MA PLAN OR MA ORGANIZATION, AND LOPER BRIGHT EXTINGUISHES ITS PREEMPTION DEFENSE.

### A. United admitted in binding written discovery that it is neither an MA plan nor an MA organization.

Despite United's efforts to shut down discovery and withhold disclosures, it produced two sets of verified responses to interrogatories prior to the district court granting its motion to stay discovery. 1-ER-6,8; 2-ER-156–158,160–161. United admitted in written discovery that it is "*not a Medicare Advantage Organization*" and "*does not itself administer any Medicare Advantage Plan*". 2-ER-156-158; 160–161.

United's sworn responses—prepared and served with the assistance of counsel—constitute binding admissions under Fed. R. Civ. P. 36(b), and eliminate any genuine dispute as to United's non-MAO status.

*American Auto. Ass'n v. AAA Legal Clinic of Jefferson Crooke,* 930 F.2d 1117, 1120 (5th Cir. 1991); *Cook v. Allstate Ins.*, 337 F. Supp. 2d 1206, 1210 (C.D. Cal. 2004); *Milton H. Greene Archives v. Marilyn Monroe LLC,* 692 F.3d 983, 995 (9th Cir. 2012). United's verified responses also qualify as admissible party admissions under Fed. R. Evid. 801(d)(2). *Estate of Lockett v. Fallin*, 841 F.3d 1098, 1102 n.2 (10th Cir. 2016); *Scottsdale Ins. Co. v. Educ. Mgmt., Inc.,* 2007 WL 2746885, at *2.

Two weeks before the dismissal hearing, Appellant sought leave to file supplemental briefing and attached United's verified admissions. 2-ER-133–136. Appellant cited controlling authority permitting courts to consider interrogatory responses and other extrinsic documents incorporated into the pleadings without converting a Rule 12(b)(6) motion into summary judgment. *Lee v. City of Los Angeles,* 250 F.3d 668, 688 (9th Cir. 2001); *Tellabs, Inc. v. Makor Issues & Rights*, 551 U.S. 308, 322 (2007). 2-ER-121–122.

The district court cited that Appellant had requested judicial notice of United's discovery responses "*which confirm that the specific United Healthcare entities named as defendants in this case are not MA Organizations*". 1-ER-8. However, the court declined to take judicial notice, citing inapposite authorities, while ignoring that Appellant did not rely on Rule 201 alone, but offered United's responses as binding admissions under Rule 801(d)(2). 2-ER-133–136.

Courts routinely consider party admissions at the pleading stage when relevant to threshold issues. *Gomez v. Hasbro, Inc.,* 2020 WL 5797980, at *6 n.4 (C.D. Cal. July 27, 2020); *Scottsdale Ins. Co.,* 2007 WL 2746885. Sworn admissions made in discovery and served under court-

47

authorized requests rebut United's preemption defense.

Even if the court declined judicial notice, it should have considered the public CMS.gov website establishing that neither United defendant held an MAO contract. 2-ER-171, 209. Lastly, the court declined to take notice of other records including United's website–but some of those records were attached as complaint exhibits–and should have been considered. 1-ER-7; 3-ER–475–476,483–484, 501–502, 504.

The district court nevertheless prejudicially declined to consider either the public records, or United's sworn responses—presented via a prompt ex parte application. 1-ER-2. The case was dismissed based on MA preemption, even though United admitted it was not an MAO. This was not an improper attempt to inject external facts, but a focused clarification of United's binding admissions. Reversal is warranted.

## B. Because United is not an MA plan or MAO, it is not entitled to preemption.

The plain text of 42 U.S.C. § 1395w-26(b)(3) governs this case, not agency interpretation. Here, the district court predicated its express preemption dismissal on two precedents: *Uhm* and *Aylward v. SelectHealth, Inc.*, 35 F.4th 673 (9th Cir. 2022)1-ER-9. However, the

48

district court's holding is erroneous in the post-*Chevron* era, where independent judicial analysis and determination not only supersede any agency deference–but they are explicitly required. The district court relied—*either directly or indirectly*—on the now-overruled doctrine of *Chevron* deference, allowing prior expanded agency interpretations–specifically expanded CMS interpretations–of statutes to control judicial outcomes. That is erroneous.

## C. CMS, not the statute, introduced the overbroad language preempting affiliates of MA organizations.

CMS *improperly* broadened the scope of the explicit congressional statute under § 1395w-26(b)(3). However, CMS implementing regulations cannot override the plain text of the Medicare Act and displace traditional state consumer protections absent express congressional authorization.

CMS's amended regulation extending express preemption to all MAO affiliates and downstream entities is invalid; and its regulation asserting that "all state laws" are preempted is likewise invalid. 2-ER-25. Under *Loper Bright*, if Congress intended express preemption to

49

apply to any and all persons and entities without MAO status, and as to any and all state laws- it would have said so. Administrative agencies cannot change the law. Many courts thereafter–including *Uhm and it progeny–Quishenberry and Escarcega*[11] in particular–relied on CMS's incorrectly expanded implementing regulation referencing *"all State standards",* language found nowhere in the statute. If Congress had intended that result, it would have said so. It did not.

In its initial proposed implementing rule for the 2003 amendment, CMS stated that: "[g]enerally applicable State tort, contract, or consumer protection law would not be preempted" because the preemption provision "was intended to preempt State standards governing health plans, not generally applicable State laws" or "contract laws and tort laws." 69 Fed. Reg. 46866, 46913 (Aug. 3, 2004). *Quishenberry,* 14 Cal. 5th at 1065, slip op. 12–13. That was fine because that interpretations reflected the statute's plain language.

However, CMS later improperly altered its position when it promulgated the final rule–presumably in response to industry lobbying

---

[11] *Escarcega v. Verdugo Vista Operating,* 2020 WL 1703181, at *5–6 (C.D. Cal. Apr. 8, 2020)

and pressure (2-ER-76)–concluding that "*all State standards, including those established through case law, are preempted to the extent they specifically would regulate MA plans, with exceptions of State licensing and solvency laws.* Other State health and safety standards, or generally applicable standards, that do not involve regulation of an MA plan are not preempted". *Uhm*, 620 F.3d 1134; *Quishenberry*, 14 Cal. 5th at 1078.

"As CMS explained in the final rule implementing the 2003 amendment, federal standards established under Part C supersede "*all State standards…*to the extent they specifically would regulate MA plans," other than "State licensing and solvency laws". MMA, 70 Fed. Reg. 4588, 4665 (Jan. 28, 2005). These include state statutory or regulatory provisions that specifically reference MA plans and duties established under generally applicable state law when invoked to regulate MA plans. *Quishenberry,* 14 Cal. 5th at 1071.

However, these cases were decided under *Chevron* and should no longer control this case. *Loper bright* precludes reliance on agency statutory interpretation. As such, the courts now interpret the plain language of the statute, not rely on CMS's expanded implementing regulations.

51

### D. CMS lacked authority to enlarge the text of the congressional statute.

Federal agencies may not rewrite or expand the scope of congressional statutes beyond their text. *Loper Bright Enters. v. Raimondo,* 144 S. Ct. 2337, 2354 (2024) ("Agencies have no special competence in resolving statutory ambiguities—they cannot override the judiciary's role in interpreting the law.") Analysis of §1395w-26(b)(3) shows that there is no express preemption except as to an "MAO" entity offering an "MA plan". Absent *deference* to CMS's (federal agency) expanded regulation including those under 42 C.F.R. § 422.2 which– is now invalidated under *Loper Bright*–neither *Quishenberry*, *Roberts*[12], nor *Escarcega* could have found preemption. Therefore, United's reliance on CMS's expanded implementing regulations are also "fundamentally misguided", because CMS lacks authority to enlarge the congressional statute. 2-ER-27.

Even if CMS previously had implied authority to interpret statutes under *Chevron*, that is no longer good law. *Chevron* prescribed that courts review the lawfulness of agency rules and decisions in a now discarded

---

[12] *Roberts v. United Healthcare Servs.*, 2 Cal. App. 5th 132 (2016).

"two step" process. First, courts evaluated whether a statute spoke clearly to the issue under review — if the statute was clear, "that [was] the end of the matter."

Second, if the statute was vague or ambiguous, and the agency's interpretation of the statute was permissible or reasonable, the reviewing court "deferred" to the agency's interpretation. In practice, this two-step formula often resulted in federal agencies exercising broad power in interpreting federal statutes. Applying so-called "Chevron deference", federal courts frequently deferred to the agency's "permissible construction" of the statute at issue–at that time. That was what evidently happened in *Uhm* and its progeny.

*Chevron* is dead. Even if *Chevron* wasn't over, in order for CMS to have added in own interpretations of "affiliates" and "downstream", there must have been some *ambiguity* in the original statue, and the interpretations must have been permissible. They were not.

42 U.S.C. § 1395w–26(b)(3) is unambiguous. CMS lacked authority to expand the statute to "all state laws" and any "affiliated" parties. CMS's amended interpretation was incorrect on multiple levels. 2-ER-76.

Lastly, pursuant to *Loper Bright*, CMS's expanded implementing

53

regulations for MA plans under 42 C.F.R. § 422.2 are also improper. CMS lacked authority to expand congressional text and statute. 2-ER-27.

### E. Courts have extended preemption reasoning too far—to preempt all claims against all United affiliates.

*Uhm* and its progeny have been cited over the past nearly two decades in support of broad preemption applications to "related to" unqualified third parties who are neither MAOs nor MA plans. 1-ER-9–11. This is contrary to the statute's plain language.

In granting dismissal, the district court explicitly relied on *Uhm* and *Aylward* to conclude that preemption applied even where United is not an MAO. 1-ER-11. But neither decision supports preemption in the circumstances here.

The district court erroneously reasoned that claims against non-MAO entities may still be preempted under § 1395w-26(b)(3) if those claims are "entirely derivative" of the entity's relationship with an MAO. In contrast, *Uhm* defendants had participated directly in marketing *CMS-approved* MA plans alongside an MAO, and the court found that such conduct was governed by federal standards and thus subject to express preemption. *Uhm*, 620 F.3d 1134. The district court here

54

explained that given precedent, it was "bound to accept" *Uhm's* interpretation. 1-ER-11. But *Uhm* must be applied on its facts, not to this new case.

In *Uhm*, this Court first analyzed the scope of Medicare Act preemption and noted that § 1395w-26(b)(3) supersedes state laws inconsistent with federal standards for MA plans. *Uhm*, 620 F.3d at 1142. *U*

*hm* involved defendants directly tied to a CMS-approved MA plan and its marketing materials, and acting in concert with an MAO. In contrast, Appellant's claims here are asserted against two non-MAO entities.

*Uhm* held that the plaintiffs' fraud in the inducement claims were preempted because they would require a determination that the marketing materials were misleading, which would directly conflict with CMS's prior determination that the materials were not misleading.

By striking contrast, neither Appellee here is an MAO, nor have they asserted that their marketing materials and communications were submitted to CMS for approval. Further, Appellant's claims arise from fraudulent disenrollment conduct and misrepresentations about plan

55

identity, not benefit administration—placing this case outside the scope of *Uhm's* preemption analysis. *Uhm*, 620 F.3d at 1157.

To the extent *Uhm* deferred to CMS's expanded agency interpretation of § 1395w–26(b)(3) of "affiliates" and "downstream entities", that reasoning predates *Loper Bright*, which now requires courts in new cases to independently interpret statutes without affording deference to agency views. While Appellant does not dispute the outcome in *Uhm* on its facts, the scope of § 1395w–26(b)(3) must now be plainly construed based on the statute's text, structure, and purpose. *Uhm* underscored significant limitations:

> "We emphasize that this holding does not mean that all common law fraud and fraud in the inducement claims would be preempted under the Act. The preemption inquiry turns on specific allegations forming the basis of those claims, not their labels." *Uhm*, 620 F.3d at 1157 n.35; 2-ER-89.

However, *Uhm's* progeny has expanded its preemption interpretation. This has resulted in serious downstream effects, impacting many unregulated entities and independent third-party producers. Here, United's fraudulent disenrollment of vulnerable beneficiaries from OM—*e.g.,* tricking seniors into losing OM and

unknowingly enrolling in an MA plan (3-ER-492, 510, 545–546)—is not preempted, particularly when the claims turn on common law fraud. Where disenrollment is the result of fraudulent concealment by separate legal entities that are not MAOs, general state consumer protection claims are not preempted. That is plain, actionable unlawful conduct.

Thus, there remains a meaningful distinction between the entities governed by the preemption clause—namely "*MA plan offered by an MAO*"—and the types of private third-party actors at issue here. The preemption statute is tailored to apply only to MA plan operations and their compliance with federal standards. It was not intended to improperly protect non-MAO entities from all liability. *Uhm, 620 F.3d 1134; Aylward, 35 F.4th 673.* U

### 1. hm's precedential value should be confined to its facts.

*Uhm* followed a somewhat unprecedented path before its final publication in 2010. The case was first argued and submitted on March 14, 2008; the initial opinion was filed on August 25, 2008; rehearing was granted and the opinion withdrawn on July 22, 2009. The final opinion was refiled in August 2010. It has since served as the leading Ninth Circuit and California authority on MA preemption.

57

In *Uhm*, Medicare beneficiaries brought a class action against the health care insurer, alleging failure to receive promised coverage for prescription drugs under Medicare Part D. They made claims including breach of contract and fraud in the inducement The district court dismissed the action, concluding that the standards promulgated by CMS under the Act governed the grievances that *Uhm* alleged in the complaint, and that *Uhm's* state law claims were therefore preempted by the Act's express preemption provision. The beneficiaries appealed.

Notably, in *Uhm,* this Court explicitly cited and relied in part on an amicus brief filed by CMS in that action. CMS cited to its own expanded agency implementing regulations of the 2003 amendment. Being nearly twenty years ago, *Uhm* seemed to apply CMS's expanded statutory interpretation of the preemption provision under § 1395w26(b)(3)relying–– on *Chevron* at that time.

Thus, *Uhm's* preemption analysis likely relied not just on the statute, but on CMS implementing and interpretive guidance. However, Congress did not grant CMS interpretive authority. *Loper Bright* now reinforces that statutory interpretation rests with the courts, not agencies.

Appellant does not ask this Court to overturn *Uhm*, but merely to apply it according to its own terms. Moreover, *stare decisis* does not require this Court to extend prior *Chevron*-era rulings beyond their original statutory context, particularly now that agency deference has been abrogated by *Loper Bright*.

In any event, *Uhm* is inapplicable to this case because it addressed conduct by a certified MAO–directly contracted with CMS, and it turned on a benefits determination. Those factual predicates do not exist here: neither UnitedHealth Group nor United Healthcare is an MAO or offers an MA plan. 2-ER-158–160, 209. Therefore, *Uhm* does not control where the defendants are not acting "with respect to" MA plans offered by MAOs. By further contrast, this case arises from deceptive marketing by non-MAO entities. *Uhm*'s claims arose from the administration of benefits–hence the claims were determined to be preempted. Here, Appellant is not seeking benefits, and its claims do not arise under the Medicare Act. *Uhm* is distinguishable on its face.

Finally, as discussed below, *Loper Bright* now requires courts to independently interpret whether § 1395w–26(b)(3) applies here at all.

**2. California courts have similarly overextended *Uhm*.**

California courts of last resort have at least twice interpreted Medicare Act Part C preemption, extending preemption to non-MAO entities.

The district court's ruling here relied on *Quishenberry*, a state court decision that both misread *Uhm* and was materially shaped by now-overruled agency deference. 1-ER-12–13. *Quishenberry*, 14 Cal. 5th 1057.

In *Quishenberry,* the California Supreme Court extended *Uhm* to non-MAO entities based on loosely alleged affiliations. *Quishenberry's* overbroad interpretation suffers from a fatal flaw–its failure to observe the plain text of § 1395w26(b)(3)– which applies only to laws "*with respect to MA plans…*" *Quishenberry* also disregarded statutory limits—although it did acknowledge that "*claims against providers, doctors are not preempted.*" 2-ER-104–105. *Quishenberry* is no longer good law insofar as it relied on *Chevron*, overruled in *Loper Bright*. *Quishenberry* determined that Congress intended the MA standards to supersede any state-law duties related to MA plans, regardless of whether those duties arise from statutory or common law, and even if they are consistent with federal standards. *Quishenberry's* flawed interpretation threatens to

preempt any overlapping state-law duty—and risks encompassing non-MAOs if their conduct merely "relates to" Medicare standards.

Notably, *Quishenberry* also did not recognize that Medicare Parts A and B have no preemption clause—making fraudulent disenrollment claims like Appellant's materially different. 1-ER-12; 2-ER-100–101.

Similarly, *Roberts* expanded *Uhm* and preempted claims against a non-MAO based solely on corporate affiliation. *Roberts,* 2 Cal. App. 5th 132. 2-ER-190. *Roberts* affirmed dismissal of state-law claims—unfair competition, unjust enrichment, and elder abuse—based on allegedly misleading MA plan marketing materials. But *Roberts* faltered because it failed to examine whether the defendant, United Healthcare Services, Inc. ("UHSI"), was itself a CMS-contracted MAO. It did not distinguish UHSI from UHIC, the actual MAO. *Robert* incorrectly preempted a non-MAO affiliate without factually analyzing whether CMS standards governed the disputed conduct at all. 2-ER-94–95.

This case is materially distinguishable from both *Roberts* and *Quishenberry*. Appellant's claims arise from misrepresentations causing disenrollment from OM. 3-ER-434. *Roberts*, by contrast, turned on CMS pre-approval of the MAO's marketing materials—a fact not present here.

61

*Roberts* illustrates the broader judicial drift of § 1395w-26(b)(3) beyond its plain text, underscoring the danger of expanding preemption to loosely affiliated, non-MAO entities. 2-ER-94–95, 190,194.

Both federal and California rules of statutory construction support that the plain language of a statute controls where the text is unambiguous, regardless of an agency's contrary or expanded interpretation. Under these principles, courts first examine the statutory text and legislative purpose. The statute at issue–42 U.S.C. § 1395w-26(b)(3) uses– the phrase "*with respect to*". The plain meaning of that phrase is "concerning" or "relating to" the operation of MA plans themselves. After *Chevron*, *"with respect to"* has plain meaning. At its core, *Quishenberry* entirely hinged on *Chevron*, but under *Loper Bright,* there should be no deference given to CMS's improper agency interpretation of § 1395w-26(b)(3).

The district court relied on an incorrect preemption standard that an entity "participated alongside" an MAO–which does not meet the statutory definition of an MAO. 1-ER-10–11; 3-ER-429–430.

The district court was bound to independently interpret (1) the plain meaning of "*with respect to MA plans offered by MA organizations*",

(2) the precise statutory definition of an MAO, and (3) determine whether that language expressly applied to United. It did not.

Finally, United–and in turn the district court–referenced an unpublished federal decision, that preemption may apply when downstream actors participate in the administration of MA plans. *Escarcega*, 2020 WL 1703181, at *5–6. (citing the regulatory definitions of "first tier" and "downstream" entities). 2-ER-19, 94. But *Escarcega* is distinguished because it involved CMS-regulated conduct. 2-ER-23, 26–27. Section 1395w-26(b)(3) applies only to MAO entities contracting directly with CMS. The statute contains no language extending preemption to affiliates, downstream entities, or parent companies of MAOs. Nor may courts disregard corporate separateness: each entity is presumed distinct—even if misleadingly branded.

Therefore, this action was not preempted because neither the statutory nor factual predicates were satisfied.

### 3. Aylward is inapplicable to this case.

The district court also relied on *Aylward v. SelectHealth, Inc.*, 35 F.4th 673 (9th Cir. 2022), which involved claims against an MAO. 2-ER-12. That predicate is not met here. United is not an MAO and does not

offer an MA plan. 2-ER-158–160, 209. *Aylward* found preemption where the state-law duty related to MA plan operations and the defendant was an MAO. Neither *Uhm* nor *Aylward* addressed whether preemption extends to independent marketing entities operating outside the CMS regulatory framework. Finally, both cases were decided under *Chevron*-era deference, which *Loper Bright* has since abrogated. This case warrants a *de novo* review of the statute.

### F.  Following Loper Bright, courts may no longer defer to CMS agency regulatory interpretations.

> *"Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority… Courts may not defer to an agency interpretation of the law simply because a statute is ambiguous."—Loper Bright,* slip op. at *35.*

After *Loper Bright*, courts must independently interpret the Medicare preemption statute without deference to CMS agency regulations or implementing definitions. Appellees conceded in this action that they are neither MA plans nor MAOs. Accordingly, they are not entitled to invoke preemption under § 1395w-26(b)(3), which applies only to *"MA plans offered by MA organizations"*. The Court should not defer to CMS's expanded agency definitions of MAOs to downstream entities—to do so would be improper under *Loper Bright*.

64

*On the morning of June 14, 2024[13]–less than 24 hours after the district court heard oral argument in this case*–and again on June 28, 2024, the Supreme Court issued two controlling decisions overturning *Chevron*, which now require courts to interpret the congressional statutes, and not give deference to federal agency interpretations of regulations. 2-ER-46. These decisions materially impact United's express preemption claims.

United argued that *Chevron* was immaterial to *Uhm* and its progeny (2-ER-17). But without CMS's amicus brief in *Uhm*, and courts deferring to CMS's expanded agency interpretation of (b)(3), the plain text of the statute–"*with respect to MA plans offered by MAO*"– would have controlled. No such language about "affiliates" or "downstream entities" appears in the congressional text.

Although *Loper Bright* does not disturb settled judicial precedent under *stare decisis*, it does require courts to cease deferring to agency

_____

[13] Appellant submitted its letter brief on June 14, 2024—hours after oral argument—informing the court of the U.S. Supreme Court's decision in *Garland v. Cargill, 602 U.S. 406 (2024)*, issued that same morning. (Dkt. No. 35 was ordered stricken under Dkt. No. 38, and is cited here solely for procedural context.)

interpretations *going forward.* To the extent prior cases rested on Chevron-based deference to CMS, their reasoning does not apply to this case. This case warrants reexamination under the correct interpretive framework—independent judicial construction of the statute's plain text.

Accordingly, the district court cannot rely on decisions which defer to or rely upon CMS's expanded agency implementing regulations and interpretations of the Medicare Act. The very foundation for the broad preemption readings in those cases has arguably been eliminated. Any judicial presumption that CMS's regulatory framework or interpretation of its own jurisdiction (*e.g.,* the scope of § 1395w-26(b)(3)) must be accepted simply because CMS adopted it, is now improper.

More critically, the statute at issue has no explicit language delegating to CMS the power to define the scope of express preemption. Under *Loper Bright*, courts may no longer defer to an agency's views about the meaning of *unambiguous* statutory terms including, "*with respect to*" or "*MA organizations*". Instead, the judiciary must interpret those terms based on statutory text, context, and traditional canons of statutory construction.

Thus, *prior precedents*–to the extent they deferred to CMS's

66

expanded construction–are no longer reliable for this new case. Here, the district court cited CMS's role in administering MA plans and its presumed promulgation of standards as justification for preemption. 1-ER-11. However, United presented no evidence that, as a non-MAO, that its disputed misleading materials were ever submitted to CMS. But post-*Loper Bright*, that analysis is incomplete and erroneous**.** The district court was required to determine whether the federal statute—by its own terms—preempts state law claims brought against non-MAO defendants. It did not do so.

In sum, this Court should apply a *de novo* preemption analysis, discard reliance on agency precedents premised on now-invalid *Chevron* deference, and independently determine whether the statute at issue explicitly preempts these non-MAO parties and claims.

This action should not have been dismissed–not at the pleading stage. Accordingly, this Court should *reverse.*

## G. Circuit Courts are applying Loper Bright and rejecting similar agency overreach.

This Court has already begun applying *Loper Bright* in other statutory contexts, affirming that courts exercise their independent

judgment in deciding whether an agency has acted within its statutory authority. *Lopez v. Garland*, 116 F.4th 1032, 1036 (9th Cir. 2024).

In January 2025, the Sixth Circuit similarly implemented *Loper Bright In re MCP No. 185 Open Internet Rule* (FCC 24-52), also captioned *Ohio Telecom Association v. FCC*. It vacated the FCC's 2024 net neutrality rules, concluding that the FCC lacked statutory authority under the Communications Act to reclassify broadband as a "telecommunications service".

*Ohio Telecom* carries broad implications because courts are no longer required to defer to an agency's interpretation merely because a statute is ambiguous. Instead, courts must undertake their own independent reading of the statute's text and structure. The Sixth Circuit scrutinized the statutory text itself and determined that Congress had not delegated authority to the FCC to promulgate the challenged net neutrality rule.

The Sixth Circuit's reasoning reflects a significant doctrinal shift: *agencies are no longer presumed to have interpretive supremacy*. This principle applies not just to the FCC but across the administrative state, including CMS. The rationale applies equally here, where CMS exceeded

its agency authority and expanded the definition of an MAO beyond 42 U.S.C. § 1395w–28(a)(1), and expanded MA preemption beyond § 1395w-26(b)(3). CMS's expanded interpretation of the statute does not bind this court. In contrast to *Ohio Telecom,* however,  § 1395w-26(b)(3) is *not ambiguous*.

Congress has not broadened the MA preemption provision in twenty-two years, confirming its current limited scope. This Court should undertake a *de novo* interpretation of 42 U.S.C. § 1395w-26(b)(3) in its original scope–not defer to expanded CMS agency interpretations.

In sum, United is not an MAO, the Medicare preemption statute is unambiguous, and under *Loper Bright*, the judiciary—not CMS—must determine the statute's meaning. CMS's expanded implementing regulations are not controlling here, and the district court's dismissal based on preemption of MAO "affiliates" should be reversed.

## III.  THIS ACTION IS NOT IMPLIEDLY PREEMPTED BECAUSE IT DOES NOT INTRUDE ON CMS'S REGULATORY AUTHORITY OVER MA PLANS.

The district court relied not only on express preemption under 42 U.S.C. § 1395w-26(b)(3) to dismiss, but also erroneously adopted United's back-up implied preemption theory without any statutory basis–even

though United admitted it was not an MA plan or MAO (2-ER-158-160). 1-ER-10–11; 2-ER-103, 194.

Appellant challenged United's direct-to-consumer oral and written misrepresentations—statements about Original Medicare and commercial plan features never subject to CMS review or approval, expressly or impliedly. 3-ER-452. The court acknowledged United's non-MAO status (1-ER-11)–and United never asserted that it submitted the disputed marketing materials to CMS for approval. Because CMS took no action and had no opportunity to do so, Appellant's claims do not interfere with federal authority. There is no regulatory conflict–only state-law consumer fraud.

California's generally applicable laws govern fraud, elder abuse, and consumer deception. Appellant's claims neither conflict with nor supplement any federal standard, and are directed at non-MAO entities fraudulently marketing commercial plans to seniors. The presumption against preemption applies, especially where no clear congressional intent exists to displace traditional state police powers.

Appellant's claims are not impliedly preempted because they neither intrude on CMS authority nor frustrate MA administration. This

case concerns deceptive concealment of what Original Medicare is–which has no preemption clause. In contrast, *Uhm* involved materials submitted to CMS. United makes no claim here that its marketing materials were reviewed or approved by CMS. Further, as a non-MAO, it lacked any CMS contract or submission pathway. Obviously, CMS could not approve fraudulent materials it never received.

## IV.   LEAVE TO AMEND SHOULD HAVE BEEN GRANTED BECAUSE APPELLANT HAS UNCOVERED THAT OTHER GROUNDS FOR THIS ACTION EXIST.

The district court acknowledged that leave to amend should be "*freely given*," but denied leave here on the legal ground that amendment would be futile due to express preemption under 42 U.S.C. § 1395w-26(b)(3). 1-ER-12–13. Appellant respectfully disagrees. Leave to amend should have been granted because Appellant uncovered additional factual and legal grounds for this action that fall outside the scope of preemption.

Although a district court's denial of leave to amend is generally reviewed for abuse of discretion, where, as here, the denial rests on a conclusion of "futility," the underlying legal determination is reviewed *de novo*. *Moss*, 572 F.3d at 972.

71

This Court should *reverse* because amendment would not be futile.

## A. Amendment would allege that United fraudulently induced California regulators to issue it a license.

If permitted leave to amend, Appellant would allege that United fraudulently induced the California licensing agency into issuing it a license to operate as a health plan in the state by submitting false or misleading statements during the application process, and then knowingly breached conditions of that license.

Such allegations fall squarely outside the scope of express preemption. Section 1395w-26(b)(3) explicitly preserves state licensing laws, stating they *shall not be superseded* by MA standards. Under *Twombly*, these new allegations would be facially sufficient to survive dismissal. 1-ER-7–8. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

## B. Amendment would clarify that United is not an MA plan or MA organization.

Appellant would further plead, based on United's binding discovery admissions (as raised below, *e.g.* 2-ER-23, 25, 133, 202, 420), that neither Appellee–UnitedHealth Group Inc. nor United Healthcare Inc.–is an MA plan or an MAO. 2-ER-158–160. Therefore, neither can invoke the express preemption protection clause at § 1395w-26(b)(3) which applies

only to "*MA plans offered by MA organizations*".

United did not dispute its non-MAO status–instead it argued that there was "*no risk of irreparable prejudice*" from the district court not considering its binding admissions. 2-ER-122. But the prejudice was dismissal. Notwithstanding the district court's express acknowledgement that "*defendants in this case are not MA Organizations*", it treated both United Appellees as though they were MAOs entitled to full federal preemption. 1-ER-8; *also* 2-ER-156-158,163. The statute does not apply to non-MAOs. That prejudicial error alone warrants reversal, and underscores why leave to amend should have been granted.

Appellant could not plead United's non-MAO status when it filed the original complaint six months prior–because those facts were not reasonably known. 1-ER-10, 2-ER-119. Once discovery revealed that United disclaimed MAO status, the district court should have granted leave to plead those facts. 2-ER-184.

Appellant would also allege state law claims for breach of oral and implied contract, and breach of the implied covenant of good faith and fair dealing, based on United's failure to honor its promise–specifically, that new enrollees would fully retain OM and supplement it with an

73

'additional' MA plan as 'backup' coverage. 3-ER-545. These contract claims involve evaluation of United's own promises and representations made to consumers. They do not impose obligations on MAOs, and are thus not expressly preempted. *Lokken*, 2025 WL 587493.

Finally, Appellant would name additional defendants to the fraudulent inducement and implied contract claims–specifically, United's third-party, independent marketing companies and producers.

## C. Amendment would not be futile under Loper Bright's clarified legal standard.

*Loper Bright* requires courts to interpret statutes independently and without agency deference. United has argued to decouple the statute from its express limitations. It claimed that preemption turns on the existence of a federal standard rather than the identity of the defendants. United argued that "the Estate never explains how it could come up with new allegations to avoid preemption". 2-ER-186. That assertion is incorrect. United routinely wields "preemption" as what many have characterized as its "*get-out-of-jail-free card*"–a sword and shield against any and all liability for fraud and abuse–a sword which Congress never intended. 3-ER-420; 2-ER-91. Congress limited preemption to specific

74

MA plans and MAO entities under CMS oversight–not as broad immunity for all bad actors vaguely related to or promoting MA plans.

The district court held that "*for the same reasons…in Uhm, this Court is not persuaded by Appellant's argument that its claims are not preempted because…[Defendants] are not MA Organizations*". 1-ER-10.

But now, applying § 1395w26(b)(3)'s– plain text pursuant to *Loper Bright*–without agency deference, such a reading of *Uhm* ignores the statutory language. It provides that federal standards preempt state laws only "*with respect to MA plans…offered by MA organizations*". Because United is not an MAO or MA plan, preemption does not apply.

The district court's "futility" finding was legally flawed under the governing standard because it relied on an overbroad agency interpretation. Because an amended complaint would allege facts falling outside that limited scope, amendment would not be futile.

### D. Appellant explicitly requested leave to amend.

The Supreme Court emphasized that leave to amend should be freely given, a principle this Court has echoed. *Foman v. Davis*, 371 U.S. 178 (1962); *Eminence Capital v. Aspeon*, 316 F.3d 1048 (9th Cir. 2003).

Appellant expressly requested leave to amend, supported by

United's binding discovery responses. 2-ER-439. The district court acknowledged that the named "*defendants in this case are not MA Organizations*". 1-ER-8. Since neither Appellee is an MAO, Appellant can plausibly plead facts sufficient to avoid preemption under 42 U.S.C. § 1395w–26(b)(3). These newly uncovered facts rendered amendment appropriate and necessary.

Leave to amend should have been granted, if required. *Twombly,* 550 U.S. at 544; *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009); *Moss*, 572 F.3d at 972.

No undue delay or prejudice exists to United, and only one complaint has been filed. Appellant filed its claims in good faith, and is prepared to promptly cure any pleading defects through amendment. *Johnson v. Mammoth Recreations*, 975 F.2d 604, 607 (9th Cir. 1992).

For all these reasons, this Court should reverse and remand with instructions to permit amendment–if required.

## V.   THE MEDICARE ACT WAS NOT DESIGNED TO COMPEL DISMISSAL OF CASES LIKE THIS ONE.

Notwithstanding the central reasons for appeal–(1) state laws of general applicability are not preempted; (2) United is not an MA plan or

an MAO, and therefore not entitled to preemption; and (3) the district court incorrectly denied leave to amend based on "futility"–dismissal of this case is at odds with the MMA, and the broader statutory framework designed to protect *elderly, disabled, marginalized, and financially constrained* government health beneficiaries.

This case is not about disrupting MA plans or CMS's role. This suit is about generally applicable consumer protection and sending a clear message to America's largest health insurer that its reign of unlawful conduct and financial abuse of vulnerable populations must end.

The purpose of the 2003 revision, and the Medicare Act more broadly, is to preempt only claims against "*MA plans offered by MA organizations*". 42 U.S.C. § 1395w–26(b)(3)– does not reach non-MAO holding companies and third-party producers, or non-MAOs deliberately operating wholly outside the MA regulatory framework.

It stands to reason when a defendant admits that it is not an MAO, nor an MA plan, nor subject to regulation by CMS–as happened here–there is no preemption whatsoever. 2-ER-158–159.

The more appropriate question is not whether preemption exists in theory, but whether it was intended to shield the precise conduct alleged

here—namely, *predatory marketing targeting vulnerable populations–like those with Alzheimer's (1-ER-6; 3-ER-492, 512, 537)* funneled through non-MAO entities that deliberately bypass federal scrutiny. If Congress had intended MAOs to delegate marketing through shell affiliates and independent "confidential" websites (2-ER-219) beyond CMS regulatory review, it would have said so. It did not.

Legal scholars have described preemption as America's "*corporate get-out-of-jail-free card*" (3-ER-420), but it is *not limitless*. The preemption statute clearly applies only to "*MA plans offered by MA organizations*". Preemption does not protect non-MAO corporations or affiliates, purportedly "participating alongside" MAOs. 1-ER-10,11; 3-ER-425. There must be reasonable judicial checks and balances on "scams" against vulnerable populations. 3-ER-330–331. United's conduct, as alleged here, is not an isolated incident but part of a systemic and deliberate course of conduct. *See e.g.*, 3-ER-307, 555. MA preemption is not a catchall, and United should not be immune from its known unlawful acts. 3-ER-425; also 2-ER-89, 203, ¶¶7,10.

The district court erred by holding that preemption applies to United even though it is not an MAO, so long as it "participated

alongside" an MAO in marketing. 1-ER-11. But United made no such assertion. The referenced MAO (UHIC) is not a party to this action. Treating every United "affiliate" as a federal actor—converting all 4000+ such entity affiliates into federal employees shielded by federal preemption–is a catastrophic outcome which Congress did not intend. That would result in lawlessness–which is not hypothetical. 2-ER-90-91, 103, 111; 3-ER-300, 328, 491, 495.

*Loper Bright* established that courts may not defer to an agency's interpretation when it expands unambiguous statute, or departs from statutory text.

This case presents an opportunity and ideal vehicle for this Court— especially in light of *Loper Bright*—to give effect to Congress's clear directive and restore appropriate statutory limits on Medicare Advantage preemption.

## CONCLUSION

For the foregoing reasons, the district court's order should be *reversed* and this action permitted to procced on its merits.

Dated: August 7, 2025                  Respectfully submitted,

/S/AllyAlain

Ally Alain, Esq. (Cal. Bar 345524)

ALLY LAW

28202 Cabot Road, Third Floor

Laguna Niguel, California 92677

Tel: 949-799-2232

Email: aa@thegjlaw.com

*Attorneys for Appellant-Plaintiff*

# STATEMENT OF RELATED CASES

Pursuant to Circuit Rule 28-2.6, the undersigned counsel for Appellant is not aware of any related cases currently pending before this Court.

August 7, 2025          /S/AllyAlain

Ally Alain

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 25-2746

I am the attorney or self-represented party.

**This brief contains** 13,991 **words,** including [      ] words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

⦿ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated [          ].

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** S/AllyAlain **Date** August 7, 2025

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**                                                                                  *Rev. 12/01/22*

82

# CERTIFICATE OF SERVICE

I certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellateCM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.


August 8, 2025                    /S/AllyAlain
                                  Ally Alain

# ADDENDUM

# TABLE OF CONTENTS

42 U.S.C. § 1395w–26(b)(3) ...............................Add. 3

42 U.S.C. §1395w–28(b)(1) .......................................Add. 5

42 C.F.R. §§422.2265 42 .......................................Add. 15

42 U.S.C. §1395w–28(b)(1) .......................................Add. 18

**42 USC 1395w-26: Establishment of standards**
Text contains those laws in effect on August 7, 2025

**From Title 42-THE PUBLIC HEALTH AND WELFARE**
　　　CHAPTER 7-SOCIAL SECURITY
　　　SUBCHAPTER XVIII-HEALTH INSURANCE FOR AGED AND DISABLED
　　　Part C-Medicare+Choice Program
**Jump To:**
　　　**Source Credit**
　　　**Miscellaneous**
　　　**Amendments**
　　　**Change of Name**
　　　**Effective Date**

# §1395w–26. Establishment of standards

## (a) Establishment of solvency standards for provider-sponsored organizations

### (1) Establishment

#### (A) In general

The Secretary shall establish, on an expedited basis and using a negotiated rulemaking process under subchapter III of chapter 5 of title 5, standards described in section 1395w–25(c)(1) of this title (relating to the financial solvency and capital adequacy of the organization) that entities must meet to qualify as provider-sponsored organizations under this part.

#### (B) Factors to consider for solvency standards

In establishing solvency standards under subparagraph (A) for provider-sponsored organizations, the Secretary shall consult with interested parties and shall take into account-
　　　(i) the delivery system assets of such an organization and ability of such an organization to provide services directly to enrollees through affiliated providers,
　　　(ii) alternative means of protecting against insolvency, including reinsurance, unrestricted surplus, letters of credit, guarantees, organizational insurance coverage, partnerships with other licensed entities, and valuation attributable to the ability of such an organization to meet its service obligations through direct delivery of care, and
　　　(iii) any standards developed by the National Association of Insurance Commissioners specifically for risk-based health care delivery organizations.

#### (C) Enrollee protection against insolvency

Such standards shall include provisions to prevent enrollees from being held liable to any person or entity for the Medicare+Choice organization's debts in the event of the organization's insolvency.

### (2) Publication of notice

In carrying out the rulemaking process under this subsection, the Secretary, after consultation with the National Association of Insurance Commissioners, the American Academy of Actuaries, organizations representative of medicare beneficiaries, and other interested parties, shall publish the notice provided for under section 564(a) of title 5 by not later than 45 days after August 5, 1997.

### (3) Target date for publication of rule

As part of the notice under paragraph (2), and for purposes of this subsection, the "target date for publication" (referred to in section 564(a)(5) of such title) shall be April 1, 1998.

### (4) Abbreviated period for submission of comments

In applying section 564(c) of such title under this subsection, "15 days" shall be substituted for "30 days".

### (5) Appointment of negotiated rulemaking committee and facilitator

The Secretary shall provide for-
　　　(A) the appointment of a negotiated rulemaking committee under section 565(a) of such title by not later than 30 days after the end of the comment period provided for under section 564(c) of such title (as shortened under paragraph (4)), and
　　　(B) the nomination of a facilitator under section 566(c) of such title by not later than 10 days after the date of appointment of the committee.

### (6) Preliminary committee report

The negotiated rulemaking committee appointed under paragraph (5) shall report to the Secretary, by not later than January 1, 1998, regarding the committee's progress on achieving a consensus with regard to the rulemaking proceeding and whether such consensus is likely to occur before 1 month before the target date for publication of the rule. If the committee reports that the committee has failed to make significant progress towards such consensus or is unlikely to reach such consensus by the target date, the Secretary may terminate such process and provide for the publication of a rule under this subsection through such other methods as the Secretary may provide.

### (7) Final committee report

Add. 003

If the committee is not terminated under paragraph (6), the rulemaking committee shall submit a report containing a proposed rule by not later than 1 month before the target date of publication.

**(8) Interim, final effect**

The Secretary shall publish a rule under this subsection in the Federal Register by not later than the target date of publication. Such rule shall be effective and final immediately on an interim basis, but is subject to change and revision after public notice and opportunity for a period (of not less than 60 days) for public comment. In connection with such rule, the Secretary shall specify the process for the timely review and approval of applications of entities to be certified as provider-sponsored organizations pursuant to such rules and consistent with this subsection.

**(9) Publication of rule after public comment**

The Secretary shall provide for consideration of such comments and republication of such rule by not later than 1 year after the target date of publication.

**(b) Establishment of other standards**

**(1) In general**

The Secretary shall establish by regulation other standards (not described in subsection (a)) for Medicare+Choice organizations and plans consistent with, and to carry out, this part. The Secretary shall publish such regulations by June 1, 1998. In order to carry out this requirement in a timely manner, the Secretary may promulgate regulations that take effect on an interim basis, after notice and pending opportunity for public comment.

**(2) Use of current standards**

Consistent with the requirements of this part, standards established under this subsection shall be based on standards established under section 1395mm of this title to carry out analogous provisions of such section.

**(3) Relation to State laws**

The standards established under this part shall supersede any State law or regulation (other than State licensing laws or State laws relating to plan solvency) with respect to MA plans which are offered by MA organizations under this part.

**(4) Prohibition of midyear implementation of significant new regulatory requirements**

The Secretary may not implement, other than at the beginning of a calendar year, regulations under this section that impose new, significant regulatory requirements on a Medicare+Choice organization or plan.

(Aug. 14, 1935, ch. 531, title XVIII, §1856, as added Pub. L. 105–33, title IV, §4001, Aug. 5, 1997, 111 Stat. 317 ; amended Pub. L. 106–554, §1(a)(6) [title VI, §§612(a), 614(a)], Dec. 21, 2000, 114 Stat. 2763 , 2763A–560; Pub. L. 108–173, title II, §232(a), Dec. 8, 2003, 117 Stat. 2208 .)

**EDITORIAL NOTES**

**AMENDMENTS**

2003-Subsec. (b)(3). Pub. L. 108–173 reenacted heading without change and amended text generally. Prior to amendment, text consisted of subpars. (A) and (B) stating general rule and listing standards specifically superseded.
2000-Subsec. (b)(3)(B)(i). Pub. L. 106–554, §1(a)(6) [title VI, §614(a)(1)], inserted "(including cost-sharing requirements)" after "Benefit requirements".
Subsec. (b)(3)(B)(iv). Pub. L. 106–554, §1(a)(6) [title VI, §614(a)(2)], added cl. (iv).
Subsec. (b)(4). Pub. L. 106–554, §1(a)(6) [title VI, §612(a)], added par. (4).

**STATUTORY NOTES AND RELATED SUBSIDIARIES**

**CHANGE OF NAME**

References to Medicare+Choice deemed to refer to Medicare Advantage or MA, subject to an appropriate transition provided by the Secretary of Health and Human Services in the use of those terms, see section 201 of Pub. L. 108–173, set out as a note under section 1395w–21 of this title.

**EFFECTIVE DATE OF 2000 AMENDMENT**

Pub. L. 106–554, §1(a)(6) [title VI, §612(b)], Dec. 21, 2000, 114 Stat. 2763 , 2763A–560, provided that: "The amendment made by subsection (a) [amending this section] takes effect on the date of the enactment of this Act [Dec. 21, 2000]."
Pub. L. 106–554, §1(a)(6) [title VI, §614(b)], Dec. 21, 2000, 114 Stat. 2763 , 2763A–561, provided that: "The amendments made by subsection (a) [amending this section] take effect on the date of the enactment of this Act [Dec. 21, 2000]."

**42 USC 1395w-28: Definitions; miscellaneous provisions**
Text contains those laws in effect on August 3, 2025

**From Title 42-THE PUBLIC HEALTH AND WELFARE**
      CHAPTER 7-SOCIAL SECURITY
      SUBCHAPTER XVIII-HEALTH INSURANCE FOR AGED AND DISABLED
      Part C-Medicare+Choice Program
**Jump To:**
      <u>Source Credit</u>
      <u>Miscellaneous</u>
      <u>References In Text</u>
      <u>Amendments</u>
      <u>Change of Name</u>
      <u>Effective Date</u>
      <u>Regulations</u>

## §1395w–28. Definitions; miscellaneous provisions

**(a) Definitions relating to Medicare+Choice organizations**

In this part-

**(1) Medicare+Choice organization**

The term "Medicare+Choice organization" means a public or private entity that is certified under section 1395w–26 of this title as meeting the requirements and standards of this part for such an organization.

**(2) Provider-sponsored organization**

The term "provider-sponsored organization" is defined in section 1395w–25(d)(1) of this title.

**(b) Definitions relating to Medicare+Choice plans**

**(1) Medicare+Choice plan**

The term "Medicare+Choice plan" means health benefits coverage offered under a policy, contract, or plan by a Medicare+Choice organization pursuant to and in accordance with a contract under section 1395w–27 of this title.

**(2) Medicare+Choice private fee-for-service plan**

The term "Medicare+Choice private fee-for-service plan" means a Medicare+Choice plan that-

(A) reimburses hospitals, physicians, and other providers at a rate determined by the plan on a fee-for-service basis without placing the provider at financial risk;

(B) does not vary such rates for such a provider based on utilization relating to such provider; and

(C) does not restrict the selection of providers among those who are lawfully authorized to provide the covered services and agree to accept the terms and conditions of payment established by the plan.

Nothing in subparagraph (B) shall be construed to preclude a plan from varying rates for such a provider based on the specialty of the provider, the location of the provider, or other factors related to such provider that are not related to utilization, or to preclude a plan from increasing rates for such a provider based on increased utilization of specified preventive or screening services.

**(3) MSA plan**

**(A) In general**

The term "MSA plan" means a Medicare+Choice plan that-

(i) provides reimbursement for at least the items and services described in section 1395w–22(a)(1) of this title in a year but only after the enrollee incurs countable expenses (as specified under the plan) equal to the amount of an annual deductible (described in subparagraph (B));

(ii) counts as such expenses (for purposes of such deductible) at least all amounts that would have been payable under parts A and B, and that would have been payable by the enrollee as deductibles, coinsurance, or copayments, if the enrollee had elected to receive benefits through the provisions of such parts; and

(iii) provides, after such deductible is met for a year and for all subsequent expenses for items and services referred to in clause (i) in the year, for a level of reimbursement that is not less than-

(I) 100 percent of such expenses, or

(II) 100 percent of the amounts that would have been paid (without regard to any deductibles or coinsurance) under parts A and B with respect to such expenses,

whichever is less.

**(B) Deductible**

The amount of annual deductible under an MSA plan-

(i) for contract year 1999 shall be not more than $6,000; and

(ii) for a subsequent contract year shall be not more than the maximum amount of such deductible for the previous contract year under this subparagraph increased by the national per capita Medicare+Choice growth percentage under section

**Add. 005**

If the amount of the deductible under clause (ii) is not a multiple of $50, the amount shall be rounded to the nearest multiple of $50.

### (4) MA regional plan

The term "MA regional plan" means an MA plan described in section 1395w–21(a)(2)(A)(i) of this title-

(A) that has a network of providers that have agreed to a contractually specified reimbursement for covered benefits with the organization offering the plan;

(B) that provides for reimbursement for all covered benefits regardless of whether such benefits are provided within such network of providers; and

(C) the service area of which is one or more entire MA regions.

### (5) MA local plan

The term "MA local plan" means an MA plan that is not an MA regional plan.

### (6) Specialized MA plans for special needs individuals

#### (A) In general

The term "specialized MA plan for special needs individuals" means an MA plan that exclusively serves special needs individuals (as defined in subparagraph (B)) and that, as of January 1, 2010, meets the applicable requirements of paragraph (2), (3), or (4) of subsection (f), as the case may be.

#### (B) Special needs individual

The term "special needs individual" means an MA eligible individual who-

(i) is institutionalized (as defined by the Secretary);

(ii) is entitled to medical assistance under a State plan under subchapter XIX; or

(iii) meets such requirements as the Secretary may determine would benefit from enrollment in such a specialized MA plan described in subparagraph (A) for individuals with severe or disabling chronic conditions who-

(I) before January 1, 2022, have one or more comorbid and medically complex chronic conditions that are substantially disabling or life threatening, have a high risk of hospitalization or other significant adverse health outcomes, and require specialized delivery systems across domains of care; and

(II) on or after January 1, 2022, have one or more comorbid and medically complex chronic conditions that is life threatening or significantly limits [1] overall health or function, have a high risk of hospitalization or other adverse health outcomes, and require intensive care coordination and that is listed under subsection (f)(9)(A).

The Secretary may apply rules similar to the rules of section 1395eee(c)(4) of this title for continued eligibility of special needs individuals.

## (c) Other references to other terms

### (1) Medicare+Choice eligible individual

The term "Medicare+Choice eligible individual" is defined in section 1395w–21(a)(3) of this title.

### (2) Medicare+Choice payment area

The term "Medicare+Choice payment area" is defined in section 1395w–23(d) of this title.

### (3) National per capita Medicare+Choice growth percentage

The "national per capita Medicare+Choice growth percentage" is defined in section 1395w–23(c)(6) of this title.

### (4) Medicare+Choice monthly basic beneficiary premium; Medicare+Choice monthly supplemental beneficiary premium

The terms "Medicare+Choice monthly basic beneficiary premium" and "Medicare+Choice monthly supplemental beneficiary premium" are defined in section 1395w–24(a)(2) of this title.

### (5) MA local area

The term "MA local area" is defined in section 1395w–23(d)(2) of this title.

## (d) Coordinated acute and long-term care benefits under Medicare+Choice plan

Nothing in this part shall be construed as preventing a State from coordinating benefits under a medicaid plan under subchapter XIX with those provided under a Medicare+Choice plan in a manner that assures continuity of a full-range of acute care and long-term care services to poor elderly or disabled individuals eligible for benefits under this subchapter and under such plan.

## (e) Restriction on enrollment for certain Medicare+Choice plans

### (1) In general

In the case of a Medicare+Choice religious fraternal benefit society plan described in paragraph (2), notwithstanding any other provision of this part to the contrary and in accordance with regulations of the Secretary, the society offering the plan may restrict the enrollment of individuals under this part to individuals who are members of the church, convention, or group described in paragraph (3)(B) with which the society is affiliated.

### (2) Medicare+Choice religious fraternal benefit society plan described

For purposes of this subsection, a Medicare+Choice religious fraternal benefit society plan described in this paragraph is a Medicare+Choice plan described in section 1395w–21(a)(2) of this title that-

(A) is offered by a religious fraternal benefit society described in paragraph (3) only to members of the church, convention, or group described in paragraph (3)(B); and

(B) permits all such members to enroll under the plan without regard to health status-related factors.

Nothing in this subsection shall be construed as waiving any plan requirements relating to financial solvency.

### (3) "Religious fraternal benefit society" defined

For purposes of paragraph (2)(A), a "religious fraternal benefit society" described in this section is an organization that-

(A) is described in section 501(c)(8) of the Internal Revenue Code of 1986 and is exempt from taxation under section 501(a) of such Act;

(B) is affiliated with, carries out the tenets of, and shares a religious bond with, a church or convention or association of churches or an affiliated group of churches;

(C) offers, in addition to a Medicare+Choice religious fraternal benefit society plan, health coverage to individuals not entitled to benefits under this subchapter who are members of such church, convention, or group; and

(D) does not impose any limitation on membership in the society based on any health status-related factor.

### (4) Payment adjustment

Under regulations of the Secretary, in the case of individuals enrolled under this part under a Medicare+Choice religious fraternal benefit society plan described in paragraph (2), the Secretary shall provide for such adjustment to the payment amounts otherwise established under section 1395w–24 of this title as may be appropriate to assure an appropriate payment level, taking into account the actuarial characteristics and experience of such individuals.

## (f) Requirements regarding enrollment in specialized MA plans for special needs individuals

### (1) Requirements for enrollment

In the case of a specialized MA plan for special needs individuals (as defined in subsection (b)(6)), notwithstanding any other provision of this part and in accordance with regulations of the Secretary, the plan may restrict the enrollment of individuals under the plan to individuals who are within one or more classes of special needs individuals.

### (2) Additional requirements for institutional SNPS

In the case of a specialized MA plan for special needs individuals described in subsection (b)(6)(B)(i), the applicable requirements described in this paragraph are as follows:

(A) Each individual that enrolls in the plan on or after January 1, 2010, is a special needs individuals described in subsection (b)(6)(B)(i). In the case of an individual who is living in the community but requires an institutional level of care, such individual shall not be considered a special needs individual described in subsection (b)(6)(B)(i) unless the determination that the individual requires an institutional level of care was made-

(i) using a State assessment tool of the State in which the individual resides; and

(ii) by an entity other than the organization offering the plan.

(B) The plan meets the requirements described in paragraph (5).

(C) If applicable, the plan meets the requirement described in paragraph (7).

### (3) Additional requirements for dual SNPS

In the case of a specialized MA plan for special needs individuals described in subsection (b)(6)(B)(ii), the applicable requirements described in this paragraph are as follows:

(A) Each individual that enrolls in the plan on or after January 1, 2010, is a special needs individuals [2] described in subsection (b)(6)(B)(ii).

(B) The plan meets the requirements described in paragraph (5).

(C) The plan provides each prospective enrollee, prior to enrollment, with a comprehensive written statement (using standardized content and format established by the Secretary) that describes-

(i) the benefits and cost-sharing protections that the individual is entitled to under the State Medicaid program under subchapter XIX; and

(ii) which of such benefits and cost-sharing protections are covered under the plan.

Such statement shall be included with any description of benefits offered by the plan.

(D) The plan has a contract with the State Medicaid agency to provide benefits, or arrange for benefits to be provided, for which such individual is entitled to receive as medical assistance under subchapter XIX. Such benefits may include long-term care services consistent with State policy.

(E) If applicable, the plan meets the requirement described in paragraph (7).

(F) The plan meets the requirements applicable under paragraph (8).

### (4) Additional requirements for severe or disabling chronic condition SNPS

In the case of a specialized MA plan for special needs individuals described in subsection (b)(6)(B)(iii), the applicable requirements described in this paragraph are as follows:

(A) Each individual that enrolls in the plan on or after January 1, 2010, is a special needs individual described in subsection (b)(6)(B)(iii).

(B) The plan meets the requirements described in paragraph (5).

(C) If applicable, the plan meets the requirement described in paragraph (7).

### (5) Care management requirements for all SNPs

#### (A) In general

Subject to subparagraph (B), the requirements described in this paragraph are that the organization offering a specialized MA plan for special needs individuals-

(i) have in place an evidenced-based model of care with appropriate networks of providers and specialists; and
(ii) with respect to each individual enrolled in the plan-
    (I) conduct an initial assessment and an annual reassessment of the individual's physical, psychosocial, and functional needs;
    (II) develop a plan, in consultation with the individual as feasible, that identifies goals and objectives, including measurable outcomes as well as specific services and benefits to be provided; and
    (III) use an interdisciplinary team in the management of care.

**(B) Improvements to care management requirements for severe or disabling chronic condition SNPs**

For 2020 and subsequent years, in the case of a specialized MA plan for special needs individuals described in subsection (b)(6)(B)(iii), the requirements described in this paragraph include the following:
    (i) The interdisciplinary team under subparagraph (A)(ii)(III) includes a team of providers with demonstrated expertise, including training in an applicable specialty, in treating individuals similar to the targeted population of the plan.
    (ii) Requirements developed by the Secretary to provide face-to-face encounters with individuals enrolled in the plan not less frequently than on an annual basis.
    (iii) As part of the model of care under clause (i) of subparagraph (A), the results of the initial assessment and annual reassessment under clause (ii)(I) of such subparagraph of each individual enrolled in the plan are addressed in the individual's individualized care plan under clause (ii)(II) of such subparagraph.
    (iv) As part of the annual evaluation and approval of such model of care, the Secretary shall take into account whether the plan fulfilled the previous year's goals (as required under the model of care).
    (v) The Secretary shall establish a minimum benchmark for each element of the model of care of a plan. The Secretary shall only approve a plan's model of care under this paragraph if each element of the model of care meets the minimum benchmark applicable under the preceding sentence.

**(6) Transition and exception regarding restriction on enrollment**

**(A) In general**

Subject to subparagraph (C), the Secretary shall establish procedures for the transition of applicable individuals to-
    (i) a Medicare Advantage plan that is not a specialized MA plan for special needs individuals (as defined in subsection (b)(6)); or
    (ii) the original medicare fee-for-service program under parts A and B.

**(B) Applicable individuals**

For purposes of clause (i), the term "applicable individual" means an individual who-
    (i) is enrolled under a specialized MA plan for special needs individuals (as defined in subsection (b)(6)); and
    (ii) is not within the 1 or more of the classes of special needs individuals to which enrollment under the plan is restricted to.

**(C) Exception**

The Secretary shall provide for an exception to the transition described in subparagraph (A) for a limited period of time for individuals enrolled under a specialized MA plan for special needs individuals described in subsection (b)(6)(B)(ii) who are no longer eligible for medical assistance under subchapter XIX.

**(D) Timeline for initial transition**

The Secretary shall ensure that applicable individuals enrolled in a specialized MA plan for special needs individuals (as defined in subsection (b)(6)) prior to January 1, 2010, are transitioned to a plan or the program described in subparagraph (A) by not later than January 1, 2013.

**(7) Authority to require special needs plans be NCQA approved**

For 2012 and subsequent years, the Secretary shall require that a Medicare Advantage organization offering a specialized MA plan for special needs individuals be approved by the National Committee for Quality Assurance (based on standards established by the Secretary).

**(8) Increased integration of dual SNPs**

**(A) Designated contact**

The Secretary, acting through the Federal Coordinated Health Care Office established under section 1315b of this title, shall serve as a dedicated point of contact for States to address misalignments that arise with the integration of specialized MA plans for special needs individuals described in subsection (b)(6)(B)(ii) under this paragraph and, consistent with such role, shall establish-
    (i) a uniform process for disseminating to State Medicaid agencies information under this subchapter impacting contracts between such agencies and such plans under this subsection; and
    (ii) basic resources for States interested in exploring such plans as a platform for integration, such as a model contract or other tools to achieve those goals.

**(B) Unified grievances and appeals process**

**(i) In general**

Not later than April 1, 2020, the Secretary shall establish procedures, to the extent feasible as determined by the Secretary, unifying grievances and appeals procedures under sections 1395w–22(f), 1395w–22(g), 1396a(a)(3), 1396a(a)(5), and 1396u–2(b)(4) of this title for items and services provided by specialized MA plans for special needs individuals described in subsection (b)(6)(B)(ii) under this subchapter and subchapter XIX. With respect to items and services described in the preceding sentence, procedures established under this clause shall apply in place of otherwise applicable grievances and appeals procedures. The Secretary shall solicit comment in developing such procedures from States, plans, beneficiaries and their representatives, and other relevant stakeholders.

### (ii) Procedures

The procedures established under clause (i) shall be included in the plan contract under paragraph (3)(D) and shall-

(I) adopt the provisions for the enrollee that are most protective for the enrollee and, to the extent feasible as determined by the Secretary, are compatible with unified timeframes and consolidated access to external review under an integrated process;

(II) take into account differences in State plans under subchapter XIX to the extent necessary;

(III) be easily navigable by an enrollee; and

(IV) include the elements described in clause (iii), as applicable.

### (iii) Elements described

Both unified appeals and unified grievance procedures shall include, as applicable, the following elements described in this clause:

(I) Single written notification of all applicable grievances and appeal rights under this subchapter and subchapter XIX. For purposes of this subparagraph, the Secretary may waive the requirements under section 1395w–22(g)(1)(B) of this title when the specialized MA plan covers items or services under this part or under subchapter XIX.

(II) Single pathways for resolution of any grievance or appeal related to a particular item or service provided by specialized MA plans for special needs individuals described in subsection (b)(6)(B)(ii) under this subchapter and subchapter XIX.

(III) Notices written in plain language and available in a language and format that is accessible to the enrollee, including in non-English languages that are prevalent in the service area of the specialized MA plan.

(IV) Unified timeframes for grievances and appeals processes, such as an individual's filing of a grievance or appeal, a plan's acknowledgment and resolution of a grievance or appeal, and notification of decisions with respect to a grievance or appeal.

(V) Requirements for how the plan must process, track, and resolve grievances and appeals, to ensure beneficiaries are notified on a timely basis of decisions that are made throughout the grievance or appeals process and are able to easily determine the status of a grievance or appeal.

### (iv) Continuation of benefits pending appeal

The unified procedures under clause (i) shall, with respect to all benefits under parts A and B and subchapter XIX subject to appeal under such procedures, incorporate provisions under current law and implementing regulations that provide continuation of benefits pending appeal under this subchapter and subchapter XIX.

## (C) Requirement for unified grievances and appeals

For 2021 and subsequent years, the contract of a specialized MA plan for special needs individuals described in subsection (b)(6)(B)(ii) with a State Medicaid agency under paragraph (3)(D) shall require the use of unified grievances and appeals procedures as described in subparagraph (B).

## (D) Requirements for integration

### (i) In general

For 2021 and subsequent years, a specialized MA plan for special needs individuals described in subsection (b)(6)(B)(ii) shall meet one or more of the following requirements, to the extent permitted under State law, for integration of benefits under this subchapter and subchapter XIX:

(I) The MA plan must meet the requirements of contracting with the State Medicaid agency described in paragraph (3)(D) in addition to coordinating long-term services and supports or behavioral health services, or both, by meeting an additional minimum set of requirements determined by the Secretary through the Federal Coordinated Health Care Office established under section 1315b of this title based on input from stakeholders, such as notifying the State in a timely manner of hospitalizations, emergency room visits, and hospital or nursing home discharges of enrollees, assigning one primary care provider for each enrollee, or sharing data that would benefit the coordination of items and services under this subchapter and the State plan under subchapter XIX. Such minimum set of requirements must be included in the contract of the specialized MA plan with the State Medicaid agency under such paragraph.

(II) The specialized MA plan must meet the requirements of a fully integrated plan described in section 1395w–23(a)(1)(B)(iv)(II) of this title (other than the requirement that the plan have similar average levels of frailty, as determined by the Secretary, as the PACE program), or enter into a capitated contract with the State Medicaid agency to provide long-term services and supports or behavioral health services, or both.

(III) In the case of a specialized MA plan that is offered by a parent organization that is also the parent organization of a Medicaid managed care organization providing long term services and supports or behavioral services under a contract under section 1396b(m) of this title, the parent organization must assume clinical and financial responsibility for benefits provided under this subchapter and subchapter XIX with respect to any individual who is enrolled in both the specialized MA plan and the Medicaid managed care organization.

### (ii) Suspension of enrollment for failure to meet requirements during initial period

During the period of plan years 2021 through 2025, if the Secretary determines that a specialized MA plan for special needs individuals described in subsection (b)(6)(B)(ii) has failed to comply with clause (i), the Secretary may provide for the application against the Medicare Advantage organization offering the plan of the remedy described in section 1395w–27(g)(2)(B) of this title in the same manner as the Secretary may apply such remedy, and in accordance with the same procedures as would apply, in the case of an MA organization determined by the Secretary to have engaged in conduct described in section 1395w–27(g)(1) of this title. If the Secretary applies such remedy to a Medicare Advantage organization under the preceding sentence, the organization shall submit to the Secretary (at a time, and in a form and manner, specified by the Secretary) information describing how the plan will come into compliance with clause (i).

## (E) Study and report to Congress

Add. 009

### (i) In general

Not later than March 15, 2022, and, subject to clause (iii), biennially thereafter through 2032, the Medicare Payment Advisory Commission established under section 1395b–6 of this title, in consultation with the Medicaid and CHIP Payment and Access Commission established under section 1396 of this title, shall conduct (and submit to the Secretary and the Committees on Ways and Means and Energy and Commerce of the House of Representatives and the Committee on Finance of the Senate a report on) a study to determine how specialized MA plans for special needs individuals described in subsection (b)(6)(B)(ii) perform among each other based on data from Healthcare Effectiveness Data and Information Set (HEDIS) quality measures, reported on the plan level, as required under section 1395w–22(e)(3) of this title (or such other measures or data sources that are available and appropriate, such as encounter data and Consumer Assessment of Healthcare Providers and Systems data, as specified by such Commissions as enabling an accurate evaluation under this subparagraph). Such study shall include, as feasible, the following comparison groups of specialized MA plans for special needs individuals described in subsection (b)(6)(B)(ii):

(I) A comparison group of such plans that are described in subparagraph (D)(i)(I).

(II) A comparison group of such plans that are described in subparagraph (D)(i)(II).

(III) A comparison group of such plans operating within the Financial Alignment Initiative demonstration for the period for which such plan is so operating and the demonstration is in effect, and, in the case that an integration option that is not with respect to specialized MA plans for special needs individuals is established after the conclusion of the demonstration involved.

(IV) A comparison group of such plans that are described in subparagraph (D)(i)(III).

(V) A comparison group of MA plans, as feasible, not described in a previous subclause of this clause, with respect to the performance of such plans for enrollees who are special needs individuals described in subsection (b)(6)(B)(ii).

### (ii) Additional reports

Beginning with 2033 and every five years thereafter, the Medicare Payment Advisory Commission, in consultation with the Medicaid and CHIP Payment and Access Commission, shall conduct a study described in clause (i).

## (9) List of conditions for clarification of the definition of a severe or disabling chronic conditions specialized needs individual

### (A) In general

Not later than December 31, 2020, and every 5 years thereafter, subject to subparagraphs (B) and (C), the Secretary shall convene a panel of clinical advisors to establish and update a list of conditions that meet each of the following criteria:

(i) Conditions that meet the definition of a severe or disabling chronic condition under subsection (b)(6)(B)(iii) on or after January 1, 2022.

(ii) Conditions that require prescription drugs, providers, and models of care that are unique to the specific population of enrollees in a specialized MA plan for special needs individuals described in such subsection on or after such date and-

(I) as a result of access to, and enrollment in, such a specialized MA plan for special needs individuals, individuals with such condition would have a reasonable expectation of slowing or halting the progression of the disease, improving health outcomes and decreasing overall costs for individuals diagnosed with such condition compared to available options of care other than through such a specialized MA plan for special needs individuals; or

(II) have a low prevalence in the general population of beneficiaries under this subchapter or a disproportionally high per-beneficiary cost under this subchapter.

### (B) Inclusion of certain conditions

The conditions listed under subparagraph (A) shall include HIV/AIDS, end stage renal disease, and chronic and disabling mental illness.

### (C) Requirement

In establishing and updating the list under subparagraph (A), the panel shall take into account the availability of varied benefits, cost-sharing, and supplemental benefits under the model described in paragraph (2) of section 1395w–28(h) of this title, including the expansion under paragraph (1) of such section.

## (g) Special rules for senior housing facility plans

### (1) In general

In the case of a Medicare Advantage senior housing facility plan described in paragraph (2), notwithstanding any other provision of this part to the contrary and in accordance with regulations of the Secretary, the service area of such plan may be limited to a senior housing facility in a geographic area.

### (2) Medicare Advantage senior housing facility plan described

For purposes of this subsection, a Medicare Advantage senior housing facility plan is a Medicare Advantage plan that-

(A) restricts enrollment of individuals under this part to individuals who reside in a continuing care retirement community (as defined in section 1395w–22(l)(4)(B) of this title);

(B) provides primary care services onsite and has a ratio of accessible physicians to beneficiaries that the Secretary determines is adequate;

(C) provides transportation services for beneficiaries to specialty providers outside of the facility; and

(D) has participated (as of December 31, 2009) in a demonstration project established by the Secretary under which such a plan was offered for not less than 1 year.

## (h) National testing of Medicare Advantage Value-Based Insurance Design model

### (1) In general

In implementing the Medicare Advantage Value-Based Insurance Design model that is being tested under section 1315a(b) of this title, the Secretary shall revise the testing of the model under such section to cover, effective not later than January 1, 2020,

**Add. 010**

all States.

**(2) Termination and modification provision not applicable until January 1, 2022**

The provisions of section 1315a(b)(3)(B) of this title shall apply to the Medicare Advantage Value-Based Insurance Design model, including such model as revised under paragraph (1), beginning January 1, 2022, but shall not apply to such model, as so revised, prior to such date.

**(3) Funding**

The Secretary shall allocate funds made available under section 1315a(f)(1) of this title to design, implement, and evaluate the Medicare Advantage Value-Based Insurance Design model, as revised under paragraph (1).

**(i) Program integrity transparency measures**

**(1) Program integrity portal**

**(A) In general**

Not later than 2 years after October 24, 2018, the Secretary shall, after consultation with stakeholders, establish a secure internet website portal (or other successor technology) that would allow a secure path for communication between the Secretary, MA plans under this part, prescription drug plans under part D, and an eligible entity with a contract under section 1395ddd of this title (such as a Medicare drug integrity contractor or an entity responsible for carrying out program integrity activities under this part and part D) for the purpose of enabling through such portal (or other successor technology)-

(i) the referral by such plans of substantiated or suspicious activities, as defined by the Secretary, of a provider of services (including a prescriber) or supplier related to fraud, waste, and abuse for initiating or assisting investigations conducted by the eligible entity; and

(ii) data sharing among such MA plans, prescription drug plans, and the Secretary.

**(B) Required uses of portal**

The Secretary shall disseminate the following information to MA plans under this part and prescription drug plans under part D through the secure internet website portal (or other successor technology) established under subparagraph (A):

(i) Providers of services and suppliers that have been referred pursuant to subparagraph (A)(i) during the previous 12-month period.

(ii) Providers of services and suppliers who are the subject of an active exclusion under section 1320a–7 of this title or who are subject to a suspension of payment under this subchapter pursuant to section 1395y(o) of this title or otherwise.

(iii) Providers of services and suppliers who are the subject of an active revocation of participation under this subchapter, including for not satisfying conditions of participation.

(iv) In the case of such a plan that makes a referral under subparagraph (A)(i) through the portal (or other successor technology) with respect to activities of substantiated or suspicious activities of fraud, waste, or abuse of a provider of services (including a prescriber) or supplier, if such provider (including a prescriber) or supplier has been the subject of an administrative action under this subchapter or subchapter XI with respect to similar activities, a notification to such plan of such action so taken.

**(C) Rulemaking**

For purposes of this paragraph, the Secretary shall, through rulemaking, specify what constitutes substantiated or suspicious activities of fraud, waste, and abuse, using guidance such as what is provided in the Medicare Program Integrity Manual 4.8. In carrying out this subsection, a fraud hotline tip (as defined by the Secretary) without further evidence shall not be treated as sufficient evidence for substantiated fraud, waste, or abuse.

**(D) HIPAA compliant information only**

For purposes of this subsection, communications may only occur if the communications are permitted under the Federal regulations (concerning the privacy of individually identifiable health information) promulgated under section 264(c) of the Health Insurance Portability and Accountability Act of 1996.

**(2) Quarterly reports**

Beginning not later than 2 years after October 24, 2018, the Secretary shall make available to MA plans under this part and prescription drug plans under part D in a timely manner (but no less frequently than quarterly) and using information submitted to an entity described in paragraph (1) through the portal (or other successor technology) described in such paragraph or pursuant to section 1395ddd of this title, information on fraud, waste, and abuse schemes and trends in identifying suspicious activity. Information included in each such report shall-

(A) include administrative actions, pertinent information related to opioid overprescribing, and other data determined appropriate by the Secretary in consultation with stakeholders; and

(B) be anonymized information submitted by plans without identifying the source of such information.

**(3) Clarification**

Nothing in this subsection shall preclude or otherwise affect referrals to the Inspector General of the Department of Health and Human Services or other law enforcement entities.

(Aug. 14, 1935, ch. 531, title XVIII, §1859, as added Pub. L. 105–33, title IV, §4001, Aug. 5, 1997, 111 Stat. 325 ; amended Pub. L. 106–113, div. B, §1000(a)(6) [title V, §523], Nov. 29, 1999, 113 Stat. 1536 , 1501A-387; Pub. L. 108–173, title II, §§221(b)(1), (d)(2), 231(b), (c), Dec. 8, 2003, 117 Stat. 2180 , 2193, 2207, 2208; Pub. L. 110–173, title I, §108(a), Dec. 29, 2007, 121 Stat. 2496 ; Pub. L. 110–275, title I, §§162(b), 164(a), (c)(1), (d)(1), (e)(1), July 15, 2008, 122 Stat. 2571–2574 ; Pub. L. 111–148, title III, §§3205(c), (c), (e), (g), 3208(a), Mar. 23, 2010, 124 Stat. 457–459 ; Pub. L. 112–240, title VI, §607, Jan. 2, 2013, 126 Stat. 2349 ; Pub. L. 113–67, div. B, title I, §1107, Dec. 26, 2013, 127 Stat. 1197 ; Pub. L. 113–93, title I, §107, Apr. 1, 2014, 128 Stat. 1043 ; Pub. L. 114–10, title II, §206, Apr. 16, 2015, 129 Stat. 145 ; Pub. L. 114–255, div. C, title XVII, §17006(a)(2)(B), Dec. 13, 2016, 130 Stat. 1334 ; Pub.

## Editorial Notes

### References in Text

The Internal Revenue Code of 1986, referred to in subsec. (e)(3)(A), is classified generally to Title 26, Internal Revenue Code.

Section 264(c) of the Health Insurance Portability and Accountability Act of 1996, referred to in subsec. (i)(1)(D), is section 264(c) of Pub. L. 104–191, which is set out as a note under section 1320d–2 of this title.

### Amendments

**2018**-Subsec. (b)(6)(B)(iii). Pub. L. 115–123, §50311(c)(2)(A), substituted "who-" for "who have", inserted "(I) before January 1, 2022, have" before "one or more comorbid and medically complex chronic conditions that are substantially disabling", and added subcl. (II).

Subsec. (f)(1). Pub. L. 115–123, §50311(a), struck out "and for periods before January 1, 2019" after "the Secretary".

Subsec. (f)(3)(F). Pub. L. 115–123, §50311(b)(1)(A), added subpar. (F).

Subsec. (f)(5). Pub. L. 115–123, §50311(c)(1), designated existing provisions as subpar. (A), inserted heading, substituted "Subject to subparagraph (B), the requirements" for "The requirements", redesignated former subpars. (A) and (B)(i) to (iii) as cls. (i) and (ii)(I) to (III), respectively, of subpar. (A), and added subpar. (B).

Subsec. (f)(8). Pub. L. 115–123, §50311(b)(1)(B), added par. (8).

Subsec. (f)(9). Pub. L. 115–123, §50311(c)(2)(B), added par. (9).

Subsec. (h). Pub. L. 115–123, §50321, added subsec. (h).

Subsec. (i). Pub. L. 115–271 added subsec. (i).

**2016**-Subsec. (b)(6). Pub. L. 114–255 struck out "may waive application of section 1395w–21(a)(3)(B) of this title in the case of an individual described in clause (i), (ii), or (iii) of this subparagraph and" after "The Secretary" in concluding provisions.

**2015**-Subsec. (f)(1). Pub. L. 114–10 substituted "2019" for "2017".

**2014**-Subsec. (f)(1). Pub. L. 113–93 substituted "2017" for "2016".

**2013**-Subsec. (f)(1). Pub. L. 113–67 substituted "2016" for "2015".

Subsec. (f)(1). Pub. L. 112–240 substituted "2015" for "2014".

**2010**-Subsec. (f)(1). Pub. L. 111–148, §3205(a), substituted "2014" for "2011".

Subsec. (f)(2)(C). Pub. L. 111–148, §3205(e)(1), added subpar. (C).

Subsec. (f)(3)(E). Pub. L. 111–148, §3205(e)(2), added subpar. (E).

Subsec. (f)(4)(C). Pub. L. 111–148, §3205(e)(3), added subpar. (C).

Subsec. (f)(5). Pub. L. 111–148, §3205(g), struck out "described in subsection (b)(6)(B)(i)" after "individuals" in introductory provisions.

Subsec. (f)(6), (7). Pub. L. 111–148, §3205(c), (e)(4), added pars. (6) and (7).

Subsec. (g). Pub. L. 111–148, §3208(a), added subsec. (g).

**2008**-Subsec. (b)(2). Pub. L. 110–275, §162(b), inserted concluding provisions.

Subsec. (b)(6)(A). Pub. L. 110–275, §164(c)(1)(A), inserted "and that, as of January 1, 2010, meets the applicable requirements of paragraph (2), (3), or (4) of subsection (f), as the case may be" before period at end.

Subsec. (b)(6)(B)(iii). Pub. L. 110–275, §164(e)(1), inserted "who have one or more comorbid and medically complex chronic conditions that are substantially disabling or life threatening, have a high risk of hospitalization or other significant adverse health outcomes, and require specialized delivery systems across domains of care" before period at end.

Subsec. (f). Pub. L. 110–275, §164(c)(1)(B)(ii), (iii), designated existing provisions as par. (1), inserted par. heading, and added pars. (2) to (4).

Pub. L. 110–275, §164(c)(1)(B)(i), amended heading generally. Prior to amendment, heading read "Restriction on enrollment for specialized MA plans for special needs individuals".

Pub. L. 110–275, §164(a), substituted "2011" for "2010".

Subsec. (f)(5). Pub. L. 110–275, §164(d)(1), added par. (5).

**2007**-Subsec. (f). Pub. L. 110–173 substituted "2010" for "2009".

**2003**-Subsec. (b)(4), (5). Pub. L. 108–173, §221(b)(1), added pars. (4) and (5).

Subsec. (b)(6). Pub. L. 108–173, §231(b), added par. (6).

Subsec. (c)(5). Pub. L. 108–173, §221(d)(2), added par. (5).

Subsec. (f). Pub. L. 108–173, §231(c), added subsec. (f).

**1999**-Subsec. (e)(2). Pub. L. 106–113 substituted "section 1395w–21(a)(2) of this title" for "section 1395w–21(a)(2)(A) of this title" in introductory provisions.

## Statutory Notes and Related Subsidiaries

### Change of Name

References to Medicare+Choice deemed to refer to Medicare Advantage or MA, subject to an appropriate transition provided by the Secretary of Health and Human Services in the use of those terms, see section 201 of Pub. L. 108–173, set out as a note under section 1395w–21 of this title.

## Effective Date of 2016 Amendment

Amendment by Pub. L. 114–255 applicable with respect to plan years beginning on or after Jan. 1, 2021, see section 17006(a)(3) of Pub. L. 114–255, set out as a note under section 1395w–21 of this title.

## Effective Date of 2010 Amendment

Pub. L. 111–148, title III, §3208(b), Mar. 23, 2010, 124 Stat. 460 , provided that: "The amendment made by this section [amending this section] shall take effect on January 1, 2010, and shall apply to plan years beginning on or after such date."

## Effective Date of 2008 Amendment

Amendment by section 164(c)(1), (d)(1), (e)(1) of Pub. L. 110–275 applicable to plan years beginning on or after Jan. 1, 2010, and applicable to all specialized Medicare Advantage plans for special needs individuals regardless of when the plan first entered the Medicare Advantage program under this part, see section 164(g) of Pub. L. 110–275, set out as a note under section 1395w–27 of this title.

## Effective Date of 2003 Amendment

Amendment by section 221(b)(1), (d)(2) of Pub. L. 108–173 applicable with respect to plan years beginning on or after Jan. 1, 2006, see section 223(a) of Pub. L. 108–173, set out as a note under section 1395w–21 of this title.

Amendment by section 231(b), (c) of Pub. L. 108–173 effective Dec. 8, 2003, see section 231(f)(1) of Pub. L. 108–173, set out as a note under section 1395w–21 of this title.

## Regulations

Pub. L. 108–173, title II, §231(f)(2), Dec. 8, 2003, 117 Stat. 2208 , provided that: "No later than 1 year after the date of the enactment of this Act [Dec. 8, 2003], the Secretary [of Health and Human Services] shall issue final regulations to establish requirements for special needs individuals under section 1859(b)(6)(B)(iii) of the Social Security Act [42 U.S.C. 1395w–28(b)(6)(B)(iii)], as added by subsection (b)."

## Authorization To Operate; Resources for State Medicaid Agencies; Contracting Requirements

Pub. L. 110–275, title I, §164(c)(2)–(4), July 15, 2008, 122 Stat. 2573 , as amended by Pub. L. 111–148, title III, §3205(d), Mar. 23, 2010, 124 Stat. 458 , provided that:

"(2) Authority to operate but no service area expansion for dual snps that do not meet certain requirements.- Notwithstanding subsection (f) of section 1859 of the Social Security Act (42 U.S.C. 1395w–28), during the period beginning on January 1, 2010, and ending on December 31, 2012, in the case of a specialized Medicare Advantage plan for special needs individuals described in subsection (b)(6)(B)(ii) of such section, as amended by this section, that does not meet the requirement described in subsection (f)(3)(D) of such section, the Secretary of Health and Human Services-

"(A) shall permit such plan to be offered under part C of title XVIII of such Act [42 U.S.C. 1395w–21 et seq.]; and

"(B) shall not permit an expansion of the service area of the plan under such part C.

"(3) Resources for state medicaid agencies.-The Secretary of Health and Human Services shall provide for the designation of appropriate staff and resources that can address State inquiries with respect to the coordination of State and Federal policies for specialized MA plans for special needs individuals described in section 1859(b)(6)(B) (ii) of the Social Security Act (42 U.S.C. 1395w–28(b)(6)(B)(ii)), as amended by this section.

"(4) No requirement for contract.-Nothing in the provisions of, or amendments made by, this subsection [amending this section] shall require a State to enter into a contract with a Medicare Advantage organization with respect to a specialized MA plan for special needs individuals described in section 1859(b)(6)(B)(ii) of the Social Security Act (42 U.S.C. 1395w–28(b)(6)(B)(ii)), as amended by this section."

## Panel of Clinical Advisors to Determine Conditions

Pub. L. 110–275, title I, §164(e)(2), July 15, 2008, 122 Stat. 2574 , provided that: "The Secretary of Health and Human Services shall convene a panel of clinical advisors to determine the conditions that meet the definition of severe and disabling chronic conditions under section 1859(b)(6)(B)(iii) of the Social Security Act (42 U.S.C. 1395w–28(b)(6)(B)(iii)), as amended by paragraph (1). The panel shall include the Director of the Agency for Healthcare Research and Quality (or the Director's designee)."

## No Effect on Medicaid Benefits for Duals

Pub. L. 110–275, title I, §164(h), July 15, 2008, 122 Stat. 2575 , provided that: "Nothing in the provisions of, or amendments made by, this section [amending this section and sections 1395w–22 and 1395w–27 of this title and enacting provisions set out as notes under this section and sections 1395w–21, 1395w–22, and 1395w–27 of this title] shall affect

Case: 25-2746, 08/08/2025, DktEntry: 12.1, Page 109 of 116

the benefits available under the Medicaid program under title XIX of the Social Security Act [42 U.S.C. 1396 et seq.] for special needs individuals described in section 1859(b)(6)(B)(ii) of such Act (42 U.S.C. 1395w–28(b)(6)(B)(ii))."

## AUTHORITY TO DESIGNATE OTHER PLANS AS SPECIALIZED MA PLANS

Secretary of Health and Human Services authorized, in promulgating regulations to carry out subsection (b)(6) of this section, to provide, notwithstanding subsection (b)(6)(A) of this section, for the offering of specialized MA plans for special needs individuals by MA plans that disproportionately serve special needs individuals, see section 231(d) of Pub. L. 108–173, set out as a note under section 1395w–21 of this title.

---

[1] *So in original. Probably should be "that are life threatening or significantly limit".*

[2] *So in original. Probably should be "individual".*

This content is from the eCFR and is authoritative but unofficial.

# Title 42 —Public Health
# Chapter IV —Centers for Medicare & Medicaid Services, Department of Health and Human Services
# Subchapter B —Medicare Program
# Part 422 —Medicare Advantage Program
# Subpart V —Medicare Advantage Communication Requirements

**Source:** 73 FR 54220, Sept. 18, 2008, unless otherwise noted.

**Authority:** 42 U.S.C. 1302, 1306, 1395w-21 through 1395w-28, and 1395hh.

**Source:** 63 FR 18134, Apr. 14, 1998, unless otherwise noted.

**Editorial Note:** Nomenclature changes to part 422 appear at 70 FR 4741, Jan. 28, 2005.

## § 422.2265 Websites.

As required under § 422.111(h)(2), MA organizations must have a website.

(a) *General website requirements.*

  (1) MA organization websites must meet all of the following requirements:

    (i) Maintain current year contract content through December 31 of each year.

    (ii) Notify users when they will leave the MA organization's Medicare site.

    (iii) Include or provide access to (for example, through a hyperlink) applicable notices, statements, disclosures, or disclaimers with corresponding content. Overarching disclaimers, such as the Federal Contracting Statement, are not required on every page.

    (iv) Reflect the most current information within 30 days of any material change.

    (v) Keep MA content separate and distinct from other lines of business, including Medicare Supplemental Plans.

  (2) MA organization websites may not do any of the following:

    (i) Require beneficiaries to enter any information other than zip code, county, or state for access to non-beneficiary-specific website content.

    (ii) Provide links to foreign drug sales, including advertising links.

    (iii) State that the MA organization is not responsible for the content of their social media pages or the website of any first tier, downstream, or related entity that provides information on behalf of the MA organization.

(b) *Required content.* MA organization's websites must include the following content:

  (1) A toll-free customer service number, TTY number, and days and hours of operation.

  (2) A physical or Post Office Box address.

  (3) A PDF or copy of a printable provider directory.

Add. 015

(4) A provider directory searchable by every element required in the model provider directory, such as name, location, specialty.

(5) When applicable, a searchable pharmacy directory combined with a provider directory.

(6) Information on enrollees' and MA organizations' rights and responsibilities upon disenrollment. MA organizations may either post this information or provide specific information on where it is located in the Evidence of Coverage together with a link to that document.

(7) A description of and information on how to file a grievance, request an organization determination, and an appeal.

(8) Prominently displayed link to the Medicare.gov electronic complaint form.

(9) Disaster and emergency policy consistent with § 422.100(m)(5)(iii).

(10) A Notice of Privacy Practices as required under the HIPAA Privacy Rule (45 CFR 164.520).

(11) For PFFS plans, a link to the PFFS Terms and Conditions of Payment.

(12) For MSA plans, the following statements:

   (i) "You must file Form 1040, `US Individual Income Tax Return,' along with Form 8853, `Archer MSA and Long-Term Care Insurance Contracts' with the Internal Revenue Service (IRS) for any distributions made from your Medicare MSA account to ensure you aren't taxed on your MSA account withdrawals. You must file these tax forms for any year in which an MSA account withdrawal is made, even if you have no taxable income or other reason for filing a Form 1040. MSA account withdrawals for qualified medical expenses are tax free, while account withdrawals for non-medical expenses are subject to both income tax and a fifty (50) percent tax penalty."

   (ii) "Tax publications are available on the IRS website at *http://www.irs.gov* or from 1-800-TAX-FORM (1-800-829-3676)."

(13) Instructions on how to appoint a representative including a link to the downloadable version of the CMS Appointment of Representative Form (CMS Form-1696).

(14) Enrollment instructions and forms.

(c) *Required posted materials.* MA organization's website must provide access to the following materials, in a printable format, within the timeframes specified in paragraphs (c)(1) and (2) of this section.

(1) The following materials for each plan year must be posted on the website by October 15 prior to the beginning of the plan year:

   (i) Evidence of Coverage.

   (ii) Annual Notice of Change (for renewing plans).

   (iii) Summary of Benefits.

   (iv) Provider Directory.

   (v) Provider/Pharmacy Directory.

(2) The following materials must be posted on the website throughout the year and be updated as required:

Add. 016

  (i)   Prior Authorization Forms for physicians and enrollees.

  (ii)   When applicable, Part D Model Coverage Determination and Redetermination Request Forms.

  (iii)   Exception request forms for physicians (which must be posted by January 1 for new plans).

  (iv)   CMS Star Ratings document, which must be posted within 21 days after its release on the Medicare Plan Finder.

*[86 FR 6107, Jan. 19, 2021, as amended at 87 FR 27898, May 9, 2022; 88 FR 22336, Apr. 12, 2023]*

Add. 017

42 CFR 422.2262 (up to date as of 8/01/2025)
General communications materials and activities requirements.

42 CFR 422.2262 (Aug. 1, 2025)

This content is from the eCFR and is authoritative but unofficial.

# Title 42 —Public Health
# Chapter IV —Centers for Medicare & Medicaid Services, Department of Health and Human Services
# Subchapter B —Medicare Program
# Part 422 —Medicare Advantage Program
# Subpart V —Medicare Advantage Communication Requirements

**Source:** 73 FR 54220, Sept. 18, 2008, unless otherwise noted.

**Authority:** 42 U.S.C. 1302, 1306, 1395w-21 through 1395w-28, and 1395hh.

**Source:** 63 FR 18134, Apr. 14, 1998, unless otherwise noted.

**Editorial Note:** Nomenclature changes to part 422 appear at 70 FR 4741, Jan. 28, 2005.

## § 422.2262 General communications materials and activities requirements.

MA organizations may not mislead, confuse, or provide materially inaccurate information to current or potential enrollees.

(a) *General rules.* MA organizations must ensure their statements and the terminology used in communications activities and materials adhere to the following requirements:

  (1) MA organizations may not do any of the following:

    (i) Provide information that is inaccurate or misleading.

    (ii) Use of superlatives, unless sources of documentation or data supportive of the superlative is also referenced in the material. Such supportive documentation or data must reflect data, reports, studies, or other documentation that applies to the current or prior contract year.

      (A) Including data older than the prior contract year is permitted provided the current and prior contract year data are specifically identified.

      (B) [Reserved]

    (iii) Engage in activities that could mislead or confuse Medicare beneficiaries, or misrepresent the MA organization.

    (iv) Engage in any discriminatory activity such as attempting to recruit Medicare beneficiaries from higher income areas without making comparable efforts to enroll Medicare beneficiaries from lower income areas, or vice versa.

    (v) Target potential enrollees based on income levels, unless it is a dual eligible special needs plan or comparable plan as determined by the Secretary.

    (vi) Target potential enrollees based on health status, unless it is a special needs plan or comparable plan as determined by the Secretary.

    (vii) State or imply plans are only available to seniors rather than to all Medicare beneficiaries.

Add. 018

Case: 25-2746, 08/08/2025, DktEntry: 12.1, Page 114 of 116

42 CFR 422.2262 (up to date as of 8/01/2025)
General communications materials and activities requirements.

42 CFR 422.2262(a)(1)(viii)

(viii) Employ MA plan names that suggest that a plan is not available to all Medicare beneficiaries, unless it is a special needs plan or comparable plan as determined by the Secretary. This prohibition does not apply to MA plan names in effect prior to July 31, 2000.

(ix) Display the names or logos or both of co-branded network providers on the organization's member identification card, unless the provider names or logos or both are related to the member selection of specific provider organizations (for example, physicians or hospitals).

(x) Use a plan name that does not include the plan type. The plan type should be included at the end of the plan name, for example, "Super Medicare Advantage (HMO)." MA organizations are not required to repeat the plan type when the plan name is used multiple times in the same material.

(xi) Claim they are recommended or endorsed by CMS, Medicare, the Secretary, or HHS.

(xii) Convey that a failure to pay premium will not result in disenrollment, except for factually accurate descriptions of the MA organization's policies adopted in accordance with § 422.74(b)(1) and (d)(1) of this chapter.

(xiii) Use the term "free" to describe a $0 premium, any type of reduction in premium, reduction in deductibles or cost sharing, low-income subsidy, or cost sharing pertaining to dual eligible individuals.

(xiv) Imply that the plan operates as a supplement to Medicare.

(xv) State or imply a plan is available only to or is designed for beneficiaries who are dually eligible for Medicare and Medicaid, unless it is a dual-eligible special needs plan or comparable plan as determined by the Secretary.

(xvi) Market a non-dual eligible special needs plan as if it were a dual-eligible special needs plan.

(xvii) Target marketing efforts primarily to dual eligible individuals, unless the plan is a dual eligible special needs plan or comparable plan as determined by the Secretary.

(xviii) Claim a relationship with the state Medicaid agency, unless a contract to coordinate Medicaid services for enrollees in that plan is in place.

(xix) Use the Medicare name, CMS logo, and products or information issued by the Federal Government, including the Medicare card, in a misleading way. Use of the Medicare card image is permitted only with authorization from CMS.

(2) MA organizations may do the following:

(i) State that the MA organization is approved to participate in Medicare programs or is contracted to administer Medicare benefits or both.

(ii) Use the term "Medicare-approved" to describe benefits or services in materials or both.

(iii) Use the term "free" in conjunction with mandatory, supplemental, and preventative benefits provided at a zero cost share for all enrollees.

(b) *Product endorsements and testimonials.*

(1) Product endorsements and testimonials may take any of the following forms:

(i) Television or video ads.

42 CFR 422.2262 (up to date as of 8/01/2025)
General communications materials and activities requirements.

42 CFR 422.2262(b)(1)(ii)

    (ii) Radio ads.

    (iii) Print ads.

    (iv) Social media ads. In cases of social media, the use of a previous post, whether or not associated with or originated by the MA organization, is considered a product endorsement or testimonial.

    (v) Other types of ads.

(2) MA organizations may use individuals to endorse the MA organization's product provided the endorsement or testimonial adheres to the following requirements:

    (i) The speaker must identify the MA organization's product or company by name.

    (ii) Medicare beneficiaries endorsing or promoting the MA organization must have been an enrollee at the time the endorsement or testimonial was created.

    (iii) The endorsement or testimonial must clearly state that the individual was paid for the endorsement or testimonial, if applicable.

    (iv) If an individual is used (for example, an actor) to portray a real or fictitious situation, the endorsement or testimonial must state that it is an actor portrayal.

(c) *Requirements when including certain telephone numbers in materials.*

(1) MA organizations must adhere to the following requirements for including certain telephone numbers in materials:

    (i) When a MA organization includes its customer service number, the hours of operation must be prominently included at least once.

    (ii) When a MA organization includes its customer service number, it must provide a toll-free TTY number in conjunction with the customer service number in the same font size.

    (iii) On every material where 1-800-MEDICARE or Medicare TTY appears, the MA organization must prominently include, at least once, the hours and days of operation for 1-800-MEDICARE (that is, 24 hours a day/7 days a week).

(2) The following advertisement types are exempt from these requirements:

    (i) Outdoor advertising.

    (ii) Banners or banner-like ads.

    (iii) Radio advertisements and sponsorships.

(d) *Standardized material identification (SMID).*

(1) MA organizations must use a standardized method of identification for oversight and tracking of materials received by beneficiaries.

(2) The SMID consists of the following three parts:

    (i) The MA organization contract or Multi-Contract Entity (MCE) number (that is, "H" for MA or Section 1876 Cost Plans, "R" for Regional PPO plans (RPPOs), or "Y" for MCE, a means of identification available for Plans/Part D sponsors that have multiple MA contracts) followed by

42 CFR 422.2262 (up to date as of 8/01/2025)
General communications materials and activities requirements.

42 CFR 422.2262(d)(2)(ii)

an underscore, except that the SMID for multi-plan marketing materials must begin with the word "MULTI-PLAN" instead of the MA organization's contract number (for example, H1234_abc123_C or MULTI-PLAN_efg456_M).

(ii) A series of alpha numeric characters (chosen at the MA organization's discretion) unique to the material followed by an underscore.

(iii) An uppercase "C" for communications materials or an uppercase "M" for marketing materials (for example, H1234_abc123_C or H5678_efg456_M).

(3) The SMID is required on all materials except the following:

(i) Membership ID card.

(ii) Envelopes, radio ads, outdoor advertisements, banners, banner-like ads, and social media comments and posts.

(iii) OMB-approved forms/documents, except those materials specified in § 422.2267.

(iv) Corporate notices or forms (that is, not MA/Part D specific) meeting the definition of communications (see § 422.2260) such as privacy notices and authorization to disclose protected health information (PHI).

(v) Agent-developed communications materials that are not marketing.

(4) Non-English and alternate format materials, based on previously created materials, may have the same SMID as the material on which they are based.

*[86 FR 6104, Jan. 19, 2021, as amended at 88 FR 22335, Apr. 12, 2023]*