No. 25-2746

====================================================

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

————————————————————

ESTATE OF BIBI AHMAD,

*Plaintiff-Appellant,*

v.

UNITEDHEALTH GROUP INC. AND UNITED HEALTHCARE INC.,

*Defendants-Appellees.*

————————————————————

On Appeal from the United States District Court
for the Central District of California
Case No. 8:23-cv-2303 | Hon. Mónica Ramírez Almadani

====================================================

## APPELLEES' ANSWERING BRIEF

====================================================

Gillian B. Miller
GIBSON, DUNN & CRUTCHER LLP
One Embarcadero Center,
Suite 2600
San Francisco, CA 94111-3715
(415) 393-8200

Kahn A. Scolnick
Heather L. Richardson
Timothy W. Loose
Patrick J. Fuster
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
(213) 229-7000
kscolnick@gibsondunn.com

*Counsel for Defendants-Appellees UnitedHealth Group Inc. and
UnitedHealthcare, Inc.*

====================================================

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................ 1

JURISDICTIONAL STATEMENT ............................................................. 6

STATEMENT OF THE ISSUES ................................................................. 6

STATEMENT OF THE CASE ..................................................................... 7

    A.    Congress designed the Medicare Part C, or Medicare Advantage, program as a federal program operating under federal rules. ................................................................. 7

    B.    The Estate brought state-law claims challenging the marketing of United's MA plans. ......................................... 13

    C.    United moved to dismiss the Estate's claims under the Medicare Part C preemption provision. ............................... 15

    D.    The district court dismissed the complaint because Medicare Part C preempts all the claims. ........................... 17

SUMMARY OF ARGUMENT .................................................................. 19

STANDARD OF REVIEW ...................................................................... 22

ARGUMENT ...................................................................................... 23

I.    The district court correctly held that Medicare Part C preempts the Estate's claims. ....................................................... 23

    A.    Part C standards supersede state law with respect to the Estate's marketing-based claims. .................................. 24

           1.    Preemption applies if Medicare standards govern the conduct the state-law claims target ........................ 25

i

2.   The Estate's claims overlap with Medicare Part C's extensive regulations for the marketing of MA plans. ................................................................. 31

B.   Medicare Part C preemption does not depend on whether the defendant is a Medicare Advantage organization. ............................................................. 41

1.   This Court has held that a plaintiff cannot evade Medicare Part C preemption by suing the MA organization's affiliates. ............................................. 42

2.   *Loper Bright* did not abrogate this Court's precedent. ................................................................. 48

II.   The district court did not abuse its discretion in denying leave to amend. ................................................................. 51

CONCLUSION ......................................................................... 53

CERTIFICATE OF COMPLIANCE ....................................................... 55

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ali v. Federal Bureau of Prisons,*
552 U.S. 214 (2008) ................................................................. 27

*Ardary v. Aetna Health Plans of Cal., Inc.,*
98 F.3d 496 (9th Cir. 1996) ...................................................... 30

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ................................................................. 22

*Assurance Wireless USA, L.P. v. Reynolds,*
100 F.4th 1024 (9th Cir. 2024) ................................................. 29

*Atay v. County of Maui,*
842 F.3d 688 (9th Cir. 2016) .................................................... 29

*Aylward v. SelectHealth, Inc.,*
35 F.4th 673 (9th Cir. 2022) ........................... 2, 6, 9, 18, 19, 20, 24, 25,
26, 27, 29, 30, 31, 39, 50

*Azar v. Allina Health Servs.,*
587 U.S. 566 (2019) ................................................................... 7

*Becerra v. Empire Health Found.,*
597 U.S. 424 (2022) ..................................................... 7, 11, 45

*Boyle v. United Techs. Corp.,*
487 U.S. 500 (1988) ................................................................. 27

*Carrico v. City & County of San Francisco,*
656 F.3d 1002 (9th Cir. 2011) .................................................. 52

*Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,*
467 U.S. 837 (1984) ................................................................. 24

*Chinatown Neighborhood Ass'n v. Harris,*
794 F.3d 1136 (9th Cir. 2015) ............................................. 52, 53

iii

*Do Sung Uhm v. Humana, Inc.*,
620 F.3d 1134 (9th Cir. 2010).........3, 4, 5, 6, 16, 18, 19, 20, 21, 22, 23,
24, 26, 27, 28, 29, 30, 31, 38,
39, 41, 43, 44, 45, 49, 50, 51

*Doe v. United Health Grp. Inc.*,
2018 WL 3998022 (E.D.N.Y. Aug. 20, 2018).......................................47

*Escarcega v. Verdugo Vista Operating Co.*,
2020 WL 1703181 (C.D. Cal. Apr. 8, 2020)...................................44, 46

*First Medical Health Plan, Inc. v. Vega-Ramos*,
479 F.3d 46 (1st Cir. 2007) ....................................................................28

*Global Rescue Jets, LLC v. Kaiser Found. Health Plan, Inc.*,
30 F.4th 905 (9th Cir. 2022) ..................................................................30

*Hepstall v. Humana Health Plan, Inc.*,
2018 WL 6588555 (N.D. Ala. Nov. 26, 2018) ......................................44

*Jones v. Bock*,
549 U.S. 199 (2007).................................................................................23

*Estate of Lokken v. UnitedHealth Grp., Inc.*,
766 F. Supp. 3d 835 (D. Minn. 2025) ...................................................53

*Loper Bright Enterprises v. Raimondo*,
603 U.S. 369 (2024).............................................4, 5, 17, 21, 24, 49, 50

*Lopez v. Garland*,
116 F.4th 1032 (9th Cir. 2024) ......................................................22, 50

*Matthews v. Leavitt*,
452 F.3d 145 (2d Cir. 2006) .....................................................................9

*McCall v. PacifiCare of Cal., Inc.*,
21 P.3d 1189 (Cal. 2001).........................................................................30

*Medicaid & Medicare Advantage Prods. Ass'n of Puerto Rico,
Inc. v. Emanuelli Hernandez*,
58 F.4th 5 (1st Cir. 2023).......................................................................26

iv

*Northeast Hosp. Corp. v. Sebelius,*
    657 F.3d 1 (D.C. Cir. 2011) ................................................. 9

*Pegram v. Herdrich,*
    530 U.S. 211 (2000) .......................................................... 8

*Pharm. Care Mgmt. Ass'n v. Mulready,*
    78 F.4th 1183 (10th Cir. 2023) ......................................... 26

*Pharm. Care Mgmt. Ass'n v. Wehbi,*
    18 F.4th 956 (8th Cir. 2021) ................................. 26, 27, 29

*Puerto Rico v. Franklin Cal. Tax-Free Trust,*
    579 U.S. 115 (2016) ............................................... 20, 29

*Quishenberry v. UnitedHealthcare, Inc.,*
    532 P.3d 239 (Cal. 2023) ............................... 26, 29, 44, 53

*Riegel v. Medtronic, Inc.,*
    552 U.S. 312 (2008) .......................................................... 30

*Rivers v. Guerrero,*
    605 U.S. 443 (2025) ................................................... 52, 53

*Rush Prudential HMO, Inc. v. Moran,*
    536 U.S. 355 (2002) .......................................................... 8

*Ryan S. v. UnitedHealth Grp., Inc.,*
    98 F.4th 965 (9th Cir. 2024) ............................................. 47

*Tamburrino v. UnitedHealth Grp. Inc.,*
    2022 WL 1213467 (D.N.J. Apr. 25, 2022) ......................... 47

*Wheeler v. City of Santa Clara,*
    894 F.3d 1046 (9th Cir. 2018) .......................................... 23

*Wyeth v. Levine,*
    555 U.S. 555 (2009) .......................................................... 49

## Constitutional Provisions

U.S. Const. Art. VI, cl. 2 ........................................................ 25

**Statutes**

Balanced Budget Act of 1997, Pub. L. No. 105-33,
§ 4001, 111 Stat. 275-336 (codified as amended at
42 U.S.C. §§ 1395w-21 to 1395w-28)................................. 9, 12

Medicare Prescription Drug, Improvement, and
Modernization Act of 2003, Pub. L. No. 108-173,
§ 232, 117 Stat. 2208............................................................ 12

Social Security Amendments of 1965, Pub. L. No. 89-97,
§ 102, 79 Stat. 291-332 (codified as amended at
42 U.S.C. § 1395 *et seq.*)....................................................... 8

28 U.S.C. § 1291...................................................................... 6

28 U.S.C. § 1332(d)(2)............................................................ 6

42 U.S.C. §§ 1395c to 1395i-6................................................ 8

42 U.S.C. §§ 1395j to 1395w-6 .............................................. 8

42 U.S.C. § 1395w-21(e)(2) .................................................. 34

42 U.S.C. § 1395w-21(e)(4) .................................................. 41

42 U.S.C. § 1395w-21(h).................................................. 20, 45

42 U.S.C. § 1395w-21(h)(1).............................................. 11, 45

42 U.S.C. § 1395w-21(h)(2).......................................... 10, 20, 32

42 U.S.C. § 1395w-21(h)(4).......................................... 10, 32, 34

42 U.S.C. § 1395w-21(j)(1) .................................................. 34

42 U.S.C. § 1395w-22(a)(1).......................................... 10, 33, 53

42 U.S.C. § 1395w-22(a)(3).............................................. 10, 33

42 U.S.C. § 1395w-22(c)(1) ............................................... 36

42 U.S.C. § 1395w-26(b)(1)............................................. 10, 26

42 U.S.C. § 1395w-26(b)(3) ............... 2, 6, 12, 15, 23, 25, 26, 29, 40, 42, 50

42 U.S.C. § 1395w-27(g) ................................................................... 40, 45

42 U.S.C. § 1395w-27(g)(1) ..................................................................... 41

Cal. Health & Safety Code § 1386 ........................................................ 52

Consumers Legal Remedies Act, Cal. Civ. Code § 1750 *et seq.* .............. 13

False Advertising Law, Cal. Bus. & Prof. Code § 17500 ........................ 13

Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 ..................... 13

**Regulations**

42 C.F.R. § 422.1(b) ............................................................................. 10

42 C.F.R. § 422.2 ............................................................................. 11, 46

42 C.F.R. § 422.101(a) ......................................................................... 53

42 C.F.R. § 422.250 *et seq.* .................................................................. 10

42 C.F.R. § 422.400(a) ......................................................................... 27

42 C.F.R. § 422.402 .............................................................................. 27

42 C.F.R. § 422.504(a)(3) ...................................................................... 53

42 C.F.R. § 422.504(i) .......................................................................... 46

42 C.F.R. §§ 422.750-422.764 ............................................................... 40

42 C.F.R. § 422.752 .............................................................................. 45

42 C.F.R. § 422.752(a)(1) ...................................................................... 53

42 C.F.R. § 422.2260 .................................................................. 11, 12, 32

42 C.F.R. §§ 422.2260-422.2276 ........................................................... 20

42 C.F.R. § 422.2261 ............................................................. 10, 20, 32, 45

42 C.F.R. § 422.2262 ........................................................... 11

42 C.F.R. § 422.2262(a)(1)(ii) ........................................... 33

42 C.F.R. § 422.2262(a)(1)(iii) .................................... 34, 39

42 C.F.R. § 422.2262(a)(1)(xi) .................................... 34, 40

42 C.F.R. § 422.2262(a)(1)(xiv) ................................... 33, 40

42 C.F.R. § 422.2262(a)(1)(xix) ................................... 34, 40

42 C.F.R. § 422.2262(a)(2) ................................................ 34

42 C.F.R. § 422.2263(b)(7) ......................................... 34, 35

42 C.F.R. § 422.2267 ....................................................... 36

42 C.F.R. § 422.2267(e)(4) .............................................. 36

42 C.F.R. § 422.2272(a) ................................................... 35

42 C.F.R. § 422.2272(b) ................................................... 35

42 C.F.R. § 422.2272(e) ................................................... 37

42 C.F.R. § 422.2274 ....................................................... 36

42 C.F.R. § 422.2274(c) ................................................... 37

42 C.F.R. § 422.2274(c)(12) ............................................. 37

## Other Authorities

Centers for Medicare & Medicaid Services, *NHE Fact Sheet* ................. 7

H.R. Conf. Rep. No. 105-217, 1st Sess. (1997) ........................... 9

H.R. Conf. Rep. No. 108-391, 1st. Sess. (2003) ................. 12, 28, 47

# INTRODUCTION

This case is about whether federal standards or state law governs the marketing of Medicare Advantage plans. A quarter century ago, Congress established the MA program, which allows the federal government to contract with private entities to administer Medicare benefits on the government's behalf in exchange for fixed payments. That program, contained in Part C of the Medicare Act, requires such entities (called MA organizations) to cover the same medical benefits that the federal government would otherwise cover in Medicare Parts A and B, and it also allows MA organizations to seek approval from the Secretary of Health and Human Services to offer additional benefits. Congress created the MA program to expand options for Medicare beneficiaries, spur innovation in the provision of healthcare services, and help the federal government control its costs.

The plaintiff here targets purportedly "misleading Medicare Advantage ('MA') advertising practices." 3-ER-509 (¶ 1). The Estate of Bibi Ahmad alleges that sales representatives contacted Ms. Ahmad to gauge her interest in enrolling in an MA plan marketed by UnitedHealthcare, Inc. Although Ms. Ahmad never actually enrolled in any United MA

1

plan, her Estate nonetheless claims that these communications were misleading in violation of a range of California statutes and common-law duties.

The Estate advocates an overlapping regime of federal and state regulation for MA plans, but Congress expressly rejected such a regime. To ensure that Medicare Advantage would operate as a federal program governed exclusively by federal rules, Congress provided that "standards established under [Part C of Medicare] shall supersede any State law or regulation (other than State licensing laws or State laws relating to plan solvency) with respect to MA plans which are offered by MA organizations under this part." 42 U.S.C. § 1395w-26(b)(3). This provision contemplates that the federal government will ensure that benefits are accurately advertised to potential enrollees and delivered with a high quality of care to beneficiaries, subject to the States' retention of their traditional role of regulating the licensing and solvency of healthcare plans. As this Court recently explained, § 1395w-26(b)(3) broadly precludes state-law claims that overlap with federal standards contained in Part C and its implementing regulations. *Aylward v. SelectHealth, Inc.*, 35 F.4th 673, 680-81 (9th Cir. 2022).

2

The district court correctly held that Medicare Part C preempts the Estate's claims, which all concern the marketing of United MA plans. Part C governs marketing and related communications from start to finish. Federal standards require the Centers for Medicare & Medicaid Services (CMS) to approve communications, impose general standards for misrepresentations and specific rules about comparisons to the original Medicare program administered directly by the federal government, detail how MA organizations supervise their agents, prescribe the disclosures provided at the time of enrollment, and impose back-end sanctions for violations of Part C's statutory provisions and implementing regulations. Every aspect of the Estate's state-law claims overlaps with marketing standards developed by CMS. If any case falls in the heartland of Part C preemption, this is it.

As the district court also correctly observed, this Court held that Medicare Part C preempts claims just like these in *Do Sung Uhm v. Humana, Inc.*, 620 F.3d 1134 (9th Cir. 2010). *Uhm* affirmed the dismissal of materially identical claims that "written and oral statements were misleading" because those state-law claims invaded territory reserved for CMS, the expert federal agency that regulates, polices, and approves

marketing materials. *Id.* at 1157. Such marketing-based claims would "directly undermine CMS's prior determination that those materials were not misleading and in turn undermine CMS's ability to create its own standards for what constitutes 'misleading' information about Medicare Part D," the prescription-drug program that borrows the same preemption provision from Part C. *Id.* Here, too, the Estate's claims present the same risks and fall within the express preemption provision for the same reasons.

*Uhm* likewise forecloses the Estate's attempt to evade Part C preemption by suing two United entities that aren't themselves the United MA organization that contracts directly with CMS. This Court rejected that argument because "preemption under the statute is determined by whether federal standards exist with respect to the" Medicare plan, "*not by the identity of the defendant*." 620 F.3d at 1157 (emphasis added). For all that the Estate protests that holding, *Uhm* resolves the issue against the Estate—and correctly so, for that matter.

Because *Uhm* establishes that Medicare Part C preempts the claims in this case, the Estate seeks an escape hatch in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024). There is much one could say

about *Loper Bright*, a landmark decision that overruled the *Chevron* regime under which judges deferred to reasonable agency interpretations of federal statutes. But there is nothing one could say about *Loper Bright* of any import to this case. In *Uhm*, this Court explicitly gave "no deference" to CMS's interpretation when interpreting § 1395w-26(b)(3). 620 F.3d at 1155. *Uhm* was, in a phrase, this Court's understanding of the "best reading of the statute." *Loper Bright*, 603 U.S. at 400. And the Estate never explains how a case that prohibits deference to agency interpretations of federal statutes undermines a case that didn't defer to any agency interpretation, much less how a three-judge panel could ditch *Uhm* on so flimsy a basis.

At the end of the day, this Court need break no new ground. *Uhm* makes clear that § 1395w-26(b)(3) preempts the Estate's claims arising from the marketing of an MA plan, even though those claims are asserted against United affiliates of the MA organization. And that result is in line with Congress's objective that the MA program would operate under federal standards, which govern the marketing at issue here. This Court should affirm the district court's dismissal of the complaint with prejudice.

5

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over this case under 28 U.S.C. § 1332(d)(2) because the putative class satisfies the Class Action Fairness Act's minimal-diversity requirement and alleges claims that in aggregate exceed the amount-in-controversy requirement of $5 million.  3-ER-522 (¶ 51).  This Court has jurisdiction under 28 U.S.C. § 1291 over the Estate's appeal from the district court's dismissal of the complaint with prejudice.  1-ER-13.

## STATEMENT OF THE ISSUES

1.    Medicare Part C expressly preempts state-law claims that parallel, supplement, or conflict with Part C standards.  *Aylward v. SelectHealth, Inc.*, 35 F.4th 673, 681 (9th Cir. 2022) (citing 42 U.S.C. § 1395w-26(b)(3)).  Section 1395w-26(b)(3) preempts state-law claims about misleading marketing of Medicare Advantage plans when brought against affiliates of the Medicare Advantage organization that contracts with the federal government.  *Do Sung Uhm v. Humana, Inc.*, 620 F.3d 1134, 1157 (9th Cir. 2010).  Does § 1395w-26(b)(3) preempt the Estate's state-law claims targeting allegedly misleading marketing of MA plans by MA organization affiliates?

6

2.    The Estate requested leave to amend to allege expressly that the United defendants are not MA organizations.  The Estate now argues that the district court also should have granted leave to amend on two other theories concerning licensing and coverage determinations.  Did the district court properly exercise its discretion by determining that leave to amend to allege whether the United defendants are MA organizations would be futile under *Uhm* and by failing to raise sua sponte the Estate's two new theories?

## STATEMENT OF THE CASE

### A.    Congress designed the Medicare Part C, or Medicare Advantage, program as a federal program operating under federal rules.

Since 1965, Medicare has provided health insurance to elderly and disabled Americans.  The program has only grown over the past half century in terms of beneficiaries (now over 60 million Americans) and covered benefits. *Becerra v. Empire Health Found.*, 597 U.S. 424, 428 (2022). Today, "Medicare stands as the largest federal program after Social Security," expending over $1 trillion in 2023. *Azar v. Allina Health Servs.*, 587 U.S. 566, 569 (2019); *see* Centers for Medicare & Medicaid Services, *NHE Fact Sheet* (last visited Oct. 8, 2025), tinyurl.com/4vfs2a8m.

As originally enacted, Medicare contained only Part A and Part B. Social Security Amendments of 1965, Pub. L. No. 89-97, § 102, 79 Stat. 291-332 (codified as amended at 42 U.S.C. § 1395 *et seq.*).  Part A automatically insures aged and disabled individuals for inpatient treatment and other hospital services.  42 U.S.C. §§ 1395c to 1395i-6.  Part B is a voluntary program that provides supplemental insurance coverage to Medicare enrollees for other medically necessary services and preventive services.  §§ 1395j to 1395w-6.

The same decade that Congress passed the Medicare Act, insurers and healthcare entities began to establish health maintenance organizations as an alternative to traditional fee-for-service medical care in the private healthcare market.  *Pegram v. Herdrich*, 530 U.S. 211, 218-19 (2000).  The federal HMO Act of 1973 accelerated this trend by "encourag[ing] the development of HMOs."  *Rush Prudential HMO, Inc. v. Moran*, 536 U.S. 355, 367 (2002).  HMOs don't pay providers on a "fee-for-service" basis—that is, they don't pay a specific amount "for a general physical exam, a vaccination, a tonsillectomy, and so on."  *Pegram*, 530 U.S. at 218.  Instead, HMOs pay providers a "fixed fee for each patient enrolled" under the plan.  *Id.*

8

Congress incorporated the HMO model into public healthcare law by enacting Medicare Part C. Balanced Budget Act of 1997, Pub. L. No. 105-33, § 4001, 111 Stat. 275-336 (codified as amended at 42 U.S.C. §§ 1395w-21 to 1395w-28). Part C established the Medicare+Choice program—now called Medicare Advantage or MA—as "an alternative to the traditional Part A fee-for-service system" under which the government makes payments directly to providers such as hospitals. *Northeast Hosp. Corp. v. Sebelius*, 657 F.3d 1, 2 (D.C. Cir. 2011). Under Part C, beneficiaries now "can enroll in an MA plan and receive Medicare benefits through private MA organizations instead of the government." *Aylward v. SelectHealth, Inc.*, 35 F.4th 673, 675 (9th Cir. 2022). Congress believed that Part C would "allow beneficiaries to have access to a wide array of private health plan choices" and "enable the Medicare program to utilize innovations that have helped the private market contain costs and expand health care delivery options." H.R. Conf. Rep. No. 105-217, 1st Sess. 585 (1997).

Under Part C, the MA organization receives a capitated payment (a monthly fixed fee per enrollee) from CMS in exchange for the MA organization stepping into the shoes of the federal government to provide Medicare benefits. *See Matthews v. Leavitt*, 452 F.3d 145, 146 n.1 (2d Cir.

2006).  CMS approves MA plans through a process of bidding and nego-

tiation.  42 C.F.R. § 422.250 *et seq.*  MA plans must provide the benefits

available under Medicare Parts A and B, 42 U.S.C. § 1395w-22(a)(1), and

may offer such supplemental benefits as are approved by the Secretary

of Health and Human Services, § 1395w-22(a)(3)).

Given the importance of the federal function delegated to the MA

organization, CMS has the authority to extensively regulate MA plans

and MA organizations.  42 U.S.C. § 1395w-26(b)(1).  The regulations that

CMS has promulgated "establis[h] standards and se[t] forth the require-

ments, limitations, and procedures for Medicare services furnished, or

paid for, by the Medicare Advantage organizations through Medicare Ad-

vantage Plans."  42 C.F.R. § 422.1(b).

Congress also designed a comprehensive scheme for ensuring that

MA plans "shall conform to fair marketing standards."  42 U.S.C. § 1395w-

21(h)(4).  CMS rev  iews all "marketing material" that MA organizations

and their agents use.  § 1395w-21(h)(2); 42 C.F.R. § 422.2261.  CMS must

disapprove or require correction of marketing materials if they are "ma-

terially inaccurate or misleading or otherwise mak[e] a material misrep-

resentation."   42  U.S.C.  §  1395w-21(h)(2).   And  MA  plans  "may  not

10

distribute advertising materials to eligible beneficiaries unless the materials are first cleared by HHS," which acts through CMS here. *Empire Health*, 597 U.S. at 438 (citing 42 U.S.C. § 1395w-21(h)(1)).

CMS has spelled out requirements to ensure that marketing materials and other communications do not "mislead, confuse, or provide materially inaccurate information." 42 C.F.R. § 422.2262. CMS defines "communications" broadly, such that its regulations cover any "activities and use of materials created or administered by the MA organization or any downstream entity to provide information to current and prospective enrollees." § 422.2260. "Downstream entity" in turn "means any party that enters into a written arrangement, acceptable to CMS, with persons or entities involved with the MA benefit, . . . continu[ing] down to the level of the ultimate provider of both health and administrative services." § 422.2. And CMS defines the "marketing" governed by Part C standards as "communications materials and activities" that (among other things) are intended to "[d]raw a beneficiary's attention to a MA plan or plans" or "[i]nfluence a beneficiary's decision-making process when making a MA plan selection," and include content regarding the "plan's benefits,

11

benefits structure, premiums, or cost sharing" or "[r]ewards and incentives." § 422.2260.

Since the inception of Medicare Part C, Congress has protected CMS's regulatory authority with an express preemption provision. The provision originally superseded state law (outside a few enumerated categories) only "to the extent such law or regulation is inconsistent with [Part C] standards." Balanced Budget Act of 1997 § 4001, 111 Stat. 319. But in 2003, Congress considerably broadened the scope of preemption to make clear that "the MA program is a federal program operated under Federal rules" and that "[s]tate laws, do not, and should not apply, with the exception of state licensing laws or state laws related to plan solvency." H.R. Conf. Rep. No. 108-391, 1st. Sess., at 557 (2003); *see* Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No. 108-173, § 232, 117 Stat. 2208. Federal standards now "shall supersede any State law or regulation (other than State licensing laws or State laws relating to plan solvency) with respect to MA plans which are offered by MA organizations." 42 U.S.C. § 1395w-26(b)(3).

**B.    The Estate brought state-law claims challenging the marketing of United's MA plans.**

Bibi Ahmad allegedly began receiving Medicare benefits starting in 1997.  3-ER-543 (¶ 153).  Between October 2022 and November 2023, Ms. Ahmad allegedly received 24 unsolicited emails about United's MA plans.  3-ER-543-44 (¶ 153).  Ms. Ahmad's family also called a United phone number and spoke with an agent about the benefits of switching from a government-administered Medicare plan to a United MA plan.  3-ER-544-45 (¶¶ 155-56).  Ms. Ahmad did not enroll in any United MA plan or lose her existing Medicare coverage.  3-ER-543-45 (¶¶ 153-58).  But she nevertheless allegedly experienced "panic, distress, confusion, and emotional distress" from the marketing communications.  3-ER-545 (¶ 158).

After Ms. Ahmad's death, the Estate sued UnitedHealthcare, Inc. and its parent company, UnitedHealth Group Inc., on the theory that they (together, United for short) deceptively marketed an MA plan to Ms. Ahmad.  3-ER-521-22 (¶¶ 45-46); 3-ER-543-44 (¶ 153).  The Estate asserted state-law claims under the False Advertising Law, Cal. Bus. & Prof. Code § 17500; the Unfair Competition Law, Cal. Bus. & Prof. Code § 17200; and the Consumers Legal Remedies Act, Cal. Civ. Code § 1750

*et seq.*; as well as claims for negligent misrepresentation, intentional misrepresentation, unjust enrichment, and breach of express warranty. 3-ER-549-64 (¶¶ 177-249). The Estate also sought to represent a putative nationwide class of people who bought MA plans from United. 3-ER-523 (¶ 55).

The Estate alleges that United misleadingly marketed its MA plan in several ways:

- Advertising its MA plans as *supplements* to government-administered Medicare plans rather than *replacements* that cover the same benefits. *E.g.*, 3-ER-544-45 (¶¶ 155-56).

- Advertising "better" or "more" benefits than Original Medicare (or OM), meaning government-administered Medicare. *E.g.*, 3-ER-517 (¶ 32); 3-ER-535-36 (¶ 116).

- Using "Medicare logos deceptively" and "misusing the 'Medicare' brand" to "imply official government endorsement." *E.g.*, 3-ER-536 (¶ 120); 3-ER-532-33 (¶ 104).

- Referring to time-limited discounts or free benefits. *E.g.*, 3-ER-512-13 (¶ 13).

- Sending an "onslaught" of urgently captioned emails. *E.g.*, 3-ER-534 (¶ 110).

- Targeting vulnerable populations such as the elderly, disabled, those on fixed or marginal incomes, and dual eligible Medicare-Medicaid beneficiaries. *E.g.*, 3-ER-514 (¶ 19).

- Not disclosing material information about its plans, such as the directory of providers, "limited" vision and dental

14

benefits, prior authorization requirements, and claim denials. *E.g.*, 3-ER-534-35 (¶ 115); 3-ER-551 (¶ 179(f)).

- Using sales agents who "cas[h] in for oversized commissions," which incentivize "aggressive sales tactics" and "unauthorized enrollments." 3-ER-517-18 (¶¶ 33, 35).

- Not exercising "stringent oversight" over its sales agents. 3-ER-518 (¶ 37).

The Estate's overarching theory is that United's marketing was misleading because the MA program that Congress established is supposedly inferior to Original Medicare. In the Estate's view, "'Medicare Advantage is neither Medicare nor an advantage'" but instead a "complex labyrinth of 'Medicare Dis-advantage' delay and denial tactics." 3-ER-516 (¶ 28) (emphasis omitted). The Estate alleges that United "systematically and knowingly" marketed "its MA plans as combined with OM, and also as equivalent or superior to OM." 3-ER-517 (¶ 31).

### C. United moved to dismiss the Estate's claims under the Medicare Part C preemption provision.

United moved to dismiss the complaint, primarily contending that Medicare Part C, 42 U.S.C. § 1395w-26(b)(3), expressly preempts the Estate's claims. 3-ER-441-70. United pointed out that the alleged state-law duties overlap with Part C standards governing marketing of MA plans. 3-ER-456-64.

The Estate did not deny that the complaint alleged state-law duties that overlap with Part C standards. 3-ER-412-40. Instead, the Estate opposed dismissal on the theory that neither United entity in this case was the United MA organization that directly contracts with the federal government. 3-ER-430-33. The Estate had alleged in the complaint that the United defendants were the MA organizations that had "executed [the] agreements or renewals annually for all of the MA plans" with CMS. 3-ER-527 (¶ 79). But in resisting the motion to dismiss, the Estate filed an ex parte application attaching "extrinsic evidence" purporting to show that neither United defendant is the MA organization that secured CMS approval of United's MA plans. 2-ER-125-65; *see* Op. Br. 32 (arguing that the United defendants acted on behalf of UnitedHealthcare Insurance Co., the MA organization that contracts directly with CMS). As a backup, the Estate sought leave to amend with a summary request to "cure pleading defects through amendment." 3-ER-439.

In reply, United pointed out that this Court has squarely rejected the Estate's argument that Medicare Part C preempts only claims against the MA organization itself. 2-ER-185-87 (citing *Do Sung Uhm v. Humana, Inc.*, 620 F.3d 1134, 1157 (9th Cir. 2010)). United further

16

asserted that granting the Estate leave to amend to allege that the defendants here aren't MA organizations could not save the claims from Medicare preemption.  2-ER-195.

After the hearing on United's motion to dismiss, the Estate sought supplemental briefing on the Supreme Court's intervening decision in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024).  2-ER-43-85. The Estate argued that *Loper Bright* abrogated this Court's application in *Uhm* of the preemption provision to affiliates of the organization that directly contracts with the federal government.  2-ER-24.  In response, United pointed out that *Loper Bright* was irrelevant because *Uhm* did not involve deference to any agency interpretation of the preemption provision.  2-ER-18-19.

## D.     The district court dismissed the complaint because Medicare Part C preempts all the claims.

The district court dismissed the Estate's complaint with prejudice. 1-ER-2-13.  As the court explained, Congress established the Medicare Advantage program by "directing CMS to enact a regulatory scheme that would at least partially supersede state law."  1-ER-3 n.2.  Part C expressly preempts state-law claims that conflict with and "'parallel[],

17

enforce[], or supplement[]'" that federal regulatory scheme.  1-ER-9 (quoting *Aylward*, 35 F.4th at 681).

Applying this principle, the district court held that "the plain language" of § 1395w-26(b)(3) and this Court's "binding interpretation of Congress' intent" establish preemption of the Estate's claims.  1-ER-9. The Estate's allegations all "center around United's marketing tactics" when selling MA plans, 1-ER-6, and CMS has promulgated regulations that "standardize how the MA Plans can be marketed to the public," 1-ER-3.  As the court recognized, "the same logic applies" here as in *Uhm*, where this Court held that the "federal regulatory scheme" for MA plan marketing "was designed to supersede state law in this domain." 1-ER-10 (citing *Uhm*, 620 F.3d at 1157).

The district court rejected the Estate's "very careful (and fragile) argument" that its claims are not preempted because Defendants are not MA organizations.  1-ER-10-11.  The court denied the Estate's ex parte application to introduce extrinsic evidence showing the United defendants weren't the MA organization.  1-ER-7-8.  But even considering those documents, the court explained that a defendant who "'participate[s] alongside' an MA Organization in marketing MA Plans" has engaged in

18

conduct "'directly governed by federal standards.'" 1-ER-11 (quoting

*Uhm*, 620 F.3d at 1157). So it does not matter, the court observed,

"whether the Defendants are MA Organizations." 1-ER-11.

The district court dismissed the Estate's complaint with prejudice

because "[t]here are no facts that Plaintiff can allege to save" its claims.

1-ER-13. The court recognized that, "if Plaintiff pleads claims that are

not related to the MA Plans" then there is no basis for liability, "whereas

if Plaintiff pleads claims that are related to the MA Plans, those claims

are necessarily federally preempted by the language of Part C." 1-ER-13.

## SUMMARY OF ARGUMENT

I. The district court properly dismissed the Estate's marketing-

based claims because Medicare Part C expressly preempts state-law

claims that overlap with Part C standards governing marketing and com-

munications.

A. This Court has held that § 1395w-26(b)(3) preempts not only

state-law claims that are "inconsistent with" Part C standards, but also

those that "paralle[l]," "enforc[e]," or "supplemen[t]" these standards.

*Aylward v. SelectHealth, Inc.*, 35 F.4th 673, 681 (9th Cir. 2022).

Preemption applies whether the plaintiff invokes a generally applicable

duty, a statutory claim, or the common law. *Id.* And the presumption against preemption that the Estate invokes has no force when construing an express preemption provision like § 1395w-26(b)(3). *Puerto Rico v. Franklin Cal. Tax-Free Trust*, 579 U.S. 115, 125 (2016). The only question is whether the plaintiff's state-law claims address a subject already covered by Part C statutory provisions or regulations promulgated by CMS—if so, they are preempted. *Aylward*, 35 F.4th at 680-81.

The Estate's claims overlap with Medicare Part C's comprehensive regulations for the marketing of MA plans. CMS reviews all "marketing material" of MA plans. 42 U.S.C. § 1395w-21(h); 42 C.F.R. § 422.2261. Congress requires CMS to disapprove or require correction of marketing materials if they are "materially inaccurate or misleading or otherwise mak[e] a material misrepresentation." 42 U.S.C. § 1395w-21(h)(2). CMS also extensively regulates when, how, and what can be communicated to potential enrollees about MA plans, including through agents. 42 C.F.R. §§ 422.2260-422.2276. These provisions cover the same subjects that the Estate's state-law claims do.

In *Do Sung Uhm v. Humana, Inc.*, 620 F.3d 1134 (9th Cir. 2010), this Court affirmed dismissal of materially identical claims that "written

20

and oral statements were misleading" because the marketing-based claims would "directly undermine CMS's prior determination that those materials were not misleading and in turn undermine CMS's ability to create its own standards for what constitutes 'misleading' information about" Medicare. *Id.* at 1157. *Uhm* is directly on point and controls the outcome here.

B.    *Uhm* also forecloses the Estate's effort to evade preemption by bringing state-law claims against affiliates of the MA organization that formally contracts with the federal government. There, this Court held that "preemption under the statute is determined by whether federal standards exist with respect to the" Medicare plan, "not by the identity of the defendant." 620 F.3d at 1157. The Estate is wrong to argue that preemption does not apply to these United entities because they are not the topline MA organization.

The Supreme Court's overruling of *Chevron* deference in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), has no impact on this case. This Court in *Uhm* never deferred to any agency interpretation; in fact, it explicitly gave "no deference" to CMS's interpretation of the preemption provision. 620 F.3d at 1155. And even if *Uhm* had rested

21

on *Chevron*, its holding would remain binding on the interpretation of the express preemption provision until abrogated by the Supreme Court or an en banc panel of this Court. *Lopez v. Garland*, 116 F.4th 1032, 1045 (9th Cir. 2024).

II.    The district court properly dismissed the complaint with prejudice because leave to amend would have been futile. The Estate wants to allege expressly that the United defendants are not MA organizations, but those allegations would make no difference here to the preemption analysis. And the Estate's two new theories about licensing and plan benefits were not raised below, are conclusory, and would not affect the preemption of these claims.

## STANDARD OF REVIEW

This Court reviews de novo the district court's dismissal of the complaint, as well as its "determination that a federal statute preempts state law claims." *Do Sung Uhm v. Humana, Inc.*, 620 F.3d 1134, 1139-40 (9th Cir. 2010). To survive a motion to dismiss for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Dismissal is appropriate when "the allegations,

22

taken as true, show the plaintiff is not entitled to relief" because of a defense like preemption. *Jones v. Bock*, 549 U.S. 199, 215 (2007).

This Court reviews for an abuse of discretion the district court's decision to deny leave to amend the complaint. *Wheeler v. City of Santa Clara*, 894 F.3d 1046, 1051 (9th Cir. 2018).

## ARGUMENT

### I. The district court correctly held that Medicare Part C preempts the Estate's claims.

Medicare Part C broadly preempts "any State law or regulation" (other than state licensing and solvency laws) "with respect to MA plans which are offered by MA organizations under this part." 42 U.S.C. § 1395w-26(b)(3). Together, Congress and CMS have adopted standards that comprehensively regulate marketing and communications about MA plans. These standards supersede the overlapping state-law duties that the Estate asserts in its complaint as to the marketing of MA plans. As the district court recognized, this Court's decision in *Do Sung Uhm v. Humana, Inc.*, 620 F.3d 1134 (9th Cir. 2010), applied the preemption provision to materially identical marketing claims and controls here.

The statute preempts the marketing-based claims even though the Estate has filed suit against affiliates instead of the topline MA

organization that directly contracts with the federal government. This Court has held "preemption under the statute is determined by whether federal standards exist with respect to the" Medicare plan, "not by the identity of the defendant." *Uhm*, 620 F.3d at 1157. The Supreme Court's overruling of *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), has no effect on *Uhm* or this case. *Uhm* did not defer to any agency interpretation. But even if *Uhm* had deferred despite expressly disclaiming so, *Loper Bright* didn't abrogate the statutory holdings of prior decisions.

## A. Part C standards supersede state law with respect to the Estate's marketing-based claims.

Preemption under § 1395w-26(b)(3) depends on whether a plaintiff's state-law claims seek to regulate a subject that Part C statutory provisions or regulations promulgated by CMS already cover. *Aylward v. SelectHealth, Inc.*, 35 F.4th 673, 680-81 (9th Cir. 2022). The Estate alleges that United marketed MA plans in a misleading or unfair manner. Because Part C standards prescribe marketing requirements for MA plans, the preemption provision—as day follows night—applies here.

24

### 1.  Preemption applies if Medicare standards govern the conduct the state-law claims target.

Congress enacted 42 U.S.C. § 1395w-26(b)(3) to protect the Medicare Advantage program from additional, duplicative, and inconsistent regulation under state law.  Giving effect to the broad language of § 1395w-26(b)(3), this Court held that preemption applies regardless of whether the plaintiff invokes a generally applicable state law, a state statute, or a common-law duty.  *Aylward*, 35 F.4th at 681.

Preemption is woven into the Constitution's fabric.  The Supremacy Clause provides that federal law "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  U.S. Const. Art. VI, cl. 2.  To ensure even greater protection that the Supremacy Clause already guarantees, Congress enacted a broad preemption provision to protect the proper functioning of the MA program:  "The standards established under this part shall supersede any State law or regulation (other than State licensing laws or State laws relating to plan solvency) with respect to MA plans which are offered by MA organizations under this part."  42 U.S.C. § 1395w-26(b)(3).

25

This Court and others have followed the statute's "plain language" in holding Part C standards "'supersede' any state law duty that would impose obligations on MA plans on that same subject." *Aylward*, 35 F.4th at 680-81; *accord Pharm. Care Mgmt. Ass'n v. Mulready*, 78 F.4th 1183, 1205-06 (10th Cir. 2023); *Medicaid & Medicare Advantage Prods. Ass'n of Puerto Rico, Inc. v. Emanuelli Hernandez*, 58 F.4th 5, 12-13 (1st Cir. 2023); *Pharm. Care Mgmt. Ass'n v. Wehbi*, 18 F.4th 956, 970-72 (8th Cir. 2021); *Quishenberry v. UnitedHealthcare, Inc.*, 532 P.3d 239, 247 (Cal. 2023).   That interpretation honors the statute's four key components: "[1] The standards established under this part [2] shall supersede [3] any State law or regulation (other than State licensing laws or State laws relating to plan solvency) [4] with respect to MA plans which are offered by MA organizations under this part."  42 U.S.C. § 1395w-26(b)(3).

First, the *standards* that trigger the statute include, at a bare minimum, statutory provisions contained in Part C and regulations promulgated under Part C.  *Aylward*, 35 F.4th at 680; *Uhm*, 620 F.3d at 1148 & n.20.  Those standards are "established under this part," which either creates them by statute or authorized CMS's regulations implementing Part C.  42 U.S.C. § 1395w-26(b)(1).  To avoid any doubt, CMS also

26

promulgated a parallel preemption regulation stating that "standards established" for the MA program "supersede" state laws with respect to MA plans. 42 C.F.R. § 422.402.

Second, these standards *supersede* state law. The ordinary meaning of "supersede" is "displace." *Wehbi*, 18 F.4th at 971; *see Boyle v. United Techs. Corp.*, 487 U.S. 500, 507-08 (1988). A Part C statute or regulation thus "'displace[s]'" state law as to the same subject. *Aylward*, 35 F.4th at 680. But § 1395w-26(b)(3) leaves state law in place when no federal standard speaks to the conduct. *See Uhm*, 620 F.3d at 1157 n.35.

Third, the federal standards supersede *any state law or regulation*. "[T]he word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'" *Ali v. Federal Bureau of Prisons*, 552 U.S. 214, 219 (2008). The statute thus preempts any state law that is "inconsistent with" Part C standards, and that "parallels," "enforces," or "supplements" these standards. *Aylward*, 35 F.4th at 681. Congress made only two exceptions for state licensing laws and state laws relating to plan solvency. While States cannot regulate the administration of MA plans, they retain a gatekeeping function in determining which entities can offer such plans. *See, e.g.*, 42 C.F.R. § 422.400(a).

Fourth, standards supersede state law *with respect to MA plans offered by MA organizations* under Medicare Part C. This language cabins the scope of preemption. Federal standards preempt state law only as applied to MA plans—not as applied to, for example, other plans that MA organizations might offer. *E.g.*, *First Medical Health Plan, Inc. v. Vega-Ramos*, 479 F.3d 46, 52 (1st Cir. 2007) (no preemption where an MA organization participates in a Medicaid program that does not fall under Medicare Part C).

The statute's plain meaning also furthers the evident purpose of § 1395w-26(b)(3). As this Court has observed, Congress conceived of Medicare Advantage as "a federal program operated under Federal rules," meaning that "[s]tate laws, do not, and should not apply" except with respect to licensing and solvency. *Uhm*, 620 F.3d at 1149 (quoting H.R. Conf. Rep. No. 108-391, 1st Sess. 557 (2003)).

Even though Congress self-consciously crafted a broad express preemption provision, the Estate invokes a "presumption against preemption" to limit § 1395w-26(b)(3). *E.g.*, Op. Br. 17. But the Supreme Court has squarely held that, when "the statute 'contains an express preemption clause,'" courts "do not invoke any presumption against pre-

28

emption but instead 'focus on the plain wording of the clause.'" *Puerto Rico v. Franklin Cal. Tax-Free Trust*, 579 U.S. 115, 125 (2016); *see also Assurance Wireless USA, L.P. v. Reynolds*, 100 F.4th 1024, 1032 & n.4 (9th Cir. 2024). The presumption retains force only as to implied preemption. *Atay v. County of Maui*, 842 F.3d 688, 699 (9th Cir. 2016). Since *Franklin*, courts have refused to apply any presumption against preemption when interpreting § 1395w-26(b)(3). *E.g.*, *Quishenberry*, 532 P.3d at 243 n.3; *Wehbi*, 18 F.4th at 967; *cf. Aylward*, 35 F.4th at 680-81 (interpreting § 1395w-26(b)(3) without referring to any presumption against preemption).

The Estate is also wrong to argue that "generally applicable state laws" escape preemption under § 1395w-26(b)(3). Op. Br. 24. This Court has held that "generally applicable state consumer protection laws . . . can fall within the ambit of Part C's preemption provision." *Aylward*, 35 F.4th at 681 (citing *Uhm*, 620 F.3d at 1152-53, 1155-56). Federal standards supersede state law "with respect to MA plans." 42 U.S.C. § 1395w-26(b)(3). And nothing in the phrase "with respect to" means that "a state law or regulation must apply *only* to [an MA plan] in order to constitute

29

a law 'with respect to' [an MA plan]." *Uhm*, 620 F.3d at 1150 n.25 (citing *Riegel v. Medtronic, Inc.*, 552 U.S. 312, 328 (2008)).

Nor can the Estate carve out common-law claims from § 1395w-26(b)(3).  Op. Br. 56-57.  Again, this Court has held that "common law claims can fall within the ambit of Part C's preemption provision." *Aylward*, 35 F.4th at 681.  The Court addressed that precise argument at length in *Uhm*, which explained that "any State law or regulation" really does mean "any"—common-law claims included.  620 F.3d at 1153-56.

Because this Court has already rejected the Estate's proposed carveouts from § 1395w-26(b)(3), the Estate tries to change the subject to whether its claims "arise under the Medicare Act."  Op. Br. 59; *see, e.g.*, *id.* at 34-36 (citing *Global Rescue Jets, LLC v. Kaiser Found. Health Plan, Inc.*, 30 F.4th 905, 918 (9th Cir. 2022); *Ardary v. Aetna Health Plans of Cal., Inc.*, 98 F.3d 496, 500 (9th Cir. 1996); *McCall v. PacifiCare of Cal., Inc.*, 21 P.3d 1189 (Cal. 2001)).  But the Estate is mixing apples and oranges.  When a claim arises under the Medicare Act, the plaintiff must exhaust the claim in front of the agency before the district court can exercise jurisdiction.  *Uhm*, 620 F.3d at 1140.  Section 1395w-26(b)(3) separately preempts state-law claims that seek to regulate conduct already

governed by federal standards, regardless of whether the claims arise under the Medicare Act in the technical sense of requiring exhaustion before the agency.  *See id.* at 1145, 1150-57 (holding that marketing-based claims did not arise under the Medicare Act but were preempted).

In short, § 1395w-26(b)(3) preempts state-law claims that seek to impose additional, duplicative, or inconsistent duties that overlap with the MA regulatory scheme, even when the claims are based on a generally applicable state statute or a common-law duty. *Aylward*, 35 F.4th at 681.  The statute and this Court's decisions interpreting it foreclose the Estate's proposed carveouts.

### 2. The Estate's claims overlap with Medicare Part C's extensive regulations for the marketing of MA plans.

The district court properly determined that Part C standards for the marketing of MA plans govern the conduct that the Estate's complaint targets.  The Estate can't dodge preemption by promising to ignore the applicable federal standards or by redirecting its focus to the absence of a second preemption provision in Original Medicare.  Despite a lengthy brief, the Estate never describes the district court's reasoning, much less explains where the court took a wrong turn.

31

The district court correctly determined that all the Estate's claims seek to impose a state-law duty that overlaps with territory already governed by federal Medicare Part C standards. 1-ER-10. The Medicare Act requires that each MA plan "shall conform to fair marketing standards." 42 U.S.C. § 1395w-21(h)(4). Congress directed CMS to review all "marketing material" that MA organizations and their agents use and to "disapprove" or require correction of marketing materials if they are "materially inaccurate or misleading or otherwise mak[e] a material misrepresentation." § 1395w-21(h)(2); *see* 42 C.F.R. § 422.2261. CMS's standards for marketing and communications also apply to any "activities and use of materials created or administered by the MA organization or any downstream entity to provide information to current and prospective enrollees." 42 C.F.R. § 422.2260. And as the district court explained, federal standards govern because "all of [the Estate's] allegations center around United's marketing tactics when selling the MA Plans." 1-ER-6.

The Estate's core theory is that United violated California law by advertising its MA plans as *supplements* to government-administered Medicare plans rather than *replacements* that cover the same benefits. United's agents allegedly said, for example, that Ms. Ahmad could "still

32

use [her] traditional Medicare" and would not "los[e] Medicare Parts A and B" by enrolling in United's MA plans.  3-ER-544-45 (¶¶ 155-56).  But the Estate's attempt to use California law to regulate these statements overlaps with the requirements for marketing and communications under Medicare Part C.  Specifically, CMS has laid out detailed requirements for MA communications and marketing materials, including that they cannot "[i]mply that the plan operates as a supplement to Medicare." 42 C.F.R. § 422.2262(a)(1)(xiv).  These provisions cover—and thus supersede—the Estate's state-law claims.

The Estate's other allegations of deceptive marketing likewise overlap with Part C standards:

| The Estate's allegations | Medicare Part C standards |
|---|---|
| United advertised its MA plans have "better" or "more" benefits than under Original Medicare. 3-ER-517 (¶ 32); 3-ER-535-36 (¶ 116). | Congress requires that MA plans provide the same benefits as Original Medicare. 42 U.S.C. § 1395w-22(a)(1)(A).  CMS approves any supplemental health care benefits offered by MA programs. § 1395w-22(a)(3). CMS regulations also require that any use of "superlatives" include documentation or data supportive of the superlative. 42 C.F.R. § 422.2262(a)(1)(ii). |

33

| The Estate's allegations | Medicare Part C standards |
|---|---|
| United communications "use[d] Medicare logos deceptively" and "misus[ed] the 'Medicare' brand in marketing materials to falsely imply official government endorsement" of MA plans. 3-ER-536 (¶ 120); 3-ER-532-33 (¶ 104). | Part C forbids the "use [of] the Medicare name, CMS logo, and products or information issued by the Federal Government, including the Medicare card, in a misleading way" and "[c]laim[s] [that MA organizations] are recommended or endorsed by CMS, Medicare, the Secretary, or HHS." 42 C.F.R. § 422.2262(a)(1)(xi), (xix). But MA organizations may "[u]se the term 'Medicare-approved' to describe benefits or services," § 422.2262(a)(2)(ii), and the Medicare image "with authorization from CMS," § 422.2262(a)(1)(xix). |
| United's communications referred to time-limited discounts or "free" benefits and created a sense of urgency. 3-ER-512-13 (¶ 13). | MA plans may "[u]se the term 'free' in conjunction with mandatory, supplemental, and preventative benefits provided at a zero cost share for all enrollees." 42 C.F.R. § 422.2262(a)(2)(iii). But Part C disallows communications that "mislead or confuse Medicare beneficiaries." § 422.2262(a)(1)(iii). |
| United sent 24 unsolicited emails over a year-long period to Ms. Ahmad about United's MA plan. 3-ER-543-44 (¶ 153). | MA organizations and their agents can't make unsolicited direct contact with prospective enrollees, 42 U.S.C. § 1395w-21(h)(4)(C), (j)(1)(A), or send "unsolicited marketing" during the open enrollment period, § 1395w-21(e)(2)(G)(iv); 42 C.F.R. |

34

| The Estate's allegations | Medicare Part C standards |
|---|---|
| | § 422.2263(b)(7). But MA organizations may contact certain people, including "age-ins" and dual-eligible Medicare and Medicaid beneficiaries, during the enrollment period. 42 C.F.R. § 422.2263(b)(7)(i)(A). |
| United markets to vulnerable populations such as the elderly, disabled, those on fixed or marginal incomes, and dual-eligible Medicare-Medicaid beneficiaries. 3-ER-514 (¶ 19). | CMS requires that MA organizations "[d]emonstrate to CMS' satisfaction that marketing resources are allocated to marketing to the disabled Medicare population as well as beneficiaries age 65 and over." 42 C.F.R. § 422.2272(a). They must also "[e]stablish and maintain a system for confirming that enrolled beneficiaries have, in fact, enrolled in the MA plan, and understand the rules applicable under the plan." § 422.2272(b). |
| United did not disclose material information about MA plans, such as: <br>• whether enrollees can continue seeing their same doctors and the directory of providers, <br>• "limited" vision and dental benefits, <br>• prior authorization requirements, <br>• that MA plans may deny claims. | Congress prescribes the "[d]etailed description[s] of plan provisions" MA plans must provide, including: <br>• the plan's service area; the number, mix, and distribution of plan providers; out-of-network coverage (if any); coverage of emergency services and locations of physicians and hospitals; <br>• supplemental benefits and premiums; |

35

| The Estate's allegations | Medicare Part C standards |
|---|---|
| 3-ER-534-35 (¶ 115), 3-ER-551 (¶ 179(f)). | • prior authorization or other requirements that could result in nonpayment; and<br><br>• plan grievance and appeals procedures.<br><br>42 U.S.C. § 1395w-22(c)(1).<br><br>CMS has developed model materials MA plans must provide to beneficiaries or prospective enrollees that include information on provider and pharmacy directories; premiums, copays, and coinsurance; and emergency and urgent coverage. 42 C.F.R. § 422.2267. The mandatory materials also include a standardized "Pre-Enrollment checklist" that must be provided or reviewed with an enrollee by phone before enrollment; it references the provider and pharmacy directory, formulary, costs to enrollees, plan rules, and the effect on the enrollee's current coverage. § 422.2267(e)(4). |
| United's sales agents "cas[h] in for oversized commissions," which incentivizes "aggressive sales tactics" and "unauthorized enrollments." 3-ER-517-18 (¶¶ 33, 35). | Medicare Part C governs how "an MA organization uses agents and brokers to sell its Medicare plans," including their oversight, compensation, licensing, training, and use of marketing materials. 42 C.F.R. § 422.2274. CMS requires that |

| The Estate's allegations | Medicare Part C standards |
|---|---|
| United "lack[s] . . . stringent oversight" over its sales agents "evidenced by . . . minimal disciplinary action." 3-ER-518 (¶ 37). | MA organizations "oversee first tier, downstream, and related entities that represent the MA organization," ensuring they "abide by all applicable State and Federal laws, regulations, and requirements." § 422.2274(c). CMS also requires that MA organizations "[e]stablish and implement an oversight plan that monitors agent and broker activities, identifies non-compliance with CMS requirements, and reports non-compliance to CMS." § 422.2272(e).<br><br>CMS requires MA organizations to supervise their agents and ensure that "topics regarding beneficiary needs in a health plan choice are fully discussed" before enrollment, including the availability of the beneficiary's current providers and pharmacy in the plan's network, coverage of the beneficiary's current prescriptions, costs of health care services, premiums, benefits, and the beneficiary's specific health care needs. § 422.2274(c)(12). |

The district court also was right that dismissal here was all but foreordained by this Court's decision in *Uhm*. 1-ER-10 (citing *Uhm*, 620 F.3d at 1157). There, the plaintiffs alleged that a Medicare Part D organization had distributed misleading marketing materials about a prescription drug plan. 620 F.3d at 1138-39. "Medicare Part D incorporates the express preemption provision contained in Part C" at issue here. *Id.* at 1148. Because "CMS must approve all [prescription-drug-plan] marketing materials before they are made available to Medicare beneficiaries," this Court held that the preemption provision supersedes state-law claims that "could potentially undermine the Act's standards as to what constitutes non-misleading marketing." *Id.* at 1150-52. The claims here are preempted for the same reason: Allowing California law to determine whether the statements were misleading "would directly undermine CMS's prior determination that those materials were not misleading and in turn undermine CMS's ability to create its own standards for what constitutes 'misleading' information about Medicare Part [C]." *Id.* at 1157.

The Estate does not address the district court's well-reasoned decision or dispute that federal standards govern the marketing at issue in

this case. Instead, the Estate argues that its claims are not preempted "because they do not require interpreting any federal Medicare standards." Op. Br. 35. But that's precisely the problem: The Estate wants to apply California law, which at best is "parallel" to the federal standards and at worst is "'inconsistent'" with them. *Aylward*, 35 F.4th at 681 (quoting *Uhm*, 620 F.3d at 1150). Because § 1395w-26(b)(3) preempts any state-law duty that "parallels, enforces, or supplements express standards established under Part C and its implementing regulation," *id.*, the Estate cannot sidestep preemption by promising to ignore the applicable federal standards.

The Estate also argues that its claims escape preemption because they concern representations about the relationship of Medicare Parts A and B (Original Medicare) to Part C. Op. Br. 36-37, 44-45. The Estate points out that, while Part C contains a preemption provision, Parts A and B do not. *Id.* at 45. But every marketing statement about *enrolling* in an MA plan is necessarily a marketing statement about *disenrolling* from Original Medicare. For that reason, Part C standards proscribe communications "that could mislead or confuse Medicare beneficiaries," 42 C.F.R. § 422.2262(a)(1)(iii); that "[c]laim [MA organizations] are

39

recommended or endorsed by CMS, Medicare, the Secretary, or HHS," § 422.2262(a)(1)(xi); that "[i]mply that the plan operates as a supplement to Medicare," § 422.2262(a)(1)(xiv); and that "[u]se the Medicare name, CMS logo, and products or information issued by the Federal Government, including the Medicare card, in a misleading way," § 422.2262(a)(1)(xix). Section 1395w-26(b)(3), even without a *second* preemption provision, establishes that those standards supersede the Estate's claims that communications misled potential enrollees about the process of switching from Original Medicare to an MA plan.

To be clear, preemption does not immunize misleading marketing of MA plans. United categorically denies the substance of the complaint's allegations. But when fraud or misrepresentation occurs, the proper place to air such concerns is before the expert federal agency. Congress empowered CMS to issue sanctions, including civil money penalties; the suspension of plans' communication activities, enrollment, or Medicare payment; and termination or nonrenewal of organizations' contracts with CMS. 42 U.S.C. § 1395w-27(g); 42 C.F.R. §§ 422.750-422.764. These sanctions apply equally to an MA organization that "employs or contracts with any individual or entity" that engages in conduct violating the same

40

rules. 42 U.S.C. § 1395w-27(g)(1)(K). And Congress also ensured a remedy (special election periods) for enrollees who were misled. § 1395w-21(e)(4)(C)(ii).

Ultimately, this case presents a clear-cut application of *Uhm* because Part C standards govern the communications targeted by the complaint's state-law claims. 620 F.3d at 1150-57. This Court need go no further than *Uhm* in affirming the district court's ruling.

### B.   Medicare Part C preemption does not depend on whether the defendant is a Medicare Advantage organization.

The Estate principally tries to avoid preemption on the theory that § 1395w-26(b)(3) protects only MA organizations that directly contract with CMS, and not also downstream or affiliated entities regulated by CMS's standards. But as the district court recognized, this Court rejected that very argument in *Uhm*. The Estate's attempts to distinguish *Uhm* are baseless, as is its argument that *Loper Bright* frees a three-judge panel to revisit *Uhm*.

41

### 1. This Court has held that a plaintiff cannot evade Medicare Part C preemption by suing the MA organization's affiliates.

The Estate attacks the district court's decision that "preemption turns on the existence of a federal standard rather than the identity of the defendants." Op. Br. 74. But that is exactly what the statute says—and how this Court has interpreted the statute.

The text of § 1395w-26(b)(3) does not limit its preemptive scope to only MA organizations—the question is not the identity of the defendant, but rather whether the state-law claims concern an *MA plan*. The statute provides that Part C standards "shall supersede any State law or regulation . . . *with respect to MA plans which are offered by MA organizations* under this part." 42 U.S.C. § 1395w-26(b)(3) (emphasis added). The Estate concedes that the plans at issue are MA plans offered by a United MA organization under Part C even though other entities (allegedly the United defendants here) market and administer the plans. 3-ER-527 (¶ 79); 3-ER-550-51 (¶ 179). As a result, § 1395w-26(b)(3) supersedes state law with respect to those plans, even though the Estate has brought state-law claims against affiliates of the topline MA organization.

42

This Court has covered this same ground before. In *Uhm*, the plaintiffs had sued not only Humana Health Plan, Inc.—which was the CMS-approved Part D prescription-drug-plan sponsor (the equivalent of an MA organization)—but also the parent company, Humana, Inc. 620 F.3d at 1138. The plaintiffs argued that, even if Part D preempted their claims against the sponsor, their claims could go forward against Humana, Inc., because it was "not a CMS-approved PDP sponsor." *Id.* at 1157. This Court agreed with Humana that "preemption under the statute is determined by whether federal standards exist with respect to the prescription drug plan, *not by the identity of the defendant*." *Id.* (emphasis added). Instead, the "language about PDP sponsors modifies or describes what a PDP is" but "does not shift the locus of preemption from the prescription drug plan to the sponsor." *Id.* The preemption provision therefore protected the corporate affiliate against claims that were "entirely derivative of its relationship with" the Part D organization and were "directly governed by federal standards." *Id.* at 1157-58.

*Uhm* squarely governs here. The Estate contends that "[p]reemption applies only to MAOs, not to non-MAO affiliates." Op. Br. 34. But *Uhm* establishes that "the language about [MA organizations]" in

43

§ 1395w-26(b)(3) "modifies or describes what [an MA plan] is—it does not shift the locus of preemption from the [MA] plan to the [MA organization]." 620 F.3d at 1157. Courts therefore routinely hold that Part C expressly preempts claims against the MA organization's affiliates and agents. *E.g.*, *Escarcega v. Verdugo Vista Operating Co.*, 2020 WL 1703181, at *12-13 (C.D. Cal. Apr. 8, 2020) (relying on *Uhm*); *see, e.g.*, *Quishenberry*, 532 P.3d at 241-42 (holding that Part C expressly preempted state-law claims against these same two United defendants); *Hepstall v. Humana Health Plan, Inc.*, 2018 WL 6588555, at *7 (N.D. Ala. Nov. 26, 2018) (marketing agents of MA organization). Because the claims against the United defendants are "entirely derivative" of their relationship with the United MA organization, § 1395w-26(b)(3) supersedes overlapping state-law claims. *Uhm*, 620 F.3d at 1157.

Neither of the Estate's attempts to distinguish *Uhm* hits its mark. First, the Estate argues that *Uhm* "involved defendants directly tied to a CMS-approved MA plan and its marketing materials, and acting in concert with an MAO." Op. Br. 55. That's exactly the case here, too, because the Estate alleged that the United defendants marketed an MA plan in conjunction with the MA organization. *E.g.*, 3-ER-550-51 (¶ 179).

44

Second, the Estate argues that United has not "asserted that their marketing materials and communications were submitted to CMS for approval." Op. Br. 55. But MA plans "may not distribute advertising materials to eligible beneficiaries unless the materials are first cleared by HHS" acting through CMS. *Becerra v. Empire Health Found.*, 597 U.S. 424, 438 (2022) (citing 42 U.S.C. § 1395w-21(h)(1)). The complaint does not allege whether CMS reviewed the marketing materials. But CMS either approved the materials or has the prerogative to punish the distribution of unapproved materials. 42 U.S.C. §§ 1395w-21(h), 1395w-27(g); 42 C.F.R. §§ 422.752, 422.2261. Either way, Part C standards govern, lest state law could "undermine CMS's ability to create its own standards for what constitutes 'misleading' information." *Uhm*, 620 F.3d at 1157.

The Estate is wrong to argue that "CMS has no regulatory authority or oversight over" affiliates of MA organizations. Op. Br. 11. To ensure a uniform federal scheme, CMS has provided for "[f]irst tier entit[ies]," meaning "any party that enters into a written arrangement, acceptable to CMS, with an MA organization or applicant to provide administrative services or health care services for a Medicare eligible individual under the MA program"; for "[d]ownstream entit[ies]," meaning "any party that

45

enters into a written arrangement, acceptable to CMS, with persons or entities involved with the MA benefit, below the level of the arrangement between an MA organization (or applicant) and a first tier entity"; and for "related entities," meaning "any entity that is related to the MA organization by common ownership or control and," among other things, "[p]erforms some of the MA organization's management functions under contract or delegation."  42 C.F.R. § 422.2.

The Estate asserts that these entities "are not bound by MAO regulations," Op. Br. 40, but CMS *does* regulate first-tier, downstream, and related entities, which "are largely subject to the same requirements" as MA organizations when they market and administer MA plans, *Escarcega*, 2020 WL 1703181, at *12; *see* 42 C.F.R. § 422.504(i).  If Part C standards did not apply to an MA organization's affiliates, then an MA organization could opt out of the federal standards merely by subdelegating the federal function that the federal government delegated to the MA organization.  That is not how Part C works.

The Estate's proposed safe harbor for suing affiliates does not make sense either.  If Part C standards did not preempt claims against an MA organization's affiliates, then a plaintiff could circumvent preemption

46

and hamstring MA plans' administration with overlapping state regulation merely by repackaging claims against MA organizations into identical claims against their affiliates. That is a recipe for nullifying the MA program's status as a "federal program operated under Federal rules." H.R. Conf. Rep. No. 108-391, at 557.

The Estate also insists that judicial estoppel prevents the United defendants here from asserting preemption because they have asserted elsewhere that they do not administer certain plans. Op. Br. 41-43. But the cases the Estate cites do not even involve MA plans, much less any statements that are inconsistent with the arguments United advances here. *Ryan S. v. UnitedHealth Grp., Inc.*, 98 F.4th 965, 969 (9th Cir. 2024) (claim under the Parity Act for more stringent review of outpatient mental health and substance use disorder treatment than medical or surgical treatment); *Tamburrino v. UnitedHealth Grp. Inc.*, 2022 WL 1213467, at *6 (D.N.J. Apr. 25, 2022) (United entities not administrators of ERISA plan); *Doe v. United Health Grp. Inc.*, 2018 WL 3998022, at *4 (E.D.N.Y. Aug. 20, 2018) (same). The United defendants have never claimed to be an MA organization or even the United entities responsible for marketing MA plans. Instead, they have properly relied—at the

47

pleading stage—on the *Estate's* allegations that they "marke[t] and issu[e]" United MA plans. 3-ER-521 (¶¶ 45-46).

The Estate's misdirected estoppel argument highlights the tension that the district court found inherent in the Estate's "fragile" argument: "Plaintiff argues that the named Defendants are affiliated closely enough with the MA Organization United entity to be involved in the marketing of MA Plans but are also distinct enough from the MA Organization to not be subject to the CMS marketing regulations for MA Plans." 1-ER-11. If the United defendants were not involved at all in marketing the MA plans, then the Estate had no basis to sue them in the first place. 1-ER-13. But if (as the complaint alleges) the United defendants were involved in marketing the plans, then Part C standards govern their conduct—and the Part C preemption provision correspondingly supersedes state law.

### 2. *Loper Bright* did not abrogate this Court's precedent.

Because *Uhm* is directly on point, the Estate retreats to the argument that the Supreme Court's overruling of *Chevron* in *Loper Bright* allows this Court to depart from *Uhm*. Op. Br. 49-54. But *Uhm* did not defer under *Chevron* to any agency interpretation when analyzing

48

§ 1395w-26(b)(3).  On the contrary, when discussing CMS's view of the preemption of common-law claims, this Court clarified that CMS's interpretation "requir[es] no deference."  620 F.3d at 1155.  The Court also never referred to any agency guidance at all in rejecting the argument that preemption is limited to the Part D plan administrator.  *Id.* at 1157-58.  From start to finish, *Uhm* was *this Court's* "best reading of the statute"—not the agency's or anyone else's.  *Loper Bright*, 603 U.S. at 400.

So even though the Estate wants this case to be about *Chevron* and *Loper Bright*, no one argued in *Uhm* (and no one argues here) that this Court should defer to an agency interpretation of § 1395w-26(b)(3).  *Loper Bright* casts as much doubt on *Uhm* as it does on any other past decision that interpreted a federal statute without deferring under *Chevron*: None at all.

The Estate also conflates *Chevron* deference with the role of regulations in the Part C preemption scheme.  *E.g.*, Op. Br. 56.  Even in the absence of an express preemption provision, federal regulations impliedly preempt conflicting state laws under the Supremacy Clause.  *Wyeth v. Levine*, 555 U.S. 555, 576 (2009).  Congress chose to give broader express preemptive force to the "standards" that CMS promulgates under Part C,

49

no differently from how Congress can give express preemptive force to its own statutes. 42 U.S.C. § 1395w-26(b)(3). Just as preemption depends on the statute's scope, preemption here depends on the existence of "express federal MA standard[s] on the subject" of the state-law claims—here, Part C standards that extensively regulate the marketing of MA plans by affiliates. *Aylward*, 35 F.4th at 681; *see supra*, at 26-28. But this Court still decides (or, rather, already decided) the proper interpretation of § 1395w-26(b)(3). *See Uhm*, 620 F.3d at 1157-58.

The Estate's theory that a *Chevron* conspiracy lurks behind *Uhm* is not a basis to avoid an affirmance anyway. The Supreme Court clarified in *Loper Bright* that decisions applying *Chevron* "are still subject to statutory *stare decisis*." 603 U.S. at 412. And since *Loper Bright*, this Court has held that three-judge panels can't revisit prior circuit precedent that deferred to an agency interpretation under *Chevron* when interpreting a federal statute. *Lopez v. Garland*, 116 F.4th 1032, 1045 (9th Cir. 2024). So *Uhm* would remain controlling even if this Court had relied on *Chevron* deference—which it didn't do.

50

## II.  The district court did not abuse its discretion in denying leave to amend.

The Estate argues that it should have been granted leave to amend for three reasons.  Op. Br. 72-76.  But the district court didn't abuse its discretion in any respect.

First, the Estate seeks to clarify that Defendants are not MA organizations.  Op. Br. 72-73.  The district court properly denied the Estate's attempt to constructively amend its complaint through extrinsic evidence that the United defendants are not MA organizations.  1 ER-7-8.  But the court also correctly observed that these procedural shenanigans were beside the point because preemption under *Uhm* doesn't depend on the defendant's status as an MA organization.  1-ER-10-11.  Granting leave to amend on that basis would be futile because the claims are preempted "regardless of whether the Defendants are MA Organizations."  1-ER-11 (citing *Uhm*, 620 F.3d at 1157).  For the same reasons that the Estate cannot distinguish or circumvent *Uhm*, the district court's futility finding was correct.  *See supra*, at 41-51.

Second, the Estate argues for the first time on appeal that it should have been granted leave to file an amended complaint alleging that United fraudulently induced California regulators to issue its license and

51

breached its license.  Op. Br. 72.  The Estate tacitly acknowledges that it asked only for leave to allege that the United defendants are not MA organizations.  *Id.* at 75-76.  Because the Estate "never *asked*" for leave to amend on that ground, it can't show that the district court "abused its discretion by failing to [grant leave] *sua sponte*."  *Rivers v. Guerrero*, 605 U.S. 443, 458 (2025); *see also Chinatown Neighborhood Ass'n v. Harris*, 794 F.3d 1136, 1144 (9th Cir. 2015) (holding that district court did not abuse its discretion in failing to grant leave to amend sua sponte).  The Estate's new assertion that United somehow violated licensing laws also is entirely conclusory as to the supposed violations, does not identify any particular licensing law (much less any private right of action for the Estate to enforce it), and could not support leave to amend.  *Carrico v. City & County of San Francisco*, 656 F.3d 1002, 1008 (9th Cir. 2011) (denying leave to amend where request was only "an afterthought" and appellant did not "propose any specific allegations"); *see* Cal. Health & Safety Code § 1386 (granting director of Department of Managed Health Care authority to suspend or revoke licenses).

Third, the Estate seeks leave to add new claims about breaches for enrollees.  Op. Br. 73-74.  The Estate, again, never asked for leave to

52

amend on that basis. *Rivers*, 605 U.S. at 458; *Harris*, 794 F.3d at 1144. Ms. Ahmad never enrolled in an MA plan, so the Estate does not have a basis to assert these claims anyway. *See supra*, at 13. At any rate, those new claims would be preempted because Part C standards govern claims by enrollees that they did not receive the promised benefits under their MA plans. *E.g.*, 42 U.S.C. § 1395w-22(a)(1)(A); 42 C.F.R. §§ 422.101(a), 422.504(a)(3), 422.752(a)(1); *see Quishenberry*, 532 P.3d at 248 (applying § 1395w-26(b)(3) to preempt state-law claims that enrollee did not receive benefits under MA plan); *cf. Estate of Lokken v. UnitedHealth Grp., Inc.*, 766 F. Supp. 3d 835, 848-49 (D. Minn. 2025) (holding that § 1395w-26(b)(3) preempted claims regarding coverage determinations but that no Part C standards preempted claims about use of artificial intelligence to decide coverage).

## CONCLUSION

The Court should affirm the judgment.

53

Dated: October 8, 2025            Respectfully submitted,

                                        /s/ *Kahn A. Scolnick*
                                        Kahn A. Scolnick

                                   *Counsel for Defendants-Appellees*
                                   *UnitedHealth Group Inc. and*
                                   *UnitedHealthcare, Inc.*

## CERTIFICATE OF COMPLIANCE

This brief complies with the word limit of Circuit Rule 32-1(a) because it contains 10,140 words, excluding the portions exempted by Rule 32(f) of the Federal Rules of Appellate Procedure.

The brief complies with the typeface and type-style requirements of Rule 32(a)(5)(A) and (a)(6) because it has been prepared in 14-point, New Century Schoolbook font.

Dated: October 8, 2025                     Respectfully submitted,


                                          /s/ *Kahn A. Scolnick*
                                          Kahn A. Scolnick

                                     *Counsel for Defendants-Appellees*
                                     *UnitedHealth Group Inc. and*
                                     *UnitedHealthcare, Inc.*